# Exhibit (A)

 **CRC**

# FACE PAGE

This page is the face of the policy referenced by number below and is a part of the policy.

Insured's Name: <u>OJ Commerce LLC; OJ Commerce Inc d/b/a Naomi Home, WSports</u>

Policy Number: <u>W20D68180201</u>   Policy Dates: From: <u>11/11/2018</u> To: <u>11/11/2019</u>

Surplus Lines Agent's Name:   <u>Daniel Myer</u>
Surplus Lines Agent's Address:   <u>3000 Bayport Dr. Suite 485</u>
<u>Tampa, FL 33607</u>

Surplus Lines Agent's License:   <u># E092346</u>
Producing Agent's Name:   Carey Allen Keyes
Producing Agent's Physical Address:   5900 Hiatus Road
Tamarac, FL 33321

**"THIS INSURANCE IS ISSUED PURSUANT TO THE FLORIDA SURPLUS LINES LAW. PERSONS INSURED BY SURPLUS LINES CARRIERS DO NOT HAVE THE PROTECTION OF THE FLORIDA INSURANCE GUARANTY ACT TO THE EXTENT OF ANY RIGHT OF RECOVERY FOR THE OBLIGATION OF AN INSOLVENT UNLICENSED INSURER."**

## "SURPLUS LINES INSURERS' POLICY RATES AND FORMS ARE NOT APPROVED BY ANY FLORIDA REGULATORY AGENCY."

| | | | |
|---|---|---|---|
| Policy Premium: | $17,460.00 | Policy Fee: | $35.00 |
| Inspection Fee: | | Service Fee: | $17.50 |
| Tax: | $874.75 | Citizen's Assessment: | |
| EMPA Surcharge: | | FHCF Assessment: | |



Surplus Lines Agent's Countersignature:

If this policy is a surplus lines, personal lines residential property policy then the following shall apply:

## "THIS POLICY CONTAINS A CO-PAY PROVISION THAT MAY RESULT IN HIGH OUT-OF-POCKET EXPENSES TO YOU."

If this policy is a surplus lines, personal lines residential property policy which includes the peril of windstorm then the following shall apply:

## "THIS POLICY CONTAINS A SEPARATE DEDUCTIBLE FOR HURRICANE OR WIND LOSSES, WHICH MAY RESULT IN HIGH OUT-OF-POCKET EXPENSES TO YOU."

**Effective date of this Endorsement: 11-Nov-2018**
**This Endorsement is attached to and forms a part of Policy Number: W20D68180201**
**Syndicate 2623/623 at Lloyd's. Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

---

# FRONT PAGE TO POLICY

---

### IMPORTANT NOTICE – FLORIDA

**SURPLUS LINES INSURERS' POLICY RATES AND FORMS ARE NOT APPROVED BY ANY FLORIDA REGULATORY AGENCY.**



# BEAZLEY BREACH RESPONSE

**THIS POLICY'S LIABILITY INSURING AGREEMENTS PROVIDE COVERAGE ON A CLAIMS MADE AND REPORTED BASIS AND APPLY ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR THE OPTIONAL EXTENSION PERIOD (IF APPLICABLE) AND REPORTED TO THE UNDERWRITERS IN ACCORDANCE WITH THE TERMS OF THIS POLICY. AMOUNTS INCURRED AS CLAIMS EXPENSES UNDER THIS POLICY WILL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY AND ARE SUBJECT TO RETENTIONS.**

These Declarations along with the statements contained in the information and materials provided to the Underwriters in connection with the underwriting and issuance of this Policy, and the Policy with endorsements shall constitute the contract between the **Insureds** and the Underwriters.

| GENERAL INFORMATION |
|---|

| | |
|---|---|
| **Underwriters:** | Syndicate 2623/623 at Lloyd's. |
| **Named Insured:** | OJ Commerce LLC OJ Commerce Inc dba Naomi Home WSports |
| **Named Insured Address:** | 1700 Northwest 64th Street<br>Suite 460<br>Fort Lauderdale, FL 33309 |
| **Notice of Claim, Loss or Circumstance:** | Beazley Group<br>Attn: TMB Claims Group<br>1270 Avenue of the Americas, 12th Floor<br>New York, NY 10020 |
| **Breach Response Services Team:** | bbr.claims@beazley.com<br>(866) 567-8570 (24 Hours) |
| **Administrative Notice:** | Beazley USA Services, Inc.<br>30 Batterson Park Road<br>Farmington, CT 06032<br>Tel: (860) 677-3700<br>Fax: (860) 679-0247 |

F00654
112017 ed.
Date Issued: 10-Oct-2018 2:43:22 PM

Page 1 of 4



| POLICY INFORMATION | |
|---|---|
| **Policy Number:** | W20D68180201 |
| **Authority Reference Number:** | B6012BUSANMSL1801 |
| **Policy Period:** | From: 11-Nov-2018          To: 11-Nov-2019<br>Both at 12:01 a.m. Local Time at the Named Insured Address |
| **Premium:** | $17,460<br>Taxes & Surcharges (if applicable) |
| **Policy Form:** | Beazley Breach Response (F00653 112017 ed.) with<br>BBR Information Pack |
| **Optional Extension Period:** | 12 Months |
| **Optional Extension Premium:** | 100% of the Annual Policy Premium |
| **Notified Individuals Threshold:** | 100 Notified Individuals |
| **Waiting Period:** | 10 Hours |
| **Continuity Date:** | 01-Nov-2017 |

F00654
112017 ed.
Date Issued: 10-Oct-2018 2:43:22 PM

Page 2 of 4



| COVERAGE SCHEDULE (Currency in USD) | | |
|---|---|---|
| | **Limit** | **Retention** |
| **Breach Response** | | |
| Notified Individuals: | 1,000,000 | |
| Legal, Forensic & Public Relations/Crisis Management: | $2,000,000 | $10,000; but $5,000 for Legal |

**THE BREACH RESPONSE LIMITS ABOVE ARE IN ADDITION TO THE POLICY AGGREGATE LIMIT OF LIABILITY**

| | | |
|---|---|---|
| **Policy Aggregate Limit of Liability:** | $3,000,000 | |
| **Additional Breach Response Limit** | | |
| Additional Breach Response Limit: | $3,000,000 | |
| **First Party Loss** | | |
| Business Interruption Loss: | | |
| *Resulting from Security Breach:* | $3,000,000 | each incident $25,000 |
| *Resulting from System Failure:* | $3,000,000 | each incident $25,000 |
| Dependent Business Loss: | | |
| *Resulting from Dependent Security Breach:* | $1,000,000 | each incident $25,000 |
| *Resulting from Dependent System Failure:* | $1,000,000 | each incident $25,000 |
| Cyber Extortion Loss: | $3,000,000 | each incident $25,000 |
| Data Recovery Costs: | $3,000,000 | each incident $25,000 |
| **Liability** | | |
| Data & Network Liability: | $3,000,000 | each Claim $25,000 |
| Regulatory Defense & Penalties: | $3,000,000 | each Claim $25,000 |
| Payment Card Liabilities & Costs: | $3,000,000 | each Claim $25,000 |
| Media Liability: | $3,000,000 | each Claim $25,000 |
| **eCrime** | | |
| Fraudulent Instruction: | $100,000 | each loss $25,000 |
| Funds Transfer Fraud: | $100,000 | each loss $25,000 |
| Telephone Fraud: | $100,000 | each loss $25,000 |
| **Criminal Reward** | | |
| Criminal Reward: | $50,000 | |

F00654
112017 ed.
Date Issued: 10-Oct-2018 2:43:22 PM

Page 3 of 4



| | ENDORSEMENTS EFFECTIVE AT INCEPTION | |
|---|---|---|
| 1. | E10595 112017 ed. | Asbestos, Pollution, and Contamination Exclusion Endorsement |
| 2. | E11122 012018 ed. | Cap on Losses Arising Out of Certified Acts of Terrorism |
| 3. | E10596 112017 ed. | Choice of Law and Service of Suit |
| 4. | BSLMU05120809FL | Important Notice - Florida |
| 5. | SCHEDULE2018 | Lloyd's Security Schedule 2018 |
| 6. | NMA1256 | Nuclear Incident Exclusion Clause-Liability-Direct (Broad) (U.S.A.) |
| 7. | E06928 042015 ed. | Policyholder Disclosure Notice of Terrorism Insurance Coverage |
| 8. | NMA1477 | Radioactive Contamination Exclusion Clause-Liability-Direct (U.S.A.) |
| 9. | E02804 032011 ed. | Sanction Limitation and Exclusion Clause |
| 10. | E10602 112017 ed. | War and Civil War Exclusion |
| 11. | E11294 032018 ed. | Amend Data Recovery Costs |
| 12. | E06799 112017 ed. | Amend Definition of Fraudulent Instruction |
| 13. | E06798 112017 ed. | Consequential Reputational Loss |
| 14. | E11290 032018 ed. | GDPR Cyber Endorsement |
| 15. | BSLMUNMA2868 | Lloyd's Certificate - No policy language |
| 16. | E10944 122017 ed. | Post Breach Remedial Services Endorsement |
| 17. | E11204 052018 ed. | Amendatory Endorsement |

Dated:   10-Oct-2018

At:   30 Batterson Park Road
Farmington
Connecticut 06032
(the office of the Correspondent)

by _____
Beazley USA Services, Inc. (Correspondent)

F00654
112017 ed.
Date Issued: 10-Oct-2018 2:43:22 PM

Page 4 of 4

**Effective date of this Endorsement: 11-Nov-2018**
**This Endorsement is attached to and forms a part of Policy Number: W20D68180201**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

### ASBESTOS, POLLUTION, AND CONTAMINATION EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that the coverage under this Policy will not apply to any **Loss** arising out of either in whole or in part, directly or indirectly arising out of or resulting from or in consequence of, or in any way involving:

1.      asbestos, or any materials containing asbestos in whatever form or quantity;

2.      the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungi, molds, spores or mycotoxins of any kind; any action taken by any party in response to the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of fungi, molds, spores or mycotoxins of any kind, such action to include investigating, testing for, detection of, monitoring of, treating, remediating or removing such fungi, molds, spores or mycotoxins; and any governmental or regulatory order, requirement, directive, mandate or decree that any party take action in response to the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of fungi, molds, spores or mycotoxins of any kind, such action to include investigating, testing for, detection of, monitoring of, treating, remediating or removing such fungi, molds, spores or mycotoxins;

The Underwriters will have no duty or obligation to defend any **Insured** with respect to any **Claim** or governmental or regulatory order, requirement, directive, mandate or decree which either in whole or in part, directly or indirectly, arises out of or results from or in consequence of, or in any way involves the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungi, molds, spores or mycotoxins of any kind;

3.      the existence, emission or discharge of any electromagnetic field, electromagnetic radiation or electromagnetism that actually or allegedly affects the health, safety or condition of any person or the environment, or that affects the value, marketability, condition or use of any property; or

4.      the actual, alleged or threatened discharge, dispersal, release or escape of Pollutants; or any governmental, judicial or regulatory directive or request that the **Insured** or anyone acting under the direction or control of the **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants. Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant including gas, acids, alkalis, chemicals, heat, smoke, vapor, soot, fumes or waste. Waste includes but is not limited to materials to be recycled, reconditioned or reclaimed.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 11-Nov-2018**
**This Endorsement is attached to and forms a part of Policy Number: W20D68180201**
**Syndicate 2623/623 at Lloyd's. Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## CAP ON LOSSES ARISING OUT OF CERTIFIED ACT OF TERRORISM

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

A. If aggregate insured losses attributable to "Certified Acts of Terrorism" exceed $100,000,000,000 in a calendar year and the Underwriters meet the applicable insurer deductible under the Terrorism Risk Insurance Act, the Underwriters are not liable for the payment of any portion of the amount of the losses exceeding $100,000,000,000. Insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

B. As used in this endorsement, "Certified Act of Terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

C. Terrorism exclusions, or the inapplicability or omission of a terrorism exclusion, do not create coverage for injury or damage otherwise excluded under this Policy.

All other terms, exclusions and conditions of the policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 11-Nov-2018**
**This Endorsement is attached to and forms a part of Policy Number: W20D68180201**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>**CHOICE OF LAW AND SERVICE OF SUIT**</u>

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that **GENERAL CONDITIONS** is amended to include:

**Service of Suit**

It is agreed that in the event of the Underwriters' failure to pay any amount claimed to be due under this Insurance, the Underwriters will, at the **Insured's** request, submit to the jurisdiction of a court of competent jurisdiction within the United States.  Nothing in this provision constitutes or should be understood to constitute a waiver of the Underwriters' rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or seek a transfer of a case to another court as permitted by the laws of the United States or any state in the United States. It is further agreed that service of processing such suit may be made upon the Underwriters' representative:

Mendes & Mount, 750 Seventh Avenue, New York, NY 10019-6829

and that in any suit instituted against any one of them upon this contract, the Underwriters will abide by the final decision of such court or of any appellate court in the event of an appeal.
The person or entity named above is authorized and directed to accept service of process on the Underwriters' behalf in any such suit and/or upon the **Insured's** request to give a written undertaking to the **Insured** that they will enter a general appearance upon the Underwriters' behalf in the event such a suit shall be instituted.

Pursuant to any statute of any state, territory, or district of the United States which makes provision therefore, the Underwriters hereby designate the Superintendent, Commissioner, or Director of Insurance or other officer specified for that purpose in the statute, or his successor in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on the **Insured's** behalf or any beneficiary hereunder arising out of this Policy, and hereby designate the person or entity named above as the persons to whom said officer is authorized to mail such process or a true copy thereof.

**Choice of Law**

Any disputes involving this Policy will be resolved applying the law of the state of New York.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative



**Effective date of this Endorsement: 11-Nov-2018**
**This Endorsement is attached to and forms a part of Policy Number: W20D68180201**
**Syndicate 2623/623 at Lloyd's. Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

## LLOYD'S SECURITY SCHEDULE

Syndicate 2623      82%
Syndicate 623       18%


ALL OTHER TERMS, conditions and limitations of said Certificate shall remain unchanged.

**Effective date of this Endorsement: 11-Nov-2018**
**This Endorsement is attached to and forms a part of Policy Number: W20D68180201**

<u>**NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)**</u>

**BEAZLEY BREACH RESPONSE**

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

<u>This Policy</u>* does not apply:

I.      Under any Liability Coverage, to injury, sickness, disease, death or destruction:

        (a)    with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

        (b)    resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.     Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.    Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

        (a)    the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

        (b)    the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

        (c)    the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or

possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.   As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or by-product material;

"source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means:

(a)     any nuclear reactor,

(b)     any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)     any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d)     any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

**Effective date of this Endorsement: 11-Nov-2018**
**This Endorsement is attached to and forms a part of Policy Number: W20D68180201**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<table>
<tr><td><h2 style="text-align:center">POLICYHOLDER DISCLOSURE NOTICE OF<br>TERRORISM INSURANCE COVERAGE</h2></td></tr>
</table>

You are hereby notified that under the Terrorism Risk Insurance Act of 2002, as amended ("TRIA"), insurance coverage provided by this Policy includes losses arising out of acts of terrorism, **as defined in Section 102(1) of the Act, as amended:** The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Any coverage you purchase for "acts of terrorism" shall expire at 12:00 midnight December 31, 2020, the date on which the TRIA Program is scheduled to terminate, or the expiry date of the policy whichever occurs first, and shall not cover any losses or events which arise after the earlier of these dates.

YOU SHOULD KNOW THAT COVERAGE PROVIDED BY THIS POLICY FOR LOSSES CAUSED BY CERTIFIED ACTS OF TERRORISM IS PARTIALLY REIMBURSED BY THE UNITED STATES UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THIS FORMULA, THE UNITED STATES PAYS 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016, 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON JANUARY 1, 2019 AND 80% BEGINNING ON JANUARY 1, 2020; OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURER(S) PROVIDING THE COVERAGE. YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A USD100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS USD100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED USD100 BILLION, YOUR COVERAGE MAY BE REDUCED.

(LMA 9104 amended)

**Effective date of this Endorsement: 11-Nov-2018**
**This Endorsement is attached to and forms a part of Policy Number: W20D68180201**

## RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

**Effective date of this Endorsement: 11-Nov-2018**
**This Endorsement is attached to and forms a part of Policy Number: W20D68180201**
**Syndicate 2623/623 at Lloyd's. Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

<u>**SANCTION LIMITATION AND EXCLUSION CLAUSE**</u>

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, law or regulations of the European Union, United Kingdom or United States of America.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E02804                                                                                                    Page 1 of 1
032011 ed.

**Effective date of this Endorsement: 11-Nov-2018**
**This Endorsement is attached to and forms a part of Policy Number: W20D68180201**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>**WAR AND CIVIL WAR EXCLUSION**</u>

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that **EXCLUSIONS** is amended to include:

**War and Civil War**

> For resulting from, directly or indirectly occasioned by, happening through or in consequence of: war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority; provided, that this exclusion will not apply to **Cyber Terrorism**.

> For purposes of this exclusion, "**Cyber Terrorism**" means the premeditated use of disruptive activities, or threat to use disruptive activities, against a computer system or network with the intention to cause harm, further social, ideological, religious, political or similar objectives, or to intimidate any person(s) in furtherance of such objectives.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 11-Nov-2018**
**This Endorsement is attached to and forms a part of Policy Number: W20D68180201**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

<u>AMEND DATA RECOVERY COSTS</u>

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that the Data
Recovery Costs insuring agreement is deleted in its entirety and replaced with the following:

*Data Recovery Costs*

     **Data Recovery Costs** that the **Insured Organization** incurs as a direct result of a **Security**
     **Breach** or **System Failure** that the **Insured** first discovers during the **Policy Period**.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E11294                                                                                                           Page 1 of 1
032018 ed.

**Effective date of this Endorsement: 11-Nov-2018**
**This Endorsement is attached to and forms a part of Policy Number: W20D68180201**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## AMEND DEFINITION OF FRAUDULENT INSTRUCTION

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that the definition of **Fraudulent Instruction** is deleted in its entirety and replaced with the following:

**Fraudulent Instruction** means the transfer, payment or delivery of **Money** or **Securities** by an **Insured** as a result of fraudulent written, electronic, telegraphic, cable, teletype or telephone instructions provided by a third party, that is intended to mislead an **Insured** through the misrepresentation of a material fact which is relied upon in good faith by such **Insured**.

**Fraudulent Instruction** will not include loss arising out of:

1.  any actual or alleged use of credit, debit, charge, access, convenience, customer identification or other cards;

2.  any transfer involving a third party who is not a natural person **Insured**, but had authorized access to the **Insured's** authentication mechanism;

3.  the processing of, or the failure to process, credit, check, debit, personal identification number debit, electronic benefit transfers or mobile payments for merchant accounts;

4.  accounting or arithmetical errors or omissions, or the failure, malfunction, inadequacy or illegitimacy of any product or service;

5.  any liability to any third party, or any indirect or consequential loss of any kind;

6.  any legal costs or legal expenses; or

7.  proving or establishing the existence of **Fraudulent Instruction**.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 11-Nov-2018**
**This Endorsement is attached to and forms a part of Policy Number: W20D68180201**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>**CONSEQUENTIAL REPUTATIONAL LOSS**</u>

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1.      Limit listed in the Declarations under **COVERAGE SCHEDULE** is amended to include:

      **Consequential Reputational Loss**                    USD $1,000,000

2.      Retention listed in the Declarations under **COVERAGE SCHEDULE** is amended to include:

      Each incident giving rise to **Consequential Reputational**          USD $25,000
      **Loss**

3.      **INSURING AGREEMENTS** is amended by the addition of:

      **Consequential Reputational Loss**

          to indemnify the **Insured Organization** for **Consequential Reputational Loss**, that the **Insured** incurs during the **Notification Period** as a result of (i) an actual or reasonably suspected **Data Breach** or **Security Breach** that the **Insured** first discovers during the **Policy Period** and (ii) for which individuals have been notified pursuant to part 4. of the **Breach Response Services** definition.

4.      For purposes of this endorsement, **DEFINITIONS** is amended to include:

      **Consequential Reputational Loss** means the **Income Loss** during the **Notification Period**; provided that **Consequential Reputational Loss** shall not mean and no coverage shall be available under this endorsement for any of the following:  loss arising out of any liability to any third party for whatever reason; legal costs or legal expenses of any type; loss incurred as a result of unfavorable business conditions, loss of market or any other consequential loss; or costs or expenses the **Insured Organization** incurs to identify, investigate, respond to or remediate an actual or reasonably suspected **Data Breach** or **Security Breach**.

      **Income Loss** means the net profit resulting directly from the **Insured Organization's** business operations, before income taxes, that the **Insured Organization** is prevented from earning as a direct result of damage to the **Insured Organization's** reputation caused by an actual or reasonably suspected **Data Breach** or **Security Breach**. In determining **Income Loss**, due consideration shall be given to the prior experience of the **Insured Organization's** business operations before the beginning of the **Notification Period** and to the reasonable and probable business operations the **Insured Organization** could have performed had the actual or reasonably suspected **Data Breach** or **Security Breach** not occurred.

          **Income Loss** does not include any internal salary, costs or overhead expenses of the **Insured Organization**.

**Notification Period** means the 30-day period that begins on the specific date on which **Notified Individuals** first receive notification of the incident for which **Notification Services** are provided.

5.    **Notice of Claim or Loss** under **GENERAL CONDITIONS** is amended to include:

With respect to **Consequential Reputational Loss** the **Named Insured** must notify the Underwriters through the contacts listed for **Notice of Claim, Loss or Circumstance** in the Declarations as soon as practicable after discovery of the circumstance, incident or event giving rise to such loss. The **Named Insured** will provide the Underwriters a proof of **Consequential Reputational Loss**. All loss described in this paragraph must be reported, and all proofs of loss must be provided, to the Underwriters no later than six (6) months after the end of the **Policy Period**. The costs and expenses of preparing and submitting a proof of loss, and establishing or proving **Consequential Reputational Loss** shall be the **Insured's** obligation, and are not covered under this Policy.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 11-Nov-2018**
**This Endorsement is attached to and forms a part of Policy Number: W20D68180201**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

<u>**GDPR CYBER ENDORSEMENT**</u>

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that the Data & Network Liability insuring agreement is amended to include:

5.      non-compliance with the following obligations under the EU General Data Protection Regulation (or legislation in the relevant jurisdiction implementing this Regulation):

      (a)      Article 5.1(f), also known as the Security Principle;

      (b)      Article 32, Security of Processing;

      (c)      Article 33, Communication of a Personal Data Breach to the Supervisory Authority; or

      (d)      Article 34, Communication of a Personal Data Breach to the Data Subject.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative



# Lloyd's Certificate

**This Insurance** is effected with certain Underwriters at Lloyd's, London.

**This Insurance** is issued in accordance with the limited authorization granted to the Correspondent by certain Underwriters at Lloyd's, London whose syndicate numbers and the proportions underwritten by them can be ascertained from the office of the said Correspondent (such Underwriters being hereinafter called "Underwriters") and in consideration of the premium specified herein, Underwriters hereby bind themselves severally and not jointly, each for his own part and not one for another, their Executors and Administrators.

**The Insured** is requested to read their Policy, and if it is not correct, return it immediately to the Correspondent for appropriate alteration.

All inquiries regarding the Policy should be addressed to the following Correspondent:

Beazley USA

**SLC-3 (USA)** NMA2868 (24/08/2000) (amended)



One Lime Street London EC3M 7HA

**Effective date of this Endorsement: 11-Nov-2018**
**This Endorsement is attached to and forms a part of Policy Number: W20D68180201**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

### POST BREACH REMEDIAL SERVICES ENDORSEMENT

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that, following a covered **Data Breach** or **Security Breach** involving the actual **Unauthorized Access or Use** of the **Insured Organization's Computer Systems**, the **Insured Organization** is eligible to receive **Post Breach Remedial Services**.

**Post Breach Remedial Services** means up to 100 hours per **Policy Period** of post-breach computer security consultation and remedial services to be provided by Lodestone Security ("Lodestone"). Such services will be provided at the **Insured Organization's** request as per the description of services attached to this endorsement. **Post Breach Remedial Services** will be considered **Breach Response Services**, and will be available in response to incidents in which forensic services and costs covered under parts 2. and 3. of the definition of **Breach Response Services** have been provided, subject to the applicable Retention. **Post Breach Remedial Services** will not include any costs to purchase or upgrade any hardware or software.

To access the **Post Breach Remedial Services**, the **Insured Organization** must notify the Underwriters, within sixty (60) days following a determination of the actual **Unauthorized Access or Use** of the **Insured Organization's Computer Systems**, that they desire to receive such services. To receive **Post Breach Remedial Services**, the **Insured Organization** will have to enter into an engagement agreement with Lodestone.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E10944                                                                                          Page 1 of 1
122017 ed.

# CRC Insurance Services - Tampa, FL

**Effective date of this Endorsement: 11-Nov-2018**
**This Endorsement is attached to and forms a part of Policy Number: W20D68180201**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1.      Part 4. of the definition of **Breach Response Services** is deleted and replaced with the following:

4.      to notify those individuals whose **Personally Identifiable Information** was potentially impacted by a **Data Breach** exceeding the **Notified Individuals Threshold**, including notification to individuals where no obligation to notify exists ("Voluntary Notification");

2.      Part 1. of the definition of **Claim** is deleted and replaced with the following:

1.      a written demand received by any **Insured** for money or services, or any non-monetary or injunctive relief, including the service of a suit or institution of arbitration proceedings;

3.      The definition of **Claim** is amended to include the following:

4.      a written request or agreement to toll or waive a statute of limitations relating to a potential **Claim** described above;

4.      The definition of **Computer Systems** is deleted in its entirety and replaced with the following:

**Computer Systems** means computers, any software residing on such computers and any associated devices or equipment, including but not limited to wireless or mobile devices, data storage devices, networking equipment, and back up facilities:

1.      operated by and either owned by or leased to the **Insured Organization**; or

2.      with respect to coverage under the Breach Response and Liability insuring agreements, operated by a third party pursuant to written contract with the **Insured Organization** and used for the purpose of providing hosted computer application services to the **Insured Organization** or for processing, maintaining, hosting or storing the **Insured Organization's** electronic data.

5.      Parts 2. and 3. of the definition of **Insured** are deleted in their entirety and replaced with the following:

2.      any director, officer or trustee of the **Insured Organization**, but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

3.      An employee (including a part time, temporary, leased or seasonal employee or volunteer), intern or **Individual Contractor** of the **Insured Organization**, but only for work done while acting within the scope of his or her employment and related to the conduct of the **Insured Organization's** business;

6.    The definition of **Media Liability** is amended to include the following:

11.     negligence regarding the content of any **Media Material**, including harm caused through any reliance or failure to rely upon such content;

7.    Part 2. of the definition of **Subsidiary** is deleted in its entirety and replaced with the following:

2.      which the **Named Insured** acquires Management Control after the inception date of this Policy; provided that:

(i)     the revenues of such entity do not exceed 25% of the **Named Insured's** annual revenues; or

(ii)    if the revenues of such entity exceed 25% of the **Named Insured's** annual revenues, then coverage under this Policy will be afforded for a period of 60 days, but only for any **Claim** that arises out of any act, error, omission, incident or event first occurring after the entity becomes so owned.  Coverage beyond such 60 day period will only be available if the **Named Insured** gives the Underwriters written notice of the acquisition, obtains the written consent of Underwriters to extend coverage to the entity beyond such 60 day period and agrees to pay any additional premium required by Underwriters.

8.    **RETENTIONS** is amended by the addition of:

Notwithstanding the foregoing, the Underwriters will recognize erosion of the **Retention** applicable to the Fraudulent Instruction insuring agreement by any payments made by or on behalf of the **Insured Organization** pursuant to such commercial crime policy issued to the **Insured Organization**, but only if such payments are for **Loss** that would otherwise be covered under the Fraudulent Instruction insuring agreement.

9.    **Settlement of Claims** under **GENERAL CONDITIONS** is deleted in its entirety and replaced with the following:

**Settlement of Claims**

If the **Insured** refuses to consent to any settlement recommended by the Underwriters and acceptable to the claimant, the Underwriters' liability for such **Claim** will not exceed:

1.      the amount for which the **Claim** could have been settled, less the remaining Retention, plus the **Claims Expenses** incurred up to the time of such refusal; plus

2.      seventy percent (70%) of any **Claims Expenses** incurred after the date such settlement or compromise was recommended to the **Insured** plus seventy percent (70%) of any **Damages**, **Penalties** and **PCI Fines**, **Expenses and Costs** above the amount for which the **Claim** could have been settled;

and the Underwriters will have the right to withdraw from the further defense of such **Claim**.

The **Insured** may settle any **Claim** where the **Damages**, **Penalties**, **PCI Fines**, **Expenses and Costs** and **Claims Expenses** do not exceed the Retention, provided that the entire **Claim** is resolved and the **Insured** obtains a full release on behalf of all **Insureds** from all claimants.

10.     **Other Insurance** under **GENERAL CONDITIONS** is deleted in its entirety and replaced with the following:
        **Other Insurance**

The insurance under this Policy shall apply in excess of any other valid and collectible insurance available to any **Insured** unless such other insurance is written only as specific excess insurance over this Policy; provided that this Policy shall be primary solely with respect to **Breach Response Services** under the Breach Response insuring agreement.

The existence of other insurance available to an **Insured** shall not affect the Underwriters' obligations toward an **Insured** in paying **Loss** covered under this Policy nor shall it delay payment of such **Loss**.

Notwithstanding the foregoing, this Policy will become primary and non-contributory insurance as respects any insurance maintained by an **Additional Insured** if primary insurance is required by a contract in place between the **Additional Insured** and the **Insured Organization**, but only with respect to a **Claim** or **Loss** arising solely from the **Insured Organization's** negligent acts, errors or omissions while performing services for, or on behalf of, an **Additional Insured**. In all other cases, this Insurance shall apply in excess of any other valid and collectible insurance available to any **Insured**.

11.     **Mergers and Consolidations** under **GENERAL CONDITIONS** is amended by the addition of:

If during the **Policy Period** the **Named Insured** sells any **Subsidiary**, then this Policy will continue to remain in effect with respect to such **Subsidiary** through the end of the **Policy Period**, but only with respect to events, acts or incidents that occur prior to the effective date of such sale. There will be no coverage provided by this Policy for any other **Claim** or **Loss** relating to such **Subsidiary** unless the **Named Insured** provides written notice to the Underwriters prior to such sale.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**REMEDIATION SERVICES**





**An attack occurred, it was contained and a response plan was activated–what's next?**

The inevitable happened, the organization is recovering and security resources are stretched thin. It's now time to get focused, not only on what occurred but how to limit further exposure and get back to business.  Post-breach remediation is the first, next step.

**Security expertise and guidance when it's needed most**

After a breach, clients need the advice of an experienced team that's been through this time and again to help them identify and close critical gaps, develop an enhanced security program, and get back to business – quickly. Lodestone provides immediate and experienced resources to help minimize exposure when clients are acutely vulnerable.

Following a thorough forensic investigation, Lodestone delivers a tailored, point-by-point approach and the guidance to formulate a post-breach remediation strategy. Our systematic process begins with a thorough **Assessment** of a client's existing security program to identify vulnerabilities and critical gaps, and to get a clear view of their readiness for potential attacks.  It continues with a **Definition** of an enhanced strategy, posture and roadmap. And culminates with the proper **Deployment** of resources aligned to key security priorities. Central to this strategy is Lodestone's ability to customize the strategy to a client's unique risk profile, security capability and resources.

## Assessment

**Identify** sensitive information assets, and highest risks

**Examine** existing security organization, structure and capability

**Assess** quality of policies, standards and procedures

**Develop** threat model of existing technical infrastructure

**Conduct** vulnerability assessment of networks, applications, mobile, cloud and high-risk infrastructure

**Analyze** incident response program governance and key perfomance metrics

**Review** cyber security program governance and key performance metrics

## Definition

**Define** ideal security posture in three key areas and develop strategic  recommendations:

**People**--articulate the needed organizational structure and the required skills and abilities of responsible parties

**Process:** detail security requirements, define standards, policies, procedures and controls including Governance Risk, and Compliance (GRC)

**Technology:** define appropriate architecture, tools, and applications to safeguard against future risks and threats

## Deployment

**Governance and Program Management –** Ensure security organization has defined governance structure

**Risk Management** – Ensure processes are optimized so business risks are understood, evaluated, treated, and reported

**Technology --** Ensure network security capabilities;intrusion protection, database and storage security; encrpyion malware, meet or exceed industry best practices

**Data** – Recommend secure file transfer/sharing, enterprise encryption, and data leakage protection enhancements

**Process** – Mature process around Identity and Access Management, Threat and Vulnerability Management, Incident Response, Third-party Risk Management, Information Asset Management and Secure SDLC

**People** – Security awareness and training

# Understanding the vulnerabilities of small and mid-size companies, Lodestone is well equipped to evaluate a company's security posture and develop a targeted strategy to address its crucial issues.

**External Vulnerability Posture Improvement**
We combine automated scanning with manual assessment techniques to evaluate the security of internet exposed network devices and servers— a common point of entry for attackers including VPN and Remote access systems.

Activities include: host discovery, host enumeration, scanning for network and basic web application vulnerabilities, and manual verification of results.

**Insider Threat Posture Improvement**
Working from inside your network, we conduct an internal vulnerability assessment and recommend improvements to  the security of network devices and servers including network architecture, firewall, host configuration, application servers, and databases.

**Vulnerability Management Program Improvement**
We assess a client's existing vulnerability management program and make recommendations for establishing appropriate people, process, and technology resources.

**Security Awareness Program Improvement (Social Engineering/Phishing)**
Many breaches are the result of weak passwords or social engineering  vulnerabilities such as, conveying sensitive information by telephone, complying with phishing email instructions, or using USB devices infected with malware. Lodestone helps create security awareness and training to educate end-users on the threats from common activities they perform.

**Wireless Security Posture Improvement**
We review wireless networks for exposure and vulnerability and make recommendations to enhance the wireless security posture. For example, we determine how far the wireless signal propagates, whether rogue access points exist, if secure encryption is in use and if appropriate authentication mechanisms are in place.

**Application Security Posture Improvement**
Lodestone conducts a review of the security of the client's target applications, assessing the infrastructure, configuration, input handling, application logic, and security controls in place. This review is performed against applications built in-house by the client, as well as current or potential 3rd party vendor services and applications. We look for vulnerabilities that could give an attacker access to the data the application protects, or the system it is hosted on. Lodestones' collective experience covers a wide variety of environments, including Web apps & services, Android & iOS apps, Binary applications, through Embedded and Internet of Things (IoT).

**Application Security Program Improvement**
Lodestone evaluates the maturity of the existing application SDLC and works with your organization to determine the target state using an industry standard security program maturity model. This includes security practices within Governance, Construction, Verification, and Deployment of your Application Development program. We develop an executive roadmap, CISO roadmap, and Project roadmap.

**Incident Response Program Improvement**
We review current organization, documentation, methodology, and technical capabilities to determine strengths, weaknesses, and steps required to improve the organization's ability to respond to computer security incidents. We design, develop or refine governance, skills, process and technology an organization uses to respond to computer security incidents with the goal of improving your organization's incident response practices.

**Policy, Procedure and Standards Improvement**
We evaluate and make recommendations to improve the effectiveness of existing policies and/or develop enhanced security policies with established security guidelines. We apply best practices consistent with standards; such as, Payment Card Industry Data Security Standard (PCI-DSS), Health Insurance Portability and Accountability Act (HIPAA), Gramm Leach Bliley (GLB), National Institute of Standards and Technology (NIST) and International Organization for Standardization (ISO) 27001/27002.

Lodestone Security is a wholly -owned subsidiary of Beazley plc. Lodestone provides computer security and cyber security services.  Lodestone does not provide insurance services and client information obtained by Lodestone is not shared with Beazley claims or underwriting.  Likewise, client information obtained by Beazley claims or underwriting is not shared with Lodestone.

**263 Tresser Boulevard**
**9th floor, Suite 959**
**Stamford, CT 06901**

**www.lodestonesecurity.com**



# BEAZLEY BREACH RESPONSE

## TABLE OF CONTENTS

| INSURING AGREEMENTS | 1 |
|---|---|

| | |
|---|---|
| Breach Response | 1 |
| First Party Loss | 1 |
| Liability | 2 |
| eCrime | 2 |
| Criminal Reward | 3 |

| DEFINITIONS | 3 |
|---|---|

| | |
|---|---|
| Additional Insured | 3 |
| Breach Notice Law | 3 |
| Breach Response Services | 3 |
| Business Interruption Loss | 4 |
| Claim | 4 |
| Claims Expenses | 4 |
| Computer Systems | 5 |
| Continuity Date | 5 |
| Control Group | 5 |
| Criminal Reward Funds | 5 |
| Cyber Extortion Loss | 5 |
| Damages | 5 |
| Data | 6 |
| Data Breach | 6 |
| Data Recovery Costs | 6 |
| Dependent Business | 6 |
| Dependent Business Loss | 6 |
| Dependent Security Breach | 7 |
| Dependent System Failure | 7 |
| Digital Currency | 7 |
| Education and Loss Prevention Tools | 7 |
| Extortion Payment | 7 |
| Extortion Threat | 7 |
| Extra Expense | 7 |
| Financial Institution | 7 |
| Forensic Expenses | 8 |
| Fraudulent Instruction | 8 |
| Funds Transfer Fraud | 8 |
| Income Loss | 9 |
| Individual Contractor | 9 |
| Insured | 9 |
| Insured Organization | 10 |
| Loss | 10 |
| Media Liability | 10 |
| Media Material | 10 |
| Merchant Services Agreement | 11 |
| Money | 11 |
| Named Insured | 11 |
| Notified Individuals Threshold | 11 |
| PCI Fines Expenses and Costs | 11 |
| Penalties | 11 |
| Period of Restoration | 11 |
| Personally Identifiable Information | 11 |
| Policy Period | 12 |
| Privacy Policy | 12 |
| Regulatory Proceeding | 12 |
| Securities | 12 |
| Security Breach | 12 |
| Subsidiary | 12 |
| System Failure | 12 |

| | |
|---|---|
| Telephone Fraud | 13 |
| Third Party Information | 13 |
| Transfer Account | 13 |
| Unauthorized Access or Use | 13 |
| Unauthorized Disclosure | 13 |
| Waiting Period | 13 |

| EXCLUSIONS | 13 |
|---|---|

| | |
|---|---|
| Bodily Injury or Property Damage | 13 |
| Trade Practices and Antitrust | 13 |
| Gathering or Distribution of Information | 13 |
| Prior Known Acts & Prior Noticed Claims | 14 |
| Racketeering, Benefit Plans, Employment Liability & Discrimination | 14 |
| Sale or Ownership of Securities & Violation of Securities Laws | 14 |
| Criminal, Intentional or Fraudulent Acts | 14 |
| Patent, Software Copyright, Misappropriation of Information | 15 |
| Governmental Actions | 15 |
| Other Insureds & Related Enterprises | 15 |
| Trading Losses, Loss of Money & Discounts | 15 |
| Media Related Exposures | 16 |
| First Party Loss | 16 |

| LIMIT OF LIABILITY AND COVERAGE | 17 |
|---|---|

| | |
|---|---|
| Limits of Liability | 17 |
| Breach Response Limits | 17 |
| Additional Breach Response Limits | 17 |

| RETENTIONS | 18 |
|---|---|

| OPTIONAL EXTENSION PERIOD | 18 |
|---|---|

| GENERAL CONDITIONS | 19 |
|---|---|

| | |
|---|---|
| Notice of Claim or Loss | 19 |
| Notice of Circumstance | 19 |
| Defense of Claims | 20 |
| Settlement of Claims | 20 |
| Assistance and Cooperation | 20 |
| Subrogation | 21 |
| Other Insurance | 21 |
| Action Against the Underwriters | 21 |
| Change of Law Unavailability of Breach Response Services | 21 |
| Entire Agreement | 22 |
| Mergers or Consolidations | 22 |
| Assignment | 22 |
| Cancellation | 22 |
| Singular Form of a Word | 22 |
| Headings | 23 |
| Representation by the Insured | 23 |
| Named Insured as Agent | 23 |



# BEAZLEY BREACH RESPONSE

**THIS POLICY'S LIABILITY INSURING AGREEMENTS PROVIDE COVERAGE ON A CLAIMS MADE AND REPORTED BASIS AND APPLY ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR THE OPTIONAL EXTENSION PERIOD (IF APPLICABLE) AND REPORTED TO THE UNDERWRITERS IN ACCORDANCE WITH THE TERMS OF THIS POLICY. AMOUNTS INCURRED AS CLAIMS EXPENSES UNDER THIS POLICY WILL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY AND ARE SUBJECT TO RETENTIONS.**

Please refer to the Declarations, which show the insuring agreements that the **Named Insured** purchased. If an insuring agreement has not been purchased, coverage under that insuring agreement of this Policy will not apply.

The Underwriters agree with the **Named Insured**, in consideration of the payment of the premium and reliance upon the statements contained in the information and materials provided to the Underwriters in connection with the underwriting and issuance of this Insurance Policy (hereinafter referred to as the "Policy") and subject to all the provisions, terms and conditions of this Policy:

## INSURING AGREEMENTS

### Breach Response

To provide **Breach Response Services** to the **Insured Organization** because of an actual or reasonably suspected **Data Breach** or **Security Breach** that the **Insured** first discovers during the **Policy Period**.

### First Party Loss

To indemnify the **Insured Organization** for:

*Business Interruption Loss*

**Business Interruption Loss** that the **Insured Organization** sustains as a result of a **Security Breach** or **System Failure** that the **Insured** first discovers during the **Policy Period**.

*Dependent Business Interruption Loss*

**Dependent Business Loss** that the **Insured Organization** sustains as a result of a **Dependent Security Breach** or a **Dependent System Failure** that the **Insured** first discovers during the **Policy Period**.

*Cyber Extortion Loss*

**Cyber Extortion Loss** that the **Insured Organization** incurs as a result of an **Extortion Threat** first made against the **Insured Organization** during the **Policy Period**.

*Data Recovery Costs*

**Data Recovery Costs** that the **Insured Organization** incurs as a direct result of a **Security Breach** that the **Insured** first discovers during the **Policy Period**.

**Liability**

*Data & Network Liability*

To pay **Damages** and **Claims Expenses**, which the **Insured** is legally obligated to pay because of any **Claim** first made against any **Insured** during the **Policy Period** for:

1. a **Data Breach**;

2. a **Security Breach**;

3. the **Insured Organization's** failure to timely disclose a **Data Breach** or **Security Breach**;

4. failure by the **Insured** to comply with that part of a **Privacy Policy** that specifically:

    (a) prohibits or restricts the **Insured Organization's** disclosure, sharing or selling of **Personally Identifiable Information**;

    (b) requires the **Insured Organization** to provide an individual access to **Personally Identifiable Information** or to correct incomplete or inaccurate **Personally Identifiable Information** after a request is made; or

    (c) mandates procedures and requirements to prevent the loss of **Personally Identifiable Information**;

    provided the **Insured Organization** has in force, at the time of such failure, a **Privacy Policy** that addresses those subsections above that are relevant to such **Claim**.

*Regulatory Defense & Penalties*

To pay **Penalties** and **Claims Expenses**, which the **Insured** is legally obligated to pay because of a **Regulatory Proceeding** first made against any **Insured** during the **Policy Period** for a **Data Breach** or a **Security Breach**.

*Payment Card Liabilities & Costs*

To indemnify the **Insured Organization** for **PCI Fines, Expenses and Costs** which it is legally obligated to pay because of a **Claim** first made against any **Insured** during the **Policy Period**.

*Media Liability*

To pay **Damages** and **Claims Expenses**, which the **Insured** is legally obligated to pay because of any **Claim** first made against any **Insured** during the **Policy Period** for **Media Liability**.

**eCrime**

To indemnify the **Insured Organization** for any direct financial loss sustained resulting from:

1. **Fraudulent Instruction**;

2.   **Funds Transfer Fraud**; or

3.   **Telephone Fraud**;

that the **Insured** first discovers during the **Policy Period**.

### Criminal Reward

To indemnify the **Insured Organization** for **Criminal Reward Funds**.

## DEFINITIONS

**Additional Insured** means any person or entity that the **Insured Organization** has agreed in writing to add as an **Additional Insured** under this Policy prior to the commission of any act for which such person or entity would be provided coverage under this Policy, but only to the extent the **Insured Organization** would have been liable and coverage would have been afforded under the terms and conditions of this Policy had such **Claim** been made against the **Insured Organization**.

**Breach Notice Law** means any statute or regulation that requires notice to persons whose personal information was accessed or reasonably may have been accessed by an unauthorized person. **Breach Notice Law** also includes any statute or regulation requiring notice of a **Data Breach** to be provided to governmental or regulatory authorities.

**Breach Response Services** means the following fees and costs in response to an actual or reasonably suspected **Data Breach** or **Security Breach**:

1   for an attorney to provide necessary legal advice to the **Insured Organization** to evaluate its obligations pursuant to **Breach Notice Laws** or a **Merchant Services Agreement** and in connection with providing the **Breach Response Services** described below;

2   for a computer security expert to determine the existence, cause and scope of an actual or reasonably suspected **Data Breach**, and if such **Data Breach** is actively in progress on the **Insured Organization's Computer Systems**, to assist in containing it;

3.   for a PCI Forensic Investigator to investigate the existence and extent of an actual or reasonably suspected **Data Breach** involving payment card data and for a Qualified Security Assessor to certify and assist in attesting to the **Insured Organization's** PCI compliance, as required by a **Merchant Services Agreement**;

4.   to notify those individuals whose **Personally Identifiable Information** was potentially impacted by a **Data Breach** exceeding the **Notified Individuals Threshold**;

5.   to provide a call center to respond to inquiries about a **Data Breach** that exceeds the **Notified Individuals Threshold**;

6.   to provide a credit monitoring, identity monitoring or other solution listed in the Information Packet to individuals whose **Personally Identifiable Information** was potentially impacted by a **Data Breach** exceeding the **Notified Individuals Threshold**; and

7.     public relations and crisis management costs directly related to mitigating harm to the **Insured Organization** which are approved in advance by the Underwriters in their discretion.

**Breach Response Services** will be provided by providers listed in the Information Packet, will be subject to the terms and conditions of this Policy and the Information Packet, and will not include any internal salary or overhead expenses of the **Insured Organization**. **Breach Response Services** also includes assistance from the BBR Services Team and access to **Education and Loss Prevention Tools**.

**Business Interruption Loss** means:

1.     **Income Loss**;

2.     **Forensic Expenses**; and

3.     **Extra Expense**;

actually sustained during the **Period of Restoration** as a result of the actual interruption of the **Insured Organization's** business operations caused by a **Security Breach** or **System Failure**. Coverage for **Business Interruption Loss** will apply only after the **Waiting Period** has elapsed.

**Business Interruption Loss** will not include (i) loss arising out of any liability to any third party; (ii) legal costs or legal expenses; (iii) loss incurred as a result of unfavorable business conditions; (iv) loss of market or any other consequential loss; (v) **Dependent Business Loss**; or (vi) **Data Recovery Costs**.

**Claim** means:

1.     a written demand received by any **Insured** for money or services;

2.     with respect to coverage provided under the Regulatory Defense & Penalties insuring agreement only, institution of a **Regulatory Proceeding** against any **Insured**; and

3.     with respect to coverage provided under part 1. of the Data & Network Liability insuring agreement only, a demand received by any **Insured** to fulfill the **Insured Organization's** contractual obligation to provide notice of a **Data Breach** pursuant to a **Breach Notice Law**;

Multiple **Claims** arising from the same or a series of related, repeated or continuing acts, errors, omissions or events will be considered a single **Claim** for the purposes of this Policy. All such **Claims** will be deemed to have been made at the time of the first such **Claim**.

**Claims Expenses** means:

1.     all reasonable and necessary legal costs and expenses resulting from the investigation, defense and appeal of a **Claim**, if incurred by the Underwriters, or by the **Insured** with the prior written consent of the Underwriters; and

2.     the premium cost for appeal bonds for covered judgments or bonds to release property used to secure a legal obligation, if required in any **Claim** against an **Insured**; provided the Underwriters will have no obligation to appeal or to obtain bonds.

**Claims Expenses** will not include any salary, overhead, or other charges by the **Insured** for any time spent in cooperating in the defense and investigation of any **Claim** or circumstance that might lead to a **Claim** notified under this Policy, or costs to comply with any regulatory orders, settlements or judgments.

**Computer Systems** means computers, any software residing on such computers and any associated devices or equipment:

1.    operated by and either owned by or leased to the **Insured Organization**; or

2.    with respect to coverage under the Breach Response and Liability insuring agreements, operated by a third party pursuant to written contract with the **Insured Organization** and used for the purpose of providing hosted computer application services to the **Insured Organization** or for processing, maintaining, hosting or storing the **Insured Organization's** electronic data.

**Continuity Date** means:

1.    the Continuity Date listed in the Declarations; and

2.    with respect to any **Subsidiaries** acquired after the Continuity Date listed in the Declarations, the date the **Named Insured** acquired such **Subsidiary**.

**Control Group** means any principal, partner, corporate officer, director, general counsel (or most senior legal counsel) or risk manager of the **Insured Organization** and any individual in a substantially similar position.

**Criminal Reward Funds** means any amount offered and paid by the **Insured Organization** with the Underwriters' prior written consent for information that leads to the arrest and conviction of any individual(s) committing or trying to commit any illegal act related to any coverage under this Policy; but will not include any amount based upon information provided by the **Insured**, the **Insured's** auditors or any individual hired or retained to investigate the illegal acts.  All **Criminal Reward Funds** offered pursuant to this Policy must expire no later than 6 months following the end of the **Policy Period**.

**Cyber Extortion Loss** means:

1.    any **Extortion Payment** that has been made by or on behalf of the **Insured Organization** with the Underwriters' prior written consent to prevent or terminate an **Extortion Threat**; and

2.    reasonable and necessary expenses incurred by the **Insured Organization** with the Underwriters' prior written consent to prevent or respond to an **Extortion Threat**.

**Damages** means a monetary judgment, award or settlement, including any award of prejudgment or post-judgment interest; but **Damages** will not include:

1.    future profits, restitution, disgorgement of unjust enrichment or profits by an **Insured**, or the costs of complying with orders granting injunctive or equitable relief;

2.    return or offset of fees, charges or commissions charged by or owed to an **Insured** for goods or services already provided or contracted to be provided;

3.    taxes or loss of tax benefits;

4.    fines, sanctions or penalties;

5.    punitive or exemplary damages or any damages which are a multiple of compensatory damages, unless insurable by law in any applicable venue that most favors coverage for such punitive, exemplary or multiple damages;

6.    discounts, coupons, prizes, awards or other incentives offered to the **Insured's** customers or clients;

7.    liquidated damages, but only to the extent that such damages exceed the amount for which the **Insured** would have been liable in the absence of such liquidated damages agreement;

8.    fines, costs or other amounts an **Insured** is responsible to pay under a **Merchant Services Agreement**; or

9.    any amounts for which the **Insured** is not liable, or for which there is no legal recourse against the **Insured**.

**Data** means any software or electronic data that exists in **Computer Systems** and that is subject to regular back-up procedures.

**Data Breach** means the theft, loss, or **Unauthorized Disclosure** of **Personally Identifiable Information** or **Third Party Information** that is in the care, custody or control of the **Insured Organization** or a third party for whose theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Information** or **Third Party Information** the **Insured Organization** is liable.

**Data Recovery Costs** means the reasonable and necessary costs incurred by the **Insured Organization** to regain access to, replace, or restore **Data**, or if **Data** cannot reasonably be accessed, replaced, or restored, then the reasonable and necessary costs incurred by the **Insured Organization** to reach this determination.

**Data Recovery Costs** will not include: (i) the monetary value of profits, royalties, or lost market share related to **Data**, including but not limited to trade secrets or other proprietary information or any other amount pertaining to the value of **Data**; (ii) legal costs or legal expenses; (iii) loss arising out of any liability to any third party; or (iv) **Cyber Extortion Loss**.

**Dependent Business** means any entity that is not a part of the **Insured Organization** but which provides necessary products or services to the **Insured Organization** pursuant to a written contract.

**Dependent Business Loss** means:

1.    **Income Loss**; and

2.    **Extra Expense**;

actually sustained during the **Period of Restoration** as a result of an actual interruption of the **Insured Organization's** business operations caused by a **Dependent Security Breach** or **Dependent System Failure**.  Coverage for **Dependent Business Loss** will apply only after the **Waiting Period** has elapsed.

**Dependent Business Loss** will not include (i) loss arising out of any liability to any third party; (ii) legal costs or legal expenses; (iii) loss incurred as a result of unfavorable business conditions; (iv) loss of market or any other consequential loss; (v) **Business Interruption Loss**; or (vi) **Data Recovery Costs**.

**Dependent Security Breach** means a failure of computer security to prevent a breach of computer systems operated by a **Dependent Business**.

**Dependent System Failure** means an unintentional and unplanned interruption of computer systems operated by a **Dependent Business**.

> **Dependent System Failure** will not include any interruption of computer systems resulting from (i) a **Dependent Security Breach**, or (ii) the interruption of computer systems that are not operated by a **Dependent Business**.

**Digital Currency** means a type of digital currency that:

1. requires cryptographic techniques to regulate the generation of units of currency and verify the transfer thereof;

2. is both stored and transferred electronically; and

3. operates independently of a central bank or other central authority.

**Education and Loss Prevention Tools** means information and services made available by the Underwriters from time to time and includes access to beazleybreachsolutions.com, a dedicated portal through which **Insureds** can access news and information regarding breach response planning, data and network security threats, best practices in protecting data and networks, offers from third party service providers, and related information, tools and services. **Insureds** will also have access to communications addressing timely topics in data security, loss prevention and other areas.

**Extortion Payment** means **Money**, **Digital Currency**, marketable goods or services demanded to prevent or terminate an **Extortion Threat**.

**Extortion Threat** means a threat to:

1. alter, destroy, damage, delete or corrupt **Data**;

2. perpetrate the **Unauthorized Access or Use** of **Computer Systems**;

3. prevent access to **Computer Systems** or **Data**;

4. steal, misuse or publicly disclose **Data**, **Personally Identifiable Information** or **Third Party Information**;

5. introduce malicious code into **Computer Systems** or to third party computer systems from **Computer Systems**; or

6. interrupt or suspend **Computer Systems**;

unless an **Extortion Payment** is received from or on behalf of the **Insured Organization**.

**Extra Expense** means reasonable and necessary expenses incurred by the **Insured Organization** during the **Period of Restoration** to minimize, reduce or avoid **Income Loss**, over and above those expenses the **Insured Organization** would have incurred had no **Security Breach**, **System Failure**, **Dependent Security Breach** or **Dependent System Failure** occurred.

**Financial Institution** means a bank, credit union, saving and loan association, trust company or other licensed financial service, securities broker-dealer, mutual fund, or liquid assets fund or similar investment company where the **Insured Organization** maintains a bank account.

**Forensic Expenses** means reasonable and necessary expenses incurred by the **Insured Organization** to investigate the source or cause of a **Business Interruption Loss**.

**Fraudulent Instruction** means the transfer, payment or delivery of **Money** or **Securities** by an **Insured** as a result of fraudulent written, electronic, telegraphic, cable, teletype or telephone instructions provided by a third party, that is intended to mislead an **Insured** through the misrepresentation of a material fact which is relied upon in good faith by such **Insured**.

**Fraudulent Instruction** will not include loss arising out of:

1. fraudulent instructions received by the **Insured** which are not first authenticated via a method other than the original means of request to verify the authenticity or validity of the request;

2. any actual or alleged use of credit, debit, charge, access, convenience, customer identification or other cards;

3. any transfer involving a third party who is not a natural person **Insured**, but had authorized access to the **Insured's** authentication mechanism;

4. the processing of, or the failure to process, credit, check, debit, personal identification number debit, electronic benefit transfers or mobile payments for merchant accounts;

5. accounting or arithmetical errors or omissions, or the failure, malfunction, inadequacy or illegitimacy of any product or service;

6. any liability to any third party, or any indirect or consequential loss of any kind;

7. any legal costs or legal expenses; or

8. proving or establishing the existence of **Fraudulent Instruction**.

**Funds Transfer Fraud** means the loss of **Money** or **Securities** contained in a **Transfer Account** at a **Financial Institution** resulting from fraudulent written, electronic, telegraphic, cable, teletype or telephone instructions by a third party issued to a **Financial Institution** directing such institution to transfer, pay or deliver **Money** or **Securities** from any account maintained by the **Insured Organization** at such institution, without the **Insured Organization's** knowledge or consent.

**Funds Transfer Fraud** will not include any loss arising out of:

1. the type or kind covered by the **Insured Organization's** financial institution bond or commercial crime policy;

2. any actual or alleged fraudulent, dishonest or criminal act or omission by, or involving, any natural person **Insured**;

3. any indirect or consequential loss of any kind;

4. punitive, exemplary or multiplied damages of any kind or any fines, penalties or loss of any tax benefit;

5. any liability to any third party, except for direct compensatory damages arising directly from **Funds Transfer Fraud**;

6.    any legal costs or legal expenses; or proving or establishing the existence of **Funds Transfer Fraud**;

7.    the theft, disappearance, destruction of, unauthorized access to, or unauthorized use of confidential information, including a PIN or security code;

8.    any forged, altered or fraudulent negotiable instruments, securities, documents or instructions; or

9.    any actual or alleged use of credit, debit, charge, access, convenience or other cards or the information contained on such cards.

**Income Loss** means an amount equal to:

1.    net profit or loss before interest and tax that the **Insured Organization** would have earned or incurred; and

2.    continuing normal operating expenses incurred by the **Insured Organization** (including payroll), but only to the extent that such operating expenses must necessarily continue during the **Period of Restoration**.

**Individual Contractor** means any natural person who performs labor or service for the **Insured Organization** pursuant to a written contract or agreement with the **Insured Organization**. The status of an individual as an **Individual Contractor** will be determined as of the date of an alleged act, error or omission by any such **Individual Contractor**.

**Insured** means:

1.    the **Insured Organization**;

2.    any director or officer of the **Insured Organization**, but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

3.    an employee (including a part time, temporary, leased or seasonal employee or volunteer) or **Individual Contractor** of the **Insured Organization**, but only for work done while acting within the scope of his or her employment and related to the conduct of the **Insured Organization's** business;

4.    a principal if the **Named Insured** is a sole proprietorship, or a partner if the **Named Insured** is a partnership, but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

5.    any person who previously qualified as an **Insured** under parts 2. - 4., but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

6.    an **Additional Insured**, but only as respects **Claims** against such person or entity for acts, errors or omissions of the **Insured Organization**;

7.    the estate, heirs, executors, administrators, assigns and legal representatives of any **Insured** in the event of such **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this Policy; and

8.   the lawful spouse, including any natural person qualifying as a domestic partner of any **Insured**, but solely by reason of any act, error or omission of an **Insured** other than such spouse or domestic partner.

**Insured Organization** means the **Named Insured** and any **Subsidiaries**.

**Loss** means **Breach Response Services**, **Business Interruption Loss**, **Claims Expenses**, **Criminal Reward Funds**, **Cyber Extortion Loss**, **Damages**, **Data Recovery Costs**, **Dependent Business Loss**, **PCI Fines, Expenses and Costs**, **Penalties**, loss covered under the eCrime insuring agreement and any other amounts covered under this Policy.

Multiple **Losses** arising from the same or a series of related, repeated or continuing acts, errors, omissions or events will be considered a single **Loss** for the purposes of this Policy.

With respect to the Breach Response and First Party Loss insuring agreements, all acts, errors, omissions or events (or series of related, repeated or continuing acts, errors, omissions or events) giving rise to a **Loss** or multiple **Losses** in connection with such insuring agreements will be deemed to have been discovered at the time the first such act, error, omission or event is discovered.

**Media Liability** means one or more of the following acts committed by, or on behalf of, the **Insured Organization** in the course of creating, displaying, broadcasting, disseminating or releasing **Media Material** to the public:

1.   defamation, libel, slander, product disparagement, trade libel, infliction of emotional distress, outrage, outrageous conduct, or other tort related to disparagement or harm to the reputation or character of any person or organization;

2.   a violation of the rights of privacy of an individual, including false light, intrusion upon seclusion and public disclosure of private facts;

3.   invasion or interference with an individual's right of publicity, including commercial appropriation of name, persona, voice or likeness;

4.   plagiarism, piracy, or misappropriation of ideas under implied contract;

5.   infringement of copyright;

6.   infringement of domain name, trademark, trade name, trade dress, logo, title, metatag, or slogan, service mark or service name;

7.   improper deep-linking or framing;

8.   false arrest, detention or imprisonment;

9.   invasion of or interference with any right to private occupancy, including trespass, wrongful entry or eviction; or

10.  unfair competition, if alleged in conjunction with any of the acts listed in parts 5. or 6. above.

**Media Material** means any information, including words, sounds, numbers, images or graphics, but will not include computer software or the actual goods, products or services described, illustrated or displayed in such **Media Material**.

**Merchant Services Agreement** means any agreement between an **Insured** and a financial institution, credit/debit card company, credit/debit card processor or independent service operator enabling an **Insured** to accept credit card, debit card, prepaid card or other payment cards for payments or donations.

**Money** means a medium of exchange in current use authorized or adopted by a domestic or foreign government as a part of its currency.

**Named Insured** means the Named Insured listed in the Declarations.

**Notified Individuals Threshold** means the number of individual persons listed in the Declarations.

**PCI Fines, Expenses and Costs** means the monetary amount owed by the **Insured Organization** under the terms of a **Merchant Services Agreement** as a direct result of a suspected **Data Breach**.  With the prior consent of the Underwriters, **PCI Fines, Expenses and Costs** includes reasonable and necessary legal costs and expenses incurred by the **Insured Organization** to appeal or negotiate an assessment of such monetary amount.  **PCI Fines, Expenses and Costs** will not include any charge backs, interchange fees, discount fees or other fees unrelated to a **Data Breach**.

**Penalties** means:

1.    any monetary civil fine or penalty payable to a governmental entity that was imposed in a **Regulatory Proceeding**; and

2.    amounts which the **Insured** is legally obligated to deposit in a fund as equitable relief for the payment of consumer claims due to an adverse judgment or settlement of a **Regulatory Proceeding** (including such amounts required to be paid into a "Consumer Redress Fund");

but will not include: (a) costs to remediate or improve **Computer Systems**; (b) costs to establish, implement, maintain, improve or remediate security or privacy practices, procedures, programs or policies; (c) audit, assessment, compliance or reporting costs; or (d) costs to protect the confidentiality, integrity and/or security of **Personally Identifiable Information** or other information.

The insurability of **Penalties** will be in accordance with the law in the applicable venue that most favors coverage for such **Penalties**.

**Period of Restoration** means the 180-day period of time that begins upon the actual and necessary interruption of the **Insured Organization's** business operations.

**Personally Identifiable Information** means:

1.    any information concerning an individual that is defined as personal information under any **Breach Notice Law**; and

2.    an individual's drivers license or state identification number, social security number, unpublished telephone number, and credit, debit or other financial account numbers in combination with associated security codes, access codes, passwords or PINs; if such information allows an individual to be uniquely and reliably identified or contacted or allows access to the individual's financial account or medical record information.

but will not include information that is lawfully made available to the general public.

**Policy Period** means the period of time between the inception date listed in the Declarations and the effective date of termination, expiration or cancellation of this Policy and specifically excludes any Optional Extension Period or any prior policy period or renewal period.

**Privacy Policy** means the **Insured Organization's** public declaration of its policy for collection, use, disclosure, sharing, dissemination and correction or supplementation of, and access to **Personally Identifiable Information**.

**Regulatory Proceeding** means a request for information, civil investigative demand, or civil proceeding brought by or on behalf of any federal, state, local or foreign governmental entity in such entity's regulatory or official capacity.

**Securities** means negotiable and non-negotiable instruments or contracts representing either **Money** or tangible property that has intrinsic value.

**Security Breach** means a failure of computer security to prevent:

1.  **Unauthorized Access or Use** of **Computer Systems**, including **Unauthorized Access or Use** resulting from the theft of a password from a **Computer System** or from any **Insured**;

2.  a denial of service attack affecting **Computer Systems**;

3.  with respect to coverage under the Liability insuring agreements, a denial of service attack affecting computer systems that are not owned, operated or controlled by an **Insured**; or

4.  infection of **Computer Systems** by malicious code or transmission of malicious code from **Computer Systems**.

**Subsidiary** means any entity:

1.  which, on or prior to the inception date of this Policy, the **Named Insured** owns, directly or indirectly, more than 50% of the outstanding voting securities ("Management Control"); and

2.  which the **Named Insured** acquires Management Control after the inception date of this Policy; provided that:

    (i)   the revenues of such entity do not exceed 15% of the **Named Insured's** annual revenues; or

    (ii)  if the revenues of such entity exceed 15% of the **Named Insured's** annual revenues, then coverage under this Policy will be afforded for a period of 60 days, but only for any **Claim** that arises out of any act, error, omission, incident or event first occurring after the entity becomes so owned. Coverage beyond such 60 day period will only be available if the **Named Insured** gives the Underwriters written notice of the acquisition, obtains the written consent of Underwriters to extend coverage to the entity beyond such 60 day period and agrees to pay any additional premium required by Underwriters.

This Policy provides coverage only for acts, errors, omissions, incidents or events that occur while the **Named Insured** has Management Control over an entity.

**System Failure** means an unintentional and unplanned interruption of **Computer Systems**.

**System Failure** will not include any interruption of computer systems resulting from (i) a **Security Breach**, or (ii) the interruption of any third party computer system.

**Telephone Fraud** means the act of a third party gaining access to and using the **Insured Organization's** telephone system in an unauthorized manner.

**Third Party Information** means any trade secret, data, design, interpretation, forecast, formula, method, practice, credit or debit card magnetic strip information, process, record, report or other item of information of a third party not insured under this Policy which is not available to the general public.

**Transfer Account** means an account maintained by the **Insured Organization** at a **Financial Institution** from which the **Insured Organization** can initiate the transfer, payment or delivery of **Money** or **Securities**.

**Unauthorized Access or Use** means the gaining of access to or use of **Computer Systems** by an unauthorized person(s) or the use of **Computer Systems** in an unauthorized manner.

**Unauthorized Disclosure** means the disclosure of (including disclosure resulting from phishing) or access to information in a manner that is not authorized by the **Insured Organization** and is without knowledge of, consent or acquiescence of any member of the **Control Group**.

**Waiting Period** means the period of time that begins upon the actual interruption of the **Insured Organization's** business operations caused by a **Security Breach**, **System Failure**, **Dependent Security Breach** or **Dependent System Failure**, and ends after the elapse of the number of hours listed as the **Waiting Period** in the Declarations.

## EXCLUSIONS

The coverage under this Policy will not apply to any **Loss** arising out of:

### Bodily Injury or Property Damage

1.  physical injury, sickness, disease or death of any person, including any mental anguish or emotional distress resulting from such physical injury, sickness, disease or death; or

2.  physical injury to or destruction of any tangible property, including the loss of use thereof; but electronic data will not be considered tangible property;

### Trade Practices and Antitrust

any actual or alleged false, deceptive or unfair trade practices, antitrust violation, restraint of trade, unfair competition (except as provided in the Media Liability insuring agreement), or false or deceptive or misleading advertising or violation of the Sherman Antitrust Act, the Clayton Act, or the Robinson-Patman Act; but this exclusion will not apply to:

1.  the Breach Response insuring agreement; or

2.  coverage for a **Data Breach** or **Security Breach**, provided no member of the **Control Group** participated or colluded in such **Data Breach** or **Security Breach**;

### Gathering or Distribution of Information

1.  the unlawful collection or retention of **Personally Identifiable Information** or other personal information by or on behalf of the **Insured Organization**; but this exclusion

will not apply to **Claims Expenses** incurred in defending the **Insured** against allegations of unlawful collection of **Personally Identifiable Information**; or

2.  the distribution of unsolicited email, text messages, direct mail, facsimiles or other communications, wire tapping, audio or video recording, or telemarketing, if such distribution, wire tapping, recording or telemarketing is done by or on behalf of the **Insured Organization**; but this exclusion will not apply to **Claims Expenses** incurred in defending the **Insured** against allegations of unlawful audio or video recording;

### Prior Known Acts & Prior Noticed Claims

1.  any act, error, omission, incident or event committed or occurring prior to the inception date of this Policy if any member of the **Control Group** on or before the **Continuity Date** knew or could have reasonably foreseen that such act, error or omission, incident or event might be expected to be the basis of a **Claim** or **Loss**;

2.  any **Claim**, **Loss**, incident or circumstance for which notice has been provided under any prior policy of which this Policy is a renewal or replacement;

### Racketeering, Benefit Plans, Employment Liability & Discrimination

1.  any actual or alleged violation of the Organized Crime Control Act of 1970 (commonly known as Racketeer Influenced and Corrupt Organizations Act or RICO), as amended;

2.  any actual or alleged acts, errors or omissions related to any of the **Insured Organization's** pension, healthcare, welfare, profit sharing, mutual or investment plans, funds or trusts;

3.  any employer-employee relations, policies, practices, acts or omissions, or any actual or alleged refusal to employ any person, or misconduct with respect to employees; or

4.  any actual or alleged discrimination;

but this exclusion will not apply to coverage under the Breach Response insuring agreement or parts 1., 2. or 3. of the Data & Network Liability insuring agreement that results from a **Data Breach**; provided no member of the **Control Group** participated or colluded in such **Data Breach**;

### Sale or Ownership of Securities & Violation of Securities Laws

1   the ownership, sale or purchase of, or the offer to sell or purchase stock or other securities; or

2   an actual or alleged violation of a securities law or regulation;

### Criminal, Intentional or Fraudulent Acts

any criminal, dishonest, fraudulent, or malicious act or omission, or intentional or knowing violation of the law, if committed by an **Insured**, or by others if the **Insured** colluded or participated in any such conduct or activity; but this exclusion will not apply to:

1.  **Claims Expenses** incurred in defending any **Claim** alleging the foregoing until there is a final non-appealable adjudication establishing such conduct; or

2.    with respect to a natural person **Insured**, if such **Insured** did not personally commit, participate in or know about any act, error, omission, incident or event giving rise to such **Claim** or **Loss**.

For purposes of this exclusion, only acts, errors, omissions or knowledge of a member of the **Control Group** will be imputed to the **Insured Organization**;

### Patent, Software Copyright, Misappropriation of Information

1.    infringement, misuse or abuse of patent or patent rights;

2.    infringement of copyright arising from or related to software code or software products other than infringement resulting from a theft or **Unauthorized Access or Use** of software code by a person who is not a past, present or future employee, director, officer, partner or independent contractor of the **Insured Organization**; or

3.    use or misappropriation of any ideas, trade secrets or **Third Party Information** (i) by, or on behalf of, the **Insured Organization**, or (ii) by any other person or entity if such use or misappropriation is done with the knowledge, consent or acquiescence of a member of the **Control Group**;

### Governmental Actions

a **Claim** brought by or on behalf of any state, federal, local or foreign governmental entity, in such entity's regulatory or official capacity; but this exclusion will not apply to the Regulatory Defense & Penalties insuring agreement;

### Other Insureds & Related Enterprises

a **Claim** made by or on behalf of:

1.    any **Insured**; but this exclusion will not apply to a **Claim** made by an individual that is not a member of the **Control Group** under the Data & Network Liability insuring agreement, or a **Claim** made by an **Additional Insured**; or

2.    any business enterprise in which any **Insured** has greater than 15% ownership interest or made by any parent company or other entity which owns more than 15% of the **Named Insured**;

### Trading Losses, Loss of Money & Discounts

1.    any trading losses, trading liabilities or change in value of accounts;

2.    any loss, transfer or theft of monies, securities or tangible property of the **Insured** or others in the care, custody or control of the **Insured Organization**;

3.    the monetary value of any transactions or electronic fund transfers by or on behalf of the **Insured** which is lost, diminished, or damaged during transfer from, into or between accounts; or

4.    the value of coupons, price discounts, prizes, awards, or any other valuable consideration given in excess of the total contracted or expected amount;

but this exclusion will not apply to coverage under the eCrime insuring agreement;

### Media-Related Exposures

with respect to the Media Liability insuring agreement:

1. any contractual liability or obligation; but this exclusion will not apply to a **Claim** for misappropriation of ideas under implied contract;

2. the actual or alleged obligation to make licensing fee or royalty payments;

3. any costs or expenses incurred or to be incurred by the **Insured** or others for the reprinting, reposting, recall, removal or disposal of any **Media Material** or any other information, content or media, including any media or products containing such **Media Material**, information, content or media;

4. any **Claim** brought by or on behalf of any intellectual property licensing bodies or organizations;

5. the actual or alleged inaccurate, inadequate or incomplete description of the price of goods, products or services, cost guarantees, cost representations, contract price estimates, or the failure of any goods or services to conform with any represented quality or performance;

6. any actual or alleged gambling, contest, lottery, promotional game or other game of chance; or

7. any **Claim** made by or on behalf of any independent contractor, joint venturer or venture partner arising out of or resulting from disputes over ownership of rights in **Media Material** or services provided by such independent contractor, joint venturer or venture partner;

### First Party Loss

with respect to the First Party Loss insuring agreements:

1. seizure, nationalization, confiscation, or destruction of property or data by order of any governmental or public authority;

2. costs or expenses incurred by the **Insured** to identify or remediate software program errors or vulnerabilities or update, replace, restore, assemble, reproduce, recollect or enhance data or **Computer Systems** to a level beyond that which existed prior to a **Security Breach**, **System Failure**, **Dependent Security Breach**, **Dependent System Failure** or **Extortion Threat**;

3. failure or malfunction of satellites or of power, utility, mechanical or telecommunications (including internet) infrastructure or services that are not under the **Insured Organization's** direct operational control; or

4. fire, flood, earthquake, volcanic eruption, explosion, lightning, wind, hail, tidal wave, landslide, act of God or other physical event.

## LIMIT OF LIABILITY AND COVERAGE

### Limits of Liability

The Policy Aggregate Limit of Liability listed in the Declarations (the "**Policy Aggregate Limit of Liability**") is the Underwriters' combined total limit of liability for all **Loss**, other than **Breach Response Services**, payable under this Policy.

The limit of liability payable under each insuring agreement will be an amount equal to the **Policy Aggregate Limit of Liability** unless another amount is listed in the Declarations. Such amount is the aggregate amount payable under this Policy pursuant to such insuring agreement and is part of, and not in addition to, the **Policy Aggregate Limit of Liability**.

All **Dependent Business Loss** payable under this Policy is part of and not in addition to the **Business Interruption Loss** limit listed in the Declarations.

The Underwriters will not be obligated to pay any **Damages**, **Penalties**, **PCI Fines, Expenses and Costs** or **Claims Expenses,** or to defend any **Claim**, after the **Policy Aggregate Limit of Liability** has been exhausted, or after deposit of the **Policy Aggregate Limit of Liability** in a court of competent jurisdiction.

### Breach Response Limits

Coverage for **Breach Response Services** under this Policy is in addition to the **Policy Aggregate Limit of Liability**.

The Notified Individuals limit listed in the Declarations is the maximum total number of individuals to whom notification, call center and credit or identity monitoring services will be provided (or attempted) for all incidents or series of related incidents giving rise to an obligation to provide **Breach Response Services**.

The Legal, Forensic  & Public Relations/Crisis Management limit listed in the Declarations is the aggregate limit of coverage for all services and costs covered under parts 1., 2., 3. and 7. of the definition of **Breach Response Services**.

Except as provided in the Additional Breach Response Limits clause below, the Underwriters will not be obligated to provide any **Breach Response Services** after the number of individuals to whom services are provided under part 4. of the definition of **Breach Response Services** reaches the Notified Individuals limit listed in the Declarations.  If the total number of individuals to be notified under the Policy exceeds the Notified Individuals limit listed in the Declarations, the **Insured** will be responsible for notifying and providing call center services and credit or identity monitoring services to such additional individuals in accordance with the processes described in the Information Packet.

### Additional Breach Response Limits

Notwithstanding the foregoing, if:

1.    the total number of individuals to whom services described in parts 4., 5. and 6. of the definition of **Breach Response Services** are provided exceeds the amount listed in Notified Individuals limit listed in the Declarations; or

2.    the dollar amount of the services described in parts 1., 2., 3. and 7. of the definition of **Breach Response Services** provided to the **Insured Organization** exceeds the Legal, Forensic & Public Relations/Crisis Management limit listed in the Declarations;

this Policy will cover the costs, fees and expenses incurred to provide such **Breach Response Services** up to an amount equal to the **Policy Aggregate Limit of Liability** (the "**Additional Breach Response Limit**").

The **Additional Breach Response Limit** is part of, and not in addition to, the **Policy Aggregate Limit of Liability** and will be reduced and may be exhausted by payments under either limit.  Upon exhaustion of **the Additional Breach Response Limit**, there will be no further coverage under this Policy for any costs, fees or expenses covered thereunder.

## RETENTIONS

The Retention listed in the Declarations applies separately to each incident, event or related incidents or events giving rise to a **Claim** or **Loss**.  The Retention will be satisfied by monetary payments by the **Named Insured** of covered **Loss** under each insuring agreement.  If any **Loss** arising out of an incident or **Claim** is subject to more than one Retention, the Retention for each applicable insuring agreement will apply to such **Loss**, provided that the sum of such Retention amounts will not exceed the largest applicable Retention amount.

The Retention for **Breach Response Services** listed in the Declarations applies separately to each incident, event or related incidents or events, giving rise to legal, forensic and public relations/crisis management services and costs covered under parts 1., 2., 3. and 7. of the definition of **Breach Response Services**.  The Retention will be satisfied by monetary payments by the **Named Insured** for such services and costs.

Coverage for **Business Interruption Loss** and **Dependent Business Loss** will apply after the **Waiting Period** has elapsed and the Underwriters will then indemnify the **Named Insured** for all **Business Interruption Loss** and **Dependent Business Loss** sustained during the **Period of Restoration** in excess of the Retention.

Satisfaction of the applicable Retention is a condition precedent to the payment of any **Loss** under this Policy, and the Underwriters will be liable only for the amounts in excess of such Retention.

## OPTIONAL EXTENSION PERIOD

Upon non-renewal or cancellation of this Policy for any reason except the non-payment of premium, the **Named Insured** will have the right to purchase, for additional premium in the amount of the Optional Extension Premium percentage listed in the Declarations of the full Policy Premium listed in the Declarations, an Optional Extension Period for the period of time listed in the Declarations. Coverage provided by such Optional Extension Period will only apply to **Claims** first made against any **Insured** during the Optional Extension Period and reported to the Underwriters during the Optional Extension Period, and arising out of any act, error or omission committed before the end of the **Policy Period**. In order for the **Named Insured** to invoke the Optional Extension Period option, the payment of the additional premium for the Optional Extension Period must be paid to the Underwriters within 60 days of the termination of this Policy.

The purchase of the Optional Extension Period will in no way increase the **Policy Aggregate Limit of Liability** or any sublimit of liability. At the commencement of the Optional Extension Period the entire premium will be deemed earned, and in the event the **Named Insured** terminates the Optional Extension Period for any reason prior to its natural expiration, the Underwriters will not be liable to return any premium paid for the Optional Extension Period.

All notices and premium payments with respect to the Optional Extension Period option will be directed to the Underwriters through entity listed for Administrative Notice in the Declarations.

## GENERAL CONDITIONS

### Notice of Claim or Loss

The **Insured** must notify the Underwriters of any **Claim** as soon as practicable, but in no event later than: (i) 60 days after the end of the **Policy Period**; or (ii) the end of the Optional Extension Period (if applicable).  Notice must be provided through the contacts listed for Notice of Claim, Loss or Circumstance in the Declarations.

With respect to **Breach Response Services**, the **Insured** must notify the Underwriters of any actual or reasonably suspected **Data Breach** or **Security Breach** as soon as practicable after discovery by the **Insured**, but in no event later than 60 days after the end of the **Policy Period**.  Notice must be provided to the **Breach Response Services Team** listed in the Declarations.  Notice of an actual or reasonably suspected **Data Breach** or **Security Breach** in conformance with this paragraph will also constitute notice of a circumstance that could reasonably be the basis for a **Claim**.

With respect to **Cyber Extortion Loss**, the **Named Insured** must notify the Underwriters via the email address listed in the Notice of Claim, Loss or Circumstance in the Declarations as soon as practicable after discovery of an **Extortion Threat** but no later than 60 days after the end of the **Policy Period**.  The **Named Insured** must obtain the Underwriters' consent prior to incurring **Cyber Extortion Loss**.

With respect to **Data Recovery Costs**, **Business Interruption Loss** and **Dependent Business Loss** the **Named Insured** must notify the Underwriters through the contacts for Notice of Claim, Loss or Circumstance in the Declarations as soon as practicable after discovery of the circumstance, incident or event giving rise to such loss.  The **Named Insured** will provide the Underwriters a proof of **Data Recovery Costs**, **Business Interruption Loss** and **Dependent Business Loss**, and this Policy will cover the reasonable and necessary costs, not to exceed USD 50,000, that the **Named Insured** incurs to contract with a third party to prepare such proof. All loss described in this paragraph must be reported, and all proofs of loss must be provided, to the Underwriters no later than 6 months after the end of the **Policy Period**.

The **Named Insured** must notify the Underwriters of any loss covered under the eCrime insuring agreement as soon as practicable, but in no event later than 60 days after the end of the **Policy Period**. Notice must be provided through the contacts listed for **Notice of Claim, Loss or Circumstance** in the Declarations.

Any **Claim** arising out of a **Loss** that is covered under the Breach Response, First Party Loss or eCrime insuring agreements and that is reported to the Underwriters in conformance with the foregoing will be considered to have been made during the **Policy Period**.

### Notice of Circumstance

With respect to any circumstance that could reasonably be the basis for a **Claim** (other than a **Data Breach** or **Security Breach** noticed under the Breach Response insuring agreement) the **Insured** may give written notice of such circumstance to the Underwriters through the contacts listed for Notice of Claim, Loss or Circumstance in the Declarations as soon as practicable during the **Policy Period**. Such notice must include:

1.  the specific details of the act, error, omission or event that could reasonably be the basis for a **Claim**;

2.  the injury or damage which may result or has resulted from the circumstance; and

3.  the facts by which the **Insured** first became aware of the act, error, omission or event.

Any subsequent **Claim** made against the **Insured** arising out of any circumstance reported to Underwriters in conformance with the foregoing will be considered to have been made at the time written notice complying with the above requirements was first given to the Underwriters during the **Policy Period**.

## Defense of Claims

Except with respect to coverage under the Payment Card Liabilities & Costs insuring agreement, the Underwriters have the right and duty to defend any covered **Claim** or **Regulatory Proceeding**. Defense counsel will be mutually agreed by the **Named Insured** and the Underwriters but, in the absence of such agreement, the Underwriters' decision will be final.

With respect to the Payment Card Liabilities & Costs insuring agreement, coverage will be provided on an indemnity basis and legal counsel will be mutually agreed by the **Named Insured** and the Underwriters and will be selected from one of the firms listed in the Information Packet.

The Underwriters will pay actual loss of salary and reasonable expenses resulting from the attendance by a corporate officer of the **Insured Organization** at any mediation meetings, arbitration proceedings, hearings, depositions, or trials relating to the defense of any **Claim**, subject to a maximum of $2,000 per day and $100,000 in the aggregate, which amounts will be part of and not in addition to the **Policy Aggregate Limit of Liability**.

## Settlement of Claims

If the **Insured** refuses to consent to any settlement recommended by the Underwriters and acceptable to the claimant, the Underwriters' liability for such **Claim** will not exceed:

1.  the amount for which the **Claim** could have been settled, less the remaining Retention, plus the **Claims Expenses** incurred up to the time of such refusal; plus

2.  sixty percent (60%) of any **Claims Expenses** incurred after the date such settlement or compromise was recommended to the **Insured** plus sixty percent (60%) of any **Damages, Penalties and PCI Fines, Expenses and Costs above the** amount for which the **Claim** could have been settled;

and the Underwriters will have the right to withdraw from the further defense of such **Claim**.

The **Insured** may settle any **Claim** where the **Damages**, **Penalties**, **PCI Fines**, **Expenses and Costs** and **Claims Expenses** do not exceed the Retention, provided that the entire **Claim** is resolved and the **Insured** obtains a full release on behalf of all **Insureds** from all claimants.

## Assistance and Cooperation

The Underwriters will have the right to make any investigation they deem necessary, and the **Insured** will cooperate with the Underwriters in all investigations, including investigations regarding coverage under this Policy and the information and materials provided to the underwriters in connection with the underwriting and issuance of this Policy. The **Insured** will

execute or cause to be executed all papers and render all assistance as is requested by the Underwriters. The **Insured** agrees not to take any action which in any way increases the Underwriters' exposure under this Policy.  Expenses incurred by the **Insured** in assisting and cooperating with the Underwriters do not constitute **Claims Expenses** under the Policy.

The **Insured** will not admit liability, make any payment, assume any obligations, incur any expense, enter into any settlement, stipulate to any judgment or award or dispose of any **Claim** without the written consent of the Underwriters, except as specifically provided in the Settlement of Claims clause above.  Compliance with a **Breach Notice Law** will not be considered an admission of liability.

## Subrogation

If any payment is made under this Policy and there is available to the Underwriters any of the **Insured's** rights of recovery against any other party, then the Underwriters will maintain all such rights of recovery. The **Insured** will do whatever is reasonably necessary to secure such rights and will not do anything after an incident or event giving rise to a **Claim** or **Loss** to prejudice such rights. If the **Insured** has waived its right to subrogate against a third party through written agreement made before an incident or event giving rise to a **Claim** or **Loss** has occurred, then the Underwriters waive their rights to subrogation against such third party. Any recoveries will be applied first to subrogation expenses, second to **Loss** paid by the Underwriters, and lastly to the Retention. Any additional amounts recovered will be paid to the **Named Insured**.

## Other Insurance

The insurance under this Policy will apply in excess of any other valid and collectible insurance available to any **Insured** unless such other insurance is written only as specific excess insurance over this Policy.

## Action Against the Underwriters

No action will lie against the Underwriters or the Underwriters' representatives unless and until, as a condition precedent thereto, the **Insured** has fully complied with all provisions, terms and conditions of this Policy and the amount of the **Insured's** obligation to pay has been finally determined either by judgment or award against the **Insured** after trial, regulatory proceeding, arbitration or by written agreement of the **Insured**, the claimant, and the Underwriters.

No person or organization will have the right under this Policy to join the Underwriters as a party to an action or other proceeding against the **Insured** to determine the **Insured's** liability, nor will the Underwriters be impleaded by the **Insured** or the **Insured's** legal representative.

The **Insured's** bankruptcy or insolvency of the **Insured's** estate will not relieve the Underwriters of their obligations hereunder.

## Change of Law, Unavailability of Breach Response Services

If there is a change of law, regulation or enforcement that prevents the Underwriters or its providers from providing all or part of the **Breach Response Services**, or if a provider is unable to or does not provide **Breach Response Services**, the Underwriters will make reasonable efforts to procure similar services from other sources.  In such event, the maximum the Underwriters will pay for the costs of procuring and providing all **Breach Response Services**, including substitute products and services, will be no more than USD 10,000,000 in the aggregate for the **Policy Period**, which amount will be in addition to the **Policy Aggregate**

**Limit of Liability**.  If it is not reasonably possible for the Underwriters to procure substitute products or services, the Underwriters will not be obligated to provide such services.

### Entire Agreement

By acceptance of the Policy, all **Insureds** agree that this Policy embodies all agreements between the Underwriters and the **Insured** relating to this Policy. Notice to any agent, or knowledge possessed by any agent or by any other person, will not effect a waiver or a change in any part of this Policy or stop the Underwriters from asserting any right under the terms of this Policy; nor will the terms of this Policy be waived or changed, except by endorsement issued to form a part of this Policy signed by the Underwriters.

### Mergers or Consolidations

If during the **Policy Period** the **Named Insured** consolidates or merges with or is acquired by another entity, or sells more than 50% of its assets to another entity, then this Policy will continue to remain in effect through the end of the **Policy Period**, but only with respect to events, acts or incidents that occur prior to such consolidation, merger or acquisition. There will be no coverage provided by this Policy for any other **Claim** or **Loss** unless the **Named Insured** provides written notice to the Underwriters prior to such consolidation, merger or acquisition, the **Named Insured** has agreed to any additional premium and terms of coverage required by the Underwriters and the Underwriters have issued an endorsement extending coverage under this Policy.

### Assignment

The interest hereunder of any **Insured** is not assignable. If the **Insured** dies or is adjudged incompetent, such insurance will cover the **Insured's** legal representative as if such representative were the **Insured**, in accordance with the terms and conditions of this Policy.

### Cancellation

This Policy may be canceled by the **Named Insured** by giving written notice to the Underwriters through the entity listed for Administrative Notice in the Declarations stating when the cancellation will be effective.

This Policy may be canceled by the Underwriters by mailing to the **Named Insured** at the address listed in the Declarations written notice stating when such cancellation will be effective.  Such date of cancellation will not be less than 60 days (or 10 days for cancellation due to non-payment of premium) after the date of notice.

If this Policy is canceled in accordance with the paragraphs above, the earned premium will be computed pro rata; but the premium will be deemed fully earned if any **Claim**, or any circumstance that could reasonably be the basis for a **Claim** or **Loss**, is reported to the Underwriters on or before the date of cancellation.  Payment or tender of unearned premium is not a condition of cancellation.

### Singular Form of a Word

Whenever the singular form of a word is used herein, the same will include the plural when required by context.

### Headings

The titles of paragraphs, clauses, provisions or endorsements of or to this Policy are intended solely for convenience and reference, and are not deemed in any way to limit or expand the provisions to which they relate and are not part of the Policy.

### Representation by the Insured

All **Insureds** agree that the statements contained the information and materials provided to the Underwriters in connection with the underwriting and issuance of this Policy are true, accurate and are not misleading, and that the Underwriters issued this Policy, and assume the risks hereunder, in reliance upon the truth thereof.

### Named Insured as Agent

The **Named Insured** will be considered the agent of all **Insureds**, and will act on behalf of all **Insureds** with respect to the giving of or receipt of all notices pertaining to this Policy, and the acceptance of any endorsements to this Policy.  The **Named Insured** is responsible for the payment of all premiums and Retentions and for receiving any return premiums.

# BBR

## Information Pack



Your Services

# Beazley Breach Response

## Information Packet for privacy breach response and risk management services

Thank you for purchasing a Beazley Breach Response (BBR) insurance policy.

BBR is the industry leading solution for data privacy and security risk management, and provides a range of services designed to help your organization respond to an actual or suspected data breach incident effectively, efficiently, and in compliance with the law.

This Information Packet details the features of your BBR policy and sets out the process for responding to an actual or suspected data breach, including how to obtain the maximum benefit of Beazley's Breach Response Services team. We encourage you to circulate this Information Packet to the members of your data breach incident response team, and incorporate the resources available under the policy as a component of your incident response plan.

Your BBR policy includes an array of benefits and services including:

• Complimentary loss control and risk management information including online resources and value-added educational webinars (beazleybreachsolutions.com).

• A computer forensics "Information Security Incident  Response" guide to empower your organization's IT staff with knowledge of crucial forensic procedures that can make or break the investigation of a suspected breach.

• Assistance at every stage of the investigation of, and response to, a data breach incident from Beazley's  in-house BBR Services team of data privacy attorneys and technical experts.

A single call or email to BBR Services, notifying the team of a suspected data breach will begin activation of the following services:

**Initial breach investigation and consulting**

• Legal services

• Computer forensic services

**Response to breach events**

• Notification services including foreign notification where applicable

• Call center services

• Breach resolution and mitigation services

• Public relations and crisis management expenses



To notify us of a breach, send an email to bbr.claims@beazley.com

# Risk management tools and resources

As a BBR policy holder, your organization is entitled to enroll in **beazleybreachsolutions.com**, a risk management portal that provides educational and loss control information relating to compliance with applicable laws, safeguarding information, preparing to respond to breach incidents and best practices.

If you enroll in **beazleybreachsolutions.com**, you will have the opportunity to attend webinars on current topics related to information security and breach preparedness, and be able to receive other risk management tools and information that we periodically make available to our policy holders.

The website includes a wide variety of training resources to help educate employees about privacy and data security risks. You will find overviews, security awareness posters, employee tip sheets, recorded training webinars, and PowerPoint slide decks you can download and adapt.

You will also have access to our online training site, elearning.beazleybreachsolutions.com. On this training site, you can upload employee lists, create training assignments for your employees, and track individual completion of training.

## Information Security Incident Response Guide

Beazley, in partnership with Navigant, a leader in complex data management and forensics analysis, developed a joint Information Security Incident Response Guide aimed at providing a roadmap for companies to prepare for and manage the aftermath of a data security breach. The guide, provided to BBR policyholders, addresses the increasing need for effective risk management on the part of companies hoping to limit the damage caused by a data breach.

The Information Security Incident Response Guide addresses information security incidents such as malware intrusions, social engineering attacks, unauthorized network access, lost or stolen devices, and other kinds of data security incidents and breaches. The guide also provides in-depth case studies and best practices for preparation, risk assessment, and incident documentation, highlighting the varied components of an effective response.



# Activation of breach response services

## Beazley Breach Response Services Team

Beazley is committed to providing industry leading data breach response services for our clients. This is why we created the BBR Services team; a dedicated business unit within Beazley, focused exclusively on helping insureds successfully prepare for and respond to breaches . The BBR Services team works in collaboration with you to triage and assess the severity of a data breach incident, while coordinating the range of resources and services you may need to meet legal requirements and maintain customer confidence. BBR Services is your frontline partner in data breach investigation and response, and available to your organization regardless of the size, severity, or cost of a data breach.

## When to notify us?

You should notify Beazley as soon as you suspect that personally identifiable or confidential data for which you are responsible might have been compromised. The sooner you notify us about a potential data breach, the more our BBR Services team can do to help.

It is also important that you contact us first before retaining any service providers as the BBR Services team will take you through the process and work with you to secure services from providers that best match your needs.

## How to notify us?

Send an email to **bbr.claims@beazley.com** with the following in your notification email:

- the name of your organization and insurance policy number if possible;
- a short description of the incident;
- the date the incident occurred (if known);
- the date your organization discovered the incident; and
- contact information for the point person handling the investigation.

**Do not:**

- email Beazley staff directly to provide the initial notice; or
- include any personally identifiable information or protected health information.

Email is strongly recommended as the best method of notification; you may alternatively provide notice of an incident by calling Beazley's 24-hour hotline, (866) 567-8570, and provide the information described above.

## What happens after notifying us?

A BBR Services team member will respond to the notice generally on the same or next business day and will schedule a phone call to discuss the incident, assist you with any needed breach investigation and response services available under your BBR policy. We recommend that those within your organization who are involved in investigating the incident participate on this phone call.

The BBR Services team will continue to collaborate with you throughout the investigation and response process, to provide guidance and to arrange breach investigation and response services provided by Beazley's network of expert service providers.

## Cyber extortion and ransomware response services?

With thousands of ransomware attacks occurring on a daily basis, ransomware is a threat facing all organizations across all industries. Beazley's dedicated in-house team, Beazley Breach Response (BBR) Services, provides timely ransomware assistance to BBR policyholders based on our repeated and extensive experience handling ransomware incidents.

If your organization is experiencing a ransomware attack, BBR Services assists by:

- Promptly consulting with your team to determine an appropriate response;
- Recommending and facilitating a fast connection with computer forensic services to determine if personally identifiable information or protected health information was compromised; and/or
- Facilitating introductions to service providers who can help you with data decryption, data restoration, or securing bitcoin if your organization decides to pay the ransom.

BBR Services has developed a ransomware tip sheet for BBR policyholders that explains the ransomware threat and the immediate steps companies facing this threat should take. This tip sheet can help your organization minimize the impact of a ransomware attack and speed up the recovery time following an attack.

You can download the tip sheet from our policyholder risk management website, beazleybreachsolutions.com, or you can email bbrservices@beazley.com to request a copy.

# Legal services

If an incident occurs that might require notification under relevant breach notice laws or regulations, specific Legal Services to assist you in investigating and responding to the incident are included.

BBR Services will arrange Legal Services for you and will connect you to these experts; please do not contact Beazley's partnering law firms directly without the involvement of BBR Services.



**United States**
Baker Hostetler LLP
Theodore J. Kobus III, Lynn Sessions, Craig A. Hoffman,
Randal L. Gainer, Eric A. Packel and Scott Koller
*www.bakerlaw.com*

Buchanan Ingersoll & Rooney PC
Matt Meade and Pamela Hepp
*www.bipc.com*

McDonald Hopkins LLC
James J. Giszczak and Dominic Paluzzi
*www.mcdonaldhopkins.com*

Mullen Coughlin
John F. Mullen
*www.mullen.legal*

Cooley LLP
David Navetta
*www.cooley.com*

Polsinelli LLP
Bruce Radke
*www.polsinelli.com*

**Canada**
Dentons Canada LLP
Chantal Bernier and Timothy Banks
*www.dentons.com/canada*

Fasken Martineau DuMoulin LLP
Alex Cameron
*www.fasken.com*

nNovation LLP
Kris Klein
*www.nNovation.com*

**Mexico**
Davara Abogados
Isabel Davara
*www.davara.com.mx*

Lex Informática
Joel A. Gómez Treviño
*www.lexinformatica.com*

Platero, Galicia & Lemus Abogados
Luis Mario Lemus Rivero
*www.pglabogados.com*

R1OS Abogados
Agustín Ríos
*www.riosabogados.com*

# Computer expert services

In the event that external forensics assistance is needed to assess the impact of a data incident on your computer system, Computer Expert Services will be provided to (1) help to determine whether, and the extent to which, notification must be provided to comply with Breach Notice Laws, and (2) if applicable, give advice and oversight in connection with the investigation conducted by a PCI Forensic Investigator.

The computer security expert that provides Computer Expert Services will require access to information, files and systems and it is important for you to comply with the expert's requests and cooperate with the investigation. Reports or findings of the expert will be made available to you, us, the BBR Services team and any attorney that you retain to provide advice with regard to the incident.

**BBR Services will arrange Computer Expert Services for you and will connect you to these experts; please do not contact Beazley's partnering forensics firms directly without the involvement of BBR Services.**



**United States and Canada**

Crypsis
*www.crypsisgroup.com*

Kroll Ontrack
*www.krollontrack.com*

LMG Security
*www.lmgsecurity.com*

Mandiant®
*www.mandiant.com*

Navigant Consulting, Inc.
*www.navigant.com*

RSM
*www.rsmus.com*

SecureWorks
*www.secureworks.com*

Sylint
*www.sylint.com*

Verizon Investigative Response Unit
*www.verizonenterprise.com/products/security/ risk-team/investigative-response.xml*

**Canada**

CGI
*www.cgi.com*

Mandiant®
*www.mandiant.com*

Verizon Investigative Response Unit
*www.verizonenterprise.com/products/security/ risk-team/investigative-response.xml*

**Mexico**

Duriva
*www.duriva.com*

KPMG
*www.kpmg.com.mx*

MaTTica
*www.mattica.com*

Scitum
*www.scitum.com.mx*

# Notification services and call center services

BBR Services will assist you with the notification process, including arranging for notification and/or call center service. BBR Services will walk you through notification details such as how to work with privacy counsel to develop notification letters and how to timely provide notification letters, relevant addresses and other required deliverables to the notification vendor.

Notification letters will be black and white and two-sided; returned mail will be provided to you at your request. Mailing may be staggered to accommodate the number of notifications and anticipated call center volume. For notifications by U.S. mail, the notification vendor will update and mail notifications according to the U.S. Postal Service data base of address changes. Notification services do not include further tracing of individuals whose notifications are returned.

BBR Services will also walk you through developing a set of frequently asked questions (FAQs) for use by the call center and how to anticipate and prepare for call escalations.

**United States**

Dasher
*www.dasherinc.com*

Epiq Corporate Services, Inc.
*www.epiqsystems.com*

Garden City Group, LLC
*www.gardencitygroup.com*

Intelligent Business Concepts, Inc.
*www.intellbc.com*

NPC, Inc.
*www.npcweb.com*

**Canada**

Epiq Corporate Services, Inc.
*www.epiqcorporateservices.com*

Miratel Solutions Inc.
*www.miratelinc.com*

**Mexico**

Business Advantage
*www.business-advantage.com.mx*

Konecta
*www.grupokonecta.com*

Epiq Corporate Services, Inc.
*www.epiqsystems.com*



# Breach resolution and mitigation services

Beazley Breach Response includes a number of products that provide Resolution and Mitigation Services, including one and three bureau monitoring and identity monitoring solutions. All the solutions include Identity Restoration services.* Based on our experience, three bureau credit monitoring is generally appropriate for breaches involving data such as names combined with social security numbers. For breaches involving less sensitive data, one bureau credit monitoring or identity monitoring solutions may be appropriate. The BBR Services team has handled over 6,000 data breaches and will advise you on which products or solutions may be applicable for a particular breach event.

A product or solution may be offered where reasonably practicable and only to the extent available in a particular jurisdiction. Notified Individuals will have up to ninety (90) days from mailing of the notification to subscribe to an offered product or solution and they must qualify for enrollment, complete the enrollment process and agree to the applicable terms and conditions set by the provider. Enrollees of an offered product or solution will have access to the services provided under such product or solution for 12 months from the date of their enrollment.

* Subscribers will automatically receive access to Identity Restoration services from the date of the notification letter through the full duration of the product term, even if consumers don't enroll in the product. If they do enroll in an IdentityWorks product, identity restoration is extended through the full duration of the product term as well. Product enrollments must occur prior to the Enrollment End Date indicated on the orderform.

## Credit monitoring products

- Experian IdentityWorks℠

  - Credit: Ensures they have access to credit monitoring (1 or 3 Bureaus), Identity Restoration services and identity theft insurance to help them regain their security.

  - Minor Plus: Monthly monitoring of Experian information for every enrolled child, internet surveillance, Identity Restoration services and identity theft insurance.

- Equifax Complete™ Advantage Plan
  (for Canadian residents only)

- Equifax Credit File ID Alert™
  (for Canadian residents only)

## Identity monitoring products

- Experian's Identity and Identity Minor: A solution for when credit monitoring isn't needed. This cost effective product scours chat rooms, blogs, websites and other data sources to identify and alert members of the illegal trading and selling of personal identities. Includes Identity Restoration and identity theft insurance.



## Additional information on products and offerings

Descriptions of each of the credit or identity monitoring products and solutions are attached. Such descriptions are provided by ConsumerInfo.com, Inc. and Equifax Canada Co. and are for informational purposes only and are not part of the Policy. The actual services available with each product or solution are governed by the terms and conditions of the applicable agreements that you must enter into prior to the product or solution being offered to Notified Individuals. Further information about the ConsumerInfo.com and Equifax Canada products can be obtained at the telephone numbers indicated in the applicable description. You may also contact us through your insurance broker to receive additional information about the Services.

## Your responsibilities

To ensure that the Services described above are provided promptly and properly, you must follow the requirements and procedures set forth in the Policy and in this Information Packet. We require your assistance and cooperation with us and with any third party vendors providing Services. Please respond to BBR Services or outside vendor requests and inquiries in a timely manner and enter into necessary contracts required by our vendors for the provision of services. You will be responsible for paying any costs resulting from your failure to timely provide responses, accurate information or approvals necessary for the provision of the Services. There is no coverage under the Policy for any of your internal salary or overhead expenses or for your assistance and cooperation in responding to a breach incident. In the event of a breach incident or suspected incident, do not contact any service providers directly. Instead, you must first provide notice to us at **bbr.claims@beazley.com** or at **(866) 567-8570**, as further described on page 3 of this Information Packet and also in Item 9.(b) of the Declarations.

Contacting any of the service providers listed in this Information Packet shall not constitute notice under the terms of the Policy.

As used in this Information Packet, the terms "we" or "us" or have the same meaning as the term "Underwriters" in the Policy and "you" has the same meaning as the "Insured Organization" in the Policy. Capitalized terms not defined in this Information Packet have the same meaning as set forth in the Policy.

## Appendices

Experian IdentityWorks ℠

Equifax Complete™ Advantage Plan

Equifax Credit File ID Alert™



## Beazley Group

Plantation Place South
60 Great Tower Street
London EC3R 5AD
United Kingdom

T +44 (0)20 7667 0623
F +44 (0)20 7674 7100

.......................................................

30 Batterson Park Road
Farmington
Connecticut, 06032
USA

T +1 (860) 677 3700
F +1 (860) 679 0247

.......................................................

Two Liberty Place
50 S. 16th Street, Suite 2700
Philadelphia
Pennsylvania, 19102
USA

T +1 (215) 446 8410
F +1 (215) 446 8469

.......................................................

## Beazley Insurance Services

101 California Street
Suite 1850
San Francisco
California, 94111
USA
CA Lic. #0G55497

T +1 (415) 263 4040
F +1 (415) 263 4099

## beazley

beazley.com/bbr

The descriptions contained in this communication are for preliminary informational purposes only. The product is available on an admitted basis in some but not all US jurisdictions through Beazley Insurance Company, Inc., and is available on a surplus lines basis through licensed surplus lines brokers underwritten by Beazley syndicates at Lloyd's. The exact coverage afforded by the product described herein is subject to and governed by the terms and conditions of each policy issued. The publication and delivery of the information contained herein is not intended as a solicitation for the purchase of insurance on any US risk. Beazley USA Services, Inc. is licensed and regulated by insurance regulatory authorities in the respective states of the US and transacts business in the State of California as Beazley Insurance Services (License#: 0G55497). CBSL329_US_05/17



**Experian's Credit solution ensures they have access to progressive credit monitoring, identity restoration and identity theft insurance to help them regain their security.**

It notifies your customers when their personal information has been compromised and helps them resolve identity theft and other types of criminal activity sooner rather than later.

Experian has managed thousands of data breach incidents in the finance, education, commerce, medical and government sectors. We can manage yours.

| Features | Credit |
|---|---|
| Daily Credit Monitoring | 1 or 3 Bureaus |
| Credit Report Upon Enrollment | ✔ |
| Daily Credit Reports (Online) | ✔ |
| Identity Restoration | ✔ |
| Product Delivery Method | Online (email) Off line (U.S. Mail) |
| Enrollment (Phone and Online) | ✔ |
| ExtendCARE™ | ✔ |
| Blanket Identity Restoration (Available Upon Notification) | ✔ |
| $1 Million Identity Theft Insurance* | ✔ |

### Experian Highlights:

## 100%

Success Rate Resolving Fraud Cases

## 100%

Score Received in Client Satisfaction Review

## 3,000+

Data Breaches Serviced Annually

* Identity theft insurance is underwritten by insurance company subsidiaries or affiliates of American International Group, Inc. (AIG). The description herein is a summary and intended for informational purposes only and does not include all terms, conditions and exclusions of the policies described. Please refer to the actual policies for terms, conditions, and exclusions of coverage. Coverage may not be available in all jurisdictions.

©2017 Experian Information Solutions, Inc. All rights reserved. Experian and the marks used herein are service marks or registered trademarks of Experian Information Solutions, Inc. Other product and company names mentioned herein may be the trademarks of their respective owners.

Experian Data Breach Resolution

Visit: experian.com/databreach
Call: 1 (866) 751-1323
Email: databreachinfo@experian.com



## Experian's **Minor Plus** provides comprehensive coverage when it comes to protecting a child's identity.

Minor Plus provides monthly monitoring of Experian® information for every enrolled child, internet surveillance, identity restoration services and identity theft insurance from material damages that may occur against a child whose credit file is misused. It's an important benefit for your customers and an important opportunity for you.

Experian has managed thousands of data breach incidents in the finance, education, commerce, medical and government sectors. We can manage yours.

| Features | Minor Plus |
|---|---|
| Minor Internet Surveillance | ✔ |
| Minor SSN Monitoring | 1 Bureau |
| Identity Restoration | ✔ |
| Product Delivery Method | Online (email) Off line (U.S. Mail) |
| Enrollment (Phone and Online) | ✔ |
| ExtendCARE™ | ✔ |
| Blanket Identity Restoration (Available Upon Notification) | ✔ |
| $1 Million Identity Theft Insurance* | ✔ |

**Experian Highlights:**

# 100%
### Success Rate Resolving Fraud Cases

# 100%
### Score Received in Client Satisfaction Review

# 3,000+
### Data Breaches Serviced Annually

* Identity theft insurance is underwritten by insurance company subsidiaries or affiliates of American International Group, Inc. (AIG). The description herein is a summary and intended for informational purposes only and does not include all terms, conditions and exclusions of the policies described. Please refer to the actual policies for terms, conditions, and exclusions of coverage. Coverage may not be available in all jurisdictions.

©2017 Experian Information Solutions, Inc. All rights reserved. Experian and the marks used herein are service marks or registered trademarks of Experian Information Solutions, Inc. Other product and company names mentioned herein may be the trademarks of their respective owners.

**Experian Data Breach Resolution**

Visit: experian.com/databreach
Call: 1 (866) 751-1323
Email: databreachinfo@experian.com



## Experian's **Identity** and **Identity Minor** is the most cost-effective breach response solution available

Identity and Identity Minor scours chat rooms, blogs, websites and other data sources to identify the illegal trading and selling of personal identities. Detect compromised personal information sooner, no matter where it occurs. Your members can also have peace of mind knowing our identity restoration agents and identity theft insurance are available to them if something were to happen.

Experian has managed thousands of data breach incidents in the finance, education, commerce, medical and government sectors. We can manage yours.

| Features | Identity | Identity Minor |
|---|---|---|
| Internet Surveillance | ✔ | - |
| Minor Internet Surveillance | - | ✔ |
| Identity Restoration | ✔ | ✔ |
| Product Delivery Method | Online | Online |
| Enrollment | Online | Online |
| ExtendCARE™ | ✔ | ✔ |
| Blanket Identity Restoration (Available Upon Notification) | ✔ | ✔ |
| $1 Million Identity Theft Insurance* | ✔ | ✔ |

**Experian Highlights:**

## 100%
Success Rate Resolving Fraud Cases

## 100%
Score Received in Client Satisfaction Review

## 3,000+
Data Breaches Serviced Annually

* Identity theft insurance is underwritten by insurance company subsidiaries or affiliates of American International Group, Inc. (AIG). The description herein is a summary and intended for informational purposes only and does not include all terms, conditions and exclusions of the policies described. Please refer to the actual policies for terms, conditions, and exclusions of coverage. Coverage may not be available in all jurisdictions.

©2017 Experian Information Solutions, Inc. All rights reserved. Experian and the marks used herein are service marks or registered trademarks of Experian Information Solutions, Inc. Other product and company names mentioned herein may be the trademarks of their respective owners.

Experian Data Breach Resolution

Visit: experian.com/databreach
Call: 1 (866) 751-1323
Email: databreachinfo@experian.com



**CONSUMER INFORMATION SOLUTIONS**

# Corporate Data Breach Solutions

## What is Credit Monitoring?

*Equifax Complete*™

***Advantage Plan***

*key features*

> **Online access** to view your
>   Equifax credit report 24/7

> **Credit monitoring** with
>   e-mail notification of key
>   changes to your credit file

> **Updates** of your Equifax
>   credit report and score once
>   every three months

> **Dedicated** customer service

Equifax Canada Co. is Canada's largest credit reporting agency. A credit reporting agency is an independent organization that receives information from credit grantors and other (private and public) sources regarding individuals' credit activity. This information is compiled in a credit report for each Consumer.

Your credit report is a summary of your credit history. Your credit report contains information about your credit cards and loans, such as: when you opened your account, account balance, payment history, etc. Your credit report also includes personal information that is available in public records, such as a bankruptcy.

### What is Credit Monitoring?

Your credit report is updated regularly to reflect credit activity changes. Credit monitoring allows you to have immediate visibility to changes in your credit report, providing you with the confidence that your credit identity is intact.

### Equifax Complete™ Advantage Plan

As a consumer, you can take an active role in monitoring your personal credit information. Using Equifax's online tool, you can view your credit file 24/7 and monitor any changes, maintaining certainty that your credit score and identity have not been compromised.

For further information about Equifax Canada and protecting your identity, please visit www.equifax.ca. You can also visit the Financial Consumer Agency of Canada at www.fcac-acfc.gc.ca to learn more about credit reporting agencies.

Certain conditions apply to all offers. Equifax and EFX are registered trademarks of Equifax Canada Co. Inform Enrich Empower is a trademark of Equifax Inc., used here under license. ©2013 Equifax Canada Co. All rights reserved

*EFX*® | CIS - 150 - E - 06/13 |

INFORM ❯ENRICH ❯EMPOWER™

 **CONSUMER INFORMATION SOLUTIONS**

## Corporate Data Breach Solutions

### What is a Credit Alert Flag

**How will a Credit File Alert Flag protect me from potential fraud activity?**

A Credit File Alert Flag is one layer of identity theft protection. It provides peace of mind that your credit file has a warning system for credit lenders should anyone fraudulently try to seek credit in your name.

Equifax Canada Co. is Canada's largest credit reporting agency. A credit reporting agency is an independent organization that receives information from credit grantors and other (private and public) sources regarding individuals' credit activity. This information is compiled in a credit report for each Consumer.

Your credit file is a summary of your credit history. Your credit file contains information about your credit cards and loans, such as: when you opened your account, account balance, payment history, etc. Your credit file also includes personal information that is available in public records, such as a bankruptcy

### What is a Credit File Alert Flag?

A credit file alert flag is a narrative description that is placed on your credit file. This flag alerts credit grantors that the individual's personal identification may have been compromised. Credit grantors will then need to take further precautions to verify the identity of the person seeking credit. This may take the form of requiring the credit seeker to apply in person rather than over the phone or web, provide photo ID, or answer additional authentication questions. It is at the discretion of the lending institution's authentication protocol processes as to what steps they will take.

A Credit File Alert Flag stays on your credit file for a period of six years and it does **NOT** affect your credit score in any way. You have the option to choose to have it removed at any time within the six years by calling Equifax Canada at 1-800-465-7166.

For further information about Equifax Canada and protecting your identity, please visit www.equifax.ca. You can also visit the Financial Consumer Agency of Canada at www.fcac-acfc.gc.ca to learn more about credit reporting agencies.

Certain conditions apply to all offers. Equifax and EFX are registered trademarks of Equifax Canada Co. Inform Enrich Empower is a trademark of Equifax Inc., used here under license. ©2013 Equifax Canada Co. All rights reserved

 CIS - 150 - E - 06/13

INFORM ❯ENRICH ❯EMPOWER™

# Exhibit (B)

# SURPLUS LINES DISCLOSURE and ACKNOWLEDGEMENT

At my direction, ( _KEYS COVERAGE_ ) has placed my coverage in the surplus lines market. As required by Florida Statute 626.916, I have agreed to this placement. I understand that superior coverage may be available in the admitted market and at a lesser cost and that persons insured by surplus lines carriers are not protected by the Florida Insurance Guaranty Association with respect to any right of recovery for the obligation of an insolvent unlicensed insurer.

I further understand the policy forms, conditions, premiums, and deductibles used by surplus lines insurers may be different from those found in policies used in the admitted market. I have been advised to carefully read the entire policy.

There is no liability on the part of, and I have no cause of action against, my agent for placing coverage in the surplus lines market.

_OJ COMMERCE_
Named Insured

_[signature]_      _11/30/17_
Signature of Insured's Authorized Representative      Date

_Lloyds of London_
Name of Excess and Surplus Lines Carrier

_CYBER_
Type of Insurance

_11/11/17_
Effective Date of Coverage

_[signature]_      _A140331_
Individual Retail Agent      Florida License Number



238 Bayport Drive, Suite 150  Tampa, FL 33607  Phone: (727) 536-1006 Fax: (727) 530-9076

Dec 04, 2017

Ryan Garzon
Keyes Coverage, Inc.
5900 Hiatus Road

Tamarac, FL 33321

RE:   OJ Commerce LLC; OJ Commerce Inc d/b/a Naomi Home, WSports
      Policy: W20D68170101          11/11/2017 to 11/11/2018

Dear Ryan

Attached please find the original policy for the above account.  Please review and advise if
there are any discrepancies or corrections needed.

If you have any questions or need anything further, please do not hesitate to give us a
call.

Sincerely,

Chris Iglesias
Account Manager
Phone:  727-532-6212
Fax:
Email:  CIglesias@crcswett.com

Enclosure

Sub#:  6306922

**CONFIDENTIAL**

**Effective date of this Endorsement: 11-Nov-2017**
**This Endorsement is attached to and forms a part of Policy Number: W20D68170101**
**Syndicate 2623/623 at Lloyd's. Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

---

# FRONT PAGE TO POLICY

---

## IMPORTANT NOTICE – FLORIDA

**SURPLUS LINES INSURERS' POLICY RATES AND FORMS ARE NOT APPROVED BY ANY FLORIDA REGULATORY AGENCY.**



# BEAZLEY BREACH RESPONSE

**INSURING AGREEMENTS A., C., D. AND E. OF THIS POLICY PROVIDE COVERAGE ON A CLAIMS MADE AND REPORTED BASIS AND APPLY ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR THE OPTIONAL EXTENSION PERIOD (IF APPLICABLE) AND REPORTED TO THE UNDERWRITERS DURING THE POLICY PERIOD OR AS OTHERWISE PROVIDED IN CLAUSE X. OF THIS POLICY. AMOUNTS INCURRED AS CLAIMS EXPENSES UNDER THIS POLICY SHALL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY AND ARE SUBJECT TO RETENTIONS.**

**INSURING AGREEMENT B. OF THIS POLICY PROVIDES FIRST PARTY COVERAGE ON AN INCIDENT DISCOVERED AND REPORTED BASIS; COVERAGE UNDER THIS INSURING AGREEMENT APPLIES ONLY TO INCIDENTS FIRST DISCOVERED BY THE INSURED AND REPORTED TO THE UNDERWRITERS DURING THE POLICY PERIOD.**

These Declarations along with the completed and signed **Application** and the Policy with endorsements shall constitute the contract between the **Insureds** and the Underwriters.

**Underwriters:**     Syndicate 2623/623 at Lloyd's.

**Policy Number:**     W20D68170101

**Authority Reference Number:** B6012BUSANMSL1701

Item 1.     **Named Insured:** OJ Commerce LLC OJ Commerce Inc dba Naomi Home WSports

        **Address:** 1700 Northwest 64th Street

        Suite 460

        Fort Lauderdale, FL 33309

Item 2.     **Policy Period:**

        **From:** 11-Nov-2017

        **To:**     11-Nov-2018

        Both dates at 12:01 a.m. Local Time at the Address stated in Item 1.

Please refer to the Beazley Breach Response Policy in reference to the Limits and Retentions set out in these Declarations.

Item 3.     A.     **POLICY AGGREGATE LIMIT OF LIABILITY**

        1.     For all **Damages**, **Claims Expenses**,     USD $3,000,000
            **Penalties** and **PCI Fines, Expenses and Costs**:

            But sublimited to:

F00404
042014 ed.
Date Issued: 04-Dec-2017 7:22:24 AM

Page 1 of 4

|  |  |
|---|---|
| 2. Aggregate sublimit of liability applicable to Insuring Agreement C. (Regulatory Defense and Penalties) | USD $3,000,000 |
| 3. Aggregate sublimit applicable to Insuring Agreement E. (PCI Fines, Expenses and Costs): | USD $3,000,000 |

**B. LIMITS OF COVERAGE FOR PRIVACY BREACH RESPONSE SERVICES:**

|  |  |
|---|---|
| 1. **Notified Individuals** Limit of Coverage:<br><br>A sublimit of up to 10% of the **Notified Individuals** Limit of Coverage applies to **Notified Individuals** residing outside of the United States, which amount is part of and not in addition to the **Notified Individuals** Limit of Coverage | 1,000,000 **Notified Individuals** in the aggregate |
| 2. Aggregate Limit of Coverage for all **Computer Expert Services**, **Legal Services** and **Public Relations and Crisis Management Expenses** combined: | USD $2,000,000 |

Coverage for all **Privacy Breach Response Services** is separate from and in addition to the **Policy Aggregate Limit of Liability.**

Item 4.   **RETENTIONS**:

| | | |
|---|---|---|
| | A. Each **Claim Retention**: | USD $25,000 |
| | B. **Privacy Breach Response Services** Threshold and Retention: | |
| | 1. **Notification Services**, **Call Center Services**, and **Breach Resolution and Mitigation Services** for each incident involving at least: | 100 **Notified Individuals** |
| | 2. **Retention** applicable to **Computer Expert Services**, **Legal Services** and **Public Relations and Crisis Management Expenses**: | USD $10,000 combined, but USD 5,000 for **Legal Services** (which retention is part of and not in addition to the combined retention) |

| | | |
|---|---|---|
| Item 5. | **Premium**: (plus applicable taxes and fees) | USD $20,000 |
| Item 6. | **Retroactive Date:** | Full Prior Acts |
| Item 7. | **Optional Extension Period:** | |
| | (a) Premium for Optional Extension Period: | 100% of the premium for the Policy |
| | (b) Length of Optional Extension Period: | 12 Months |

F00404
042014 ed.
Date Issued: 04-Dec-2017 7:22:24 AM

Page 2 of 4

Item 8.   **Continuity Date:**                                      11-Nov-2017

Item 9.   **Notification under this Policy:**

(a) Claims:
Beazley Group
Attn: TMB Claims Group
1270 Avenue of the Americas, 12th Floor
New York, NY 10020
Email: bbr.claims@beazley.com

(b) Privacy Breaches under Insuring Agreement B.:
Email: bbr.claims@beazley.com
Toll-Free 24-Hour Hotline: (866) 567-8570
(Emails and call reports from the toll-free hotline are forwarded to the Breach Response Services Team for response)

(c) All other notices under this Policy shall be given to:
Beazley USA Services, Inc.
30 Batterson Park Road
Farmington, CT 06032
Te: (860) 677-3700
Fax: (860) 679-0247
(All Claims and Privacy Breaches must be reported in accordance with 9.(a) and 9.(b) above)

Item 10.   **Service of process in any suit shall be made upon:**

Mendes & Mount, LLP

750 7th Ave # 24

New York, NY 10019

Item 11.   **Choice of Law:** New York

Item 12.   **Endorsements Effective At Inception:**

| | | |
|---|---|---|
| 1. | E02804 032011 ed. | Sanction Limitation and Exclusion Clause |
| 2. | BSLMU05120809FL | Important Notice - Florida |
| 3. | NMA1256 | Nuclear Incident Exclusion Clause-Liability-Direct (Broad) (U.S.A.) |
| 4. | NMA1477 | Radioactive Contamination Exclusion Clause-Liability-Direct (U.S.A.) |
| 5. | E05365 012014 ed. | Electronic Crime Endorsement |
| 6. | E06606 122014 ed. | Telecommunications Fraud Endorsement |
| 7. | E06928 042015 ed. | Policyholder Disclosure Notice of Terrorism Insurance Coverage |
| 8. | E05861 042014 ed. | Criminal Reward Coverage |
| 9. | SCHEDULE2017 | Lloyd's Security Schedule 2017 |
| 10. | E06798 122016 ed. | Consequential Reputational Loss |
| 11. | E09974 032017 ed. | CRC SWETT Amendatory Endorsement |

12. E10112 052017 ed.          BBR Boost Endorsement
13. E10115 052017 ed.          Single Retention Endorsement
14. E06800 062017 ed.          Fraudulent Instruction Coverage
15. E09267 072017 ed.          Amend Item 3.B. Endorsement
16. E10186 062017 ed.          First Party Endorsement

Dated:    04-Dec-2017

At:    30 Batterson Park Road
       Farmington
       Connecticut 06032                    By  _____
       (the office of the Correspondent)         Beazley USA Services, Inc.
                                                  (Correspondent)

**Effective date of this Endorsement: 11-Nov-2017**
**This Endorsement is attached to and forms a part of Policy Number: W20D68170101**
**Syndicate 2623/623 at Lloyd's. Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

<u>**SANCTION LIMITATION AND EXCLUSION CLAUSE**</u>

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, law or regulations of the European Union, United Kingdom or United States of America.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E02804                                                                                     Page 1 of 1
032011 ed.

**Effective date of this Endorsement: 11-Nov-2017**
**This Endorsement is attached to and forms a part of Policy Number: W20D68170101**

### NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)

**BEAZLEY BREACH RESPONSE**

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This Policy* does not apply:

I.      Under any Liability Coverage, to injury, sickness, disease, death or destruction:

      (a)     with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (b)      resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.     Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.    Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

      (a)     the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

      (b)      the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

      (c)     the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or

NMA1256                                                                                    Page 1 of 2

possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.   As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or by-product material;

"source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means:

(a)      any nuclear reactor,

(b)      any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)      any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d)      any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

**Effective date of this Endorsement: 11-Nov-2017**
**This Endorsement is attached to and forms a part of Policy Number: W20D68170101**

**RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)**

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
NMA1477

**Effective date of this Endorsement: 11-Nov-2017**
**This Endorsement is attached to and forms a part of Policy Number: W20D68170101**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

### ELECTRONIC CRIME ENDORSEMENT

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1.  Item 3.A. of the Declarations is amended to include the following prior to the last paragraph thereof:

    CC.  Aggregate sublimit of liability applicable to          USD 100,000
         Insuring Agreement CC. (Electronic Crime):

2.  Item 4. of the Declarations is amended to include the following at the end thereof:

    CC.  Insuring Agreement CC. (Electronic Crime)
         **Retention** applicable to each incident, event, or related
         incidents or events, giving rise to an obligation to pay          USD 25,000
         loss of **Money** or **Securities**:

3.  Clause I., Insuring Agreements, is amended by the addition of the following at the end thereof:

    CC.  **ELECTRONIC CRIME**

         To indemnify the **Insured Organization** for the loss of **Money** or **Securities**, in excess of the **Retention**, contained in a **Transfer Account** at a **Financial Institution** resulting directly from **Funds Transfer Fraud** committed solely by a **Third Party**;

         provided that such loss must be **Discovered** by the **Insured** during the **Policy Period** and reported to the Underwriters during the **Policy Period** or as otherwise provided in Clause IX. of this Policy.

4.  Clause V., Exclusions, paragraph R. shall not apply to loss otherwise covered under Insuring Agreement CC.

5.  There shall be no coverage under this Endorsement for any loss for, arising out of or resulting directly or indirectly from:

    CC-A.  the type or kind covered by the **Insured Organization's** financial institution bond or commercial crime policy, regardless of any deductible amount or limit of liability;

    CC-B.  any actual or alleged fraudulent, dishonest or criminal act or omission by any **Employee**, whether acting alone or in collusion with any other person or entity;

    CC-C.  indirect or consequential loss of any kind;

    CC-D.  punitive, exemplary or multiplied damages of any kind or any fines, penalties or loss of any tax benefit;

    CC-E.  the giving or surrendering of any **Money** or **Securities** in any exchange or purchase, whether fraudulent or not;

    CC-F.  fees, costs or expenses incurred or paid by the **Insured Organization** in defending or prosecuting any legal proceeding or claim;

    CC-G.  proving or establishing the existence of loss under this Endorsement;

CC-H.   the theft, disappearance, destruction of, or unauthorized access to, confidential information including, but not limited to, trade secrets, customer lists, and intellectual property;

CC-I.   any fraudulent instruction if the sender, or anyone acting in collusion with the sender, ever had access to the **Insured Organization's** password, PIN or other security code;

CC-J.   any forged, altered or fraudulent negotiable instruments, securities, documents or instructions;

CC-K.   any actual or alleged use of credit, debit, charge, access, convenience or other cards or the information contained on such cards;

CC-L.   damages of any type for which the **Insured Organization** is legally liable, except for direct compensatory damages arising directly from **Funds Transfer Fraud**; or

CC-M.   costs or expenses incurred by a customer or client of the **Insured Organization**.

6.   Clause VI. Definitions, paragraph O. is amended to include loss or damage covered under Insuring Agreement CC. within the definition of "**Loss**".

7.   For purposes of this endorsement only, Clause VI. Definitions, is amended to include the following:

CC-A.   **Discovered** means the moment when the **Insured Organization** or any director, trustee, officer, administrator, manager, partner or insurance representative of the **Insured Organization** first becomes aware of facts which would cause a reasonable person to believe that a loss covered by this Endorsement has been or will be incurred.

CC-B.   **Employee** means:

    1.   a natural person:

        (a)   while in the regular service of the **Insured Organization** in the ordinary course of its business;

        (b)   whom the **Insured Organization** has the right to direct and control while performing labor or service for the **Insured Organization**; and

        (c)   who is compensated directly by the **Insured Organization** through salary, wages or commissions;

    2.   a natural person who is directed and controlled by the **Insured Organization** while performing labor or service for the **Insured Organization** pursuant to a lease or other written contract to which the **Insured Organization** is a party;

    3.   a natural person volunteer who is directed and controlled by the **Insured Organization** while performing labor or service for the **Insured Organization**;

    4.   a natural person who is a director, trustee, officer, administrator, manager or partner of the **Insured Organization**, when performing acts coming within the scope of the usual duties of a a director, trustee, officer, administrator, manager or partner; or

    5.   a natural person who is:

        (a)   a trustee, officer, employee, administrator, fiduciary or manager of any Employee Welfare or Pension Benefit Plan, as defined in Employee Retirement Income Security Act of 1974 and any amendments thereto ("ERISA"), which is or becomes solely sponsored by the **Insured Organization**; or

        (b)   required to be bonded by Title 1 of ERISA.

CC-C.   **Financial Institution** means:

1.      a bank, credit union, saving and loan association, trust company or other licensed financial service where the **Insured Organization** maintains a **Transfer Account**; or

2.      a securities broker-dealer, mutual fund, liquid assets fund or similar investment company where the **Insured Organization** maintains a **Transfer Account**.

CC-D.   **Funds Transfer Fraud** means fraudulent written, electronic, telegraphic, cable, teletype or telephone instructions by a **Third Party** issued to a **Financial Institution** directing such institution to transfer, pay or deliver **Money** or **Securities** from any account maintained by the **Insured Organization** at such institution, without the **Insured Organization's** knowledge or consent.

CC-E.   **Money** means:

1.      currency, coins or bank notes in current use and having a face value; and

2.      travelers checks, registered checks or money orders held for sale to the public.

CC-F.   **Property** means tangible property other than **Money** or **Securities** that has intrinsic value.

CC-G.   **Securities** means negotiable and non-negotiable instruments or contracts representing either **Money** or **Property**, but **Securities** does not include **Money**.

CC-H.   **Third Party** means any person or entity other than the **Insured Organization** or **Employee** .

CC-I.   **Transfer Account** means an account maintained by the **Insured Organization** at a **Financial Institution** from which the **Insured Organization** can initiate the transfer, payment or delivery of **Money** or **Securities**.

8.   Clause VII., Limit of Liability, paragraph A. is amended to include the following immediately before the last paragraph thereof:

The sublimit of liability stated in Item 3.A.CC. of the Declarations is the aggregate limit of liability under this Policy for all loss or damage covered under Insuring Agreement CC. and is part of and not in addition to the **Policy Aggregate Limit of Liability** stated in Item 3.A.1. of the Declarations.

9.   Clause VIII., Retention, is amended to include the following immediately before the last paragraph thereof:

CC-A.   The **Retention** amount set forth in Item 4.CC. of the Declarations applies separately to each incident, event, or related incidents or events, giving rise to an obligation to pay loss or damage under Insuring Agreement CC.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 11-Nov-2017**
**This Endorsement is attached to and forms a part of Policy Number: W20D68170101**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

<u>TELECOMMUNICATIONS FRAUD ENDORSEMENT</u>

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1.  Item 3.A. of the Declarations is amended to include the following prior to the last paragraph thereof:

    TT.   Aggregate sublimit of liability applicable to                   USD 100,000
          Insuring Agreement TT. (Telecommunications
          Fraud):

2.  Item 4. of the Declarations is amended to include :

    TT.   Each incident, event, or related incidents or events,          USD 25,000
          giving rise to an obligation to pay loss under Insuring
          Agreement TT.:

3.  Clause **I. INSURING AGREEMENTS** is amended by the addition of:

    TT.   **TELECOMMUNICATIONS FRAUD**

          To indemnify the **Insured Organization** for any **Telecommunications Fraud Loss**, in
          excess of the applicable **Retention**, incurred by the **Insured** during the **Policy Period**
          and reported in writing to the Underwriters during the **Policy Period**.

4.  Clause **VI. DEFINITIONS**, paragraph O. is amended to include **Telecommunications Fraud
    Loss** within the definition of "**Loss**".

5.  Clause **VI. DEFINITIONS** is amended by the addition of:

    TT-A. **Third Party** means any person or entity other than the **Insured Organization** or a
          **Related Party**.

    TT-B. **Telecommunications Fraud Loss** means any direct financial loss to the **Insured** that
          results directly from a **Third Party** gaining access to and using the **Insured
          Organization's** telephone system in an unauthorized manner; provided that such
          unauthorized access and use must occur after the Retroactive Date and before the end
          of the **Policy Period**.

6.  Clause **VII. LIMIT OF LIABILITY AND COVERAGE**, Paragraph A. is amended to include the
    following immediately prior to the last paragraph thereof:

    The sublimit of liability stated in Item 3.A.TT. is the aggregate limit of liability payable under this
    Policy for all **Telecommunications Fraud Loss** covered under Insuring Agreement TT. and is
    part of and not in addition to the **Policy Aggregate Limit of Liability**.

7.  Clause **VIII. RETENTION** is amended by the addition of:

    TT.   The **Retention** set forth in Item 4.TT. of the Declarations applies separately to each
          incident, event, or related incidents or events, giving rise to an obligation to pay loss
          under Insuring Agreement TT.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 11-Nov-2017**
**This Endorsement is attached to and forms a part of Policy Number: W20D68170101**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<div style="border:1px solid black">

**POLICYHOLDER DISCLOSURE NOTICE OF**
**TERRORISM INSURANCE COVERAGE**

</div>

You are hereby notified that under the Terrorism Risk Insurance Act of 2002, as amended ("TRIA"), insurance coverage provided by this Policy includes losses arising out of acts of terrorism, **as defined in Section 102(1) of the Act, as amended:** The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that  is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Any coverage you purchase for "acts of terrorism" shall expire at 12:00 midnight December 31, 2020, the date on which the TRIA Program is scheduled to terminate, or the expiry date of the policy whichever occurs first, and shall not cover any losses or events which arise after the earlier of these dates.

YOU SHOULD KNOW THAT COVERAGE PROVIDED BY THIS POLICY FOR LOSSES CAUSED BY CERTIFIED ACTS OF TERRORISM IS PARTIALLY REIMBURSED BY THE UNITED STATES UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THIS FORMULA, THE UNITED STATES PAYS 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON JANUARY 1, 2019 AND 80% BEGINNING ON JANUARY 1, 2020; OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURER(S) PROVIDING THE COVERAGE. YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A USD100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS USD100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED USD100 BILLION, YOUR COVERAGE MAY BE REDUCED.

(LMA 9104 amended)

**Effective date of this Endorsement: 11-Nov-2017**
**This Endorsement is attached to and forms a part of Policy Number: W20D68170101**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>**CRIMINAL REWARD COVERAGE**</u>

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1.      Clause **I. INSURING AGREEMENTS** is amended by the addition of:

**Criminal Reward Fund**

To indemnify the **Named Insured**, at the Underwriter's sole and absolute discretion, up to USD 50,000 in the aggregate as a **Criminal Reward Fund**. No Deductible shall apply to this Insuring Agreement.

2.      Clause **VI. DEFINITIONS** is amended by the addition of:

CR-C    **Criminal Reward Fund** means any amount offered and paid by the Underwriters for information that leads to the arrest and conviction of any individual(s) committing or trying to commit any illegal act related to any coverage under this Policy. Provided, however, the Underwriters shall not pay any **Criminal Reward Fund** for, and this Policy shall not cover any amount based upon, any information provided by the **Insured**, the **Insured's** auditors, whether internal or external, any individual hired or retained to investigate the aforementioned illegal acts, or any other individuals with responsibilities for the supervision or management of the aforementioned individuals. **Criminal Reward Fund** coverage is subject to the limitations set forth in Clause VI.L..

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative



**Effective date of this Endorsement: 11-Nov-2017**
**This Endorsement is attached to and forms a part of Policy Number: W20D68170101**
**Syndicate 2623/623 at Lloyd's. Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

## LLOYD'S SECURITY SCHEDULE

Syndicate 2623        82%
Syndicate 623         18%

ALL OTHER TERMS, conditions and limitations of said Certificate shall remain unchanged.

**Effective date of this Endorsement: 11-Nov-2017**
**This Endorsement is attached to and forms a part of Policy Number: W20D68170101**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

<u>CONSEQUENTIAL REPUTATIONAL LOSS</u>

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1.    Item 3.A. of the Declarations is amended by the addition of:

      Aggregate sublimit of liability for all **Consequential**
      **Reputational Loss**, which amount is part of, and not in            USD 1,000,000
      addition to, the **Policy Aggregate Limit of Liability**:

2.    Item 4. of the Declarations is amended by the addition of:

      **Retention** applicable to each incident giving rise to            USD 25,000
      **Consequential Reputational Loss**

3.    The Underwriters will indemnify the **Named Insured** for **Consequential Reputational Loss**, in
      excess of the applicable **Retention**, incurred by the **Insured Organization** during the
      **Notification Period** as a direct result of an incident (i) described in Insuring Agreement A.1. or
      A.2. that first takes place on or after the Retroactive Date and before the end of the **Policy**
      **Period**, and (ii) for which **Notification Services** are provided pursuant to Insuring Agreement
      B.3.

4.    Clause **VI. DEFINITIONS**, paragraph O. "**Loss**" is amended to include **Consequential**
      **Reputational Loss**.

5.    For purposes of this Endorsement:

      DEF-A.  **Consequential Reputational Loss** means the **Income Loss** during the **Notification**
              **Period**; provided that **Consequential Reputational Loss** shall not mean and no
              coverage shall be available under this endorsement for any of the following:  loss arising
              out of any liability to any third party for whatever reason; legal costs or legal expenses of
              any type; loss incurred as a result of unfavorable business conditions, loss of market or
              any other consequential loss; or costs or expenses the **Insured Organization** incurs to
              identify, investigate, respond to or remediate an incident described in Insuring Agreement
              A.1. or A.2.

      DEF-B.  **Income Loss** means the net profit resulting directly from the **Insured Organization's**
              business operations, before income taxes, that the **Insured Organization** is prevented
              from earning as a direct result of damage to the **Insured Organization's** reputation
              caused by an incident (or reasonably suspected incident) described in Insuring
              Agreement A.1. or A.2. In determining **Income Loss**, due consideration shall be given to
              the prior experience of the **Insured Organization's** business operations before the
              beginning of the **Notification Period** and to the reasonable and probable business
              operations the **Insured Organization** could have performed had the incident described in
              Insuring Agreement A.1. or A.2. not occurred.

              **Income Loss** does not include any internal salary, costs or overhead expenses of the

**Insured Organization**.

DEF-C. **Notification Period** means the 30-day period that begins on the specific date on which **Notified Individuals** first receive notification of the incident for which **Notification Services** are provided.

6.    The following Clause is added to the Policy:

**PROOF AND APPRAISAL OF LOSS**

A.    **Proof of Loss**. With respect to **Consequential Reputational Loss**, before coverage will apply, the **Named Insured** must:

1.    prepare and submit to the persons named in Item 9.(a) of the Declarations a written and detailed proof of loss sworn by an officer of the **Named Insured** within ninety (90) days after the **Insured Organization** sustains a **Consequential Reputational Loss**, but in no event later than six (6) months following the end of the **Policy Period**.  Such proof of loss shall include a narrative with full particulars of such **Consequential Reputational Loss**, including, the time, place and cause of the incident giving rise to **Consequential Reputational Loss,** a detailed calculation of any **Consequential Reputational Loss**, and the amount of **Consequential Reputational Loss** and all other insurance thereon; and

2.    upon Underwriters' request, submit to an examination under oath and provide copies of the underlying documents, data and materials that reasonably relate to or are part of the basis of the claim for such **Consequential Reputational Loss**.

The costs and expenses of preparing and submitting a proof of loss, and establishing or proving **Consequential Reputational Loss** shall be the **Insured's** obligation, and are not covered under this Policy.

B.    **Appraisal of Loss**. If the **Named Insured** and Underwriters do not agree on the amount of **Consequential Reputational Loss**, each party shall select and pay an appraiser or other qualified expert (the "Appraiser") to state the amount of the loss or reasonable expenses, and the Appraisers shall choose an umpire.  If the Appraisers cannot agree on an umpire, the **Named Insured** or the Underwriters may request a judge of a court having jurisdiction to make the selection.  Each Appraiser shall submit the amount of the **Consequential Reputational Loss** or reasonable expenses to the umpire, and agreement by the umpire and at least one of the Appraisers as to the amount of **Consequential Reputational Loss** shall be binding on all **Insureds** and the Underwriters.  The **Named Insured** and Underwriters will equally share the costs of the umpire and any other costs other than the cost of the Appraisers. This provision shall govern only the appraisal of the amount of **Consequential Reputational Loss**, and shall not control the determination of whether such **Consequential Reputational Loss** is otherwise covered by the Policy.  Underwriters will still retain and do not waive their rights to deny coverage or enforce any obligation under this Policy.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 11-Nov-2017**
**This Endorsement is attached to and forms a part of Policy Number: W20D68170101**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

<u>**CRC SWETT AMENDATORY ENDORSEMENT**</u>

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1.  Item 7. of the Declarations is deleted in its entirety and replaced by:

    Item 7.  **Optional Extension Period**

    (a) Premium for Optional Extension Peri**od**:      (b) Length of Optional Extension Period

    | | |
    |---|---|
    | 100% of the Premium set forth in Item 5 of the Declarations | 12 months |
    | 150% of the Premium set forth in Item 5 of the Declarations | 24 months |
    | 200% of the Premium set forth in Item 5 of the Declarations | 36 months |

2.  Clause **II.**, **DEFENSE AND SETTLEMENT**, paragraph C.2. is deleted in its entirety and replaced with the following:

    C.2.  Sixty percent (60%) of any **Claims Expenses** incurred after the date such settlement or compromise was recommended to the **Insured** plus sixty percent (60%) of any **Damages** above the amount for which the **Claim** could have been settled. The remaining forty percent (40%) of such **Claims Expenses** and **Damages** must be borne by the **Insured** at their own risk and uninsured;

3.  Clause **III.**, **THE INSURED AND THE INSURED ORGANIZATION**, paragraph C. is deleted in its entirety and replaced with the following:

    C.  An employee (including a part time, leased, seasonal, or temporary employee), volunteer or any **Independent Contractors** of the **Insured Organization**, but only for work done while acting within the scope of his or her employment or duties and related to the conduct of the **Insured Organization's** business;

    For the purposes of this endorsement, the term "**Independent Contractor**" means any natural person independent contractor who performs labor or service for the **Insured Organization** pursuant to a written contract or agreement, where such labor or service is under the exclusive direction of the **Insured Organization**. The status of an individual as an **Independent Contractor** shall be determined as of the date of an alleged act, error or omission by any such **Independent Contractor**.

4.  Clause **III. THE INSURED AND THE INSURED ORGANIZATION**, paragraph F. is deleted in its entirety and replaced with the following:

F.    The estate, heirs, executors, administrators, assigns, trustees, court appointed receivers and legal representatives of any **Insured** in the event of such **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this Insurance; and

5.    Clause **III. THE INSURED AND THE INSURED ORGANIZATION** is amended by the addition of:

AI-A.    An **Additional Insured** for coverage afforded under Insuring Agreements A. and D., but only as respects the vicarious liability of such person or entity for acts, errors or omissions of the **Insured Organization** otherwise covered by this Insurance.

6.    Clause **VI. DEFINITIONS**, paragraph K., L., P., GG. and HH. are deleted in their entirety and replaced with the following:

K.    **Control Group** means the individuals holding the following positions in the **Insured Organization**: Chief Executive Officer, Chief Financial Officer, General Counsel, staff attorneys working for the General Counsel, Risk Manager, Chief Security Officer, Chief Privacy Officer and the head of Information Technology, and any individual in a substantially similar position as those referenced above, or with substantially similar responsibilities as those referenced above, irrespective of the exact title of such individual and any individual who previously held any of the above referenced positions.

L.    **Damages** means a monetary judgment, award or settlement including any prejudgment interest awarded against an **Insured** on the part of any judgment that the Underwriters pay, as well as all interest on the full amount of any judgment that accrues after entry of the judgment and before the Underwriters have paid, offered to pay or deposited in court the part of the judgment that is within the applicable limits of insurance; provided that the term **Damages** shall not include or mean:

1.    future profits, restitution, disgorgement of unjust enrichment or profits by an **Insured**, or the costs of complying with orders granting injunctive or equitable relief;

2.    return or offset of fees, charges, or commissions charged by or owed to an **Insured** for goods or services already provided or contracted to be provided;

3.    taxes or loss of tax benefits;

4.    fines, sanctions or penalties;

5.    punitive or exemplary damages or any damages which are a multiple of compensatory damages, unless insurable by law in any applicable venue that most favors coverage for such punitive, exemplary or multiple damages;

6.    discounts, coupons, prizes, awards or other incentives offered to the **Insured's** customers or clients;

7.    liquidated damages, but only to the extent that such damages exceed the amount for which the **Insured** would have been liable in the absence of such liquidated damages agreement;

8.    fines, costs or other amounts an **Insured** is responsible to pay under a **Merchant Services Agreement**; or

9.    any amounts for which the **Insured** is not liable, or for which there is no legal recourse against the **Insured**.

P.   **Management Control** means:

1.   owning, directly or indirectly, more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of an entity's directors (in the case of a corporation), members of the board of managers (in the case of a limited liability company), management committee members (in the case of a joint venture or partnership), directors or trustees, as applicable (in the case of a non-profit entity), or persons serving in a functionally equivalent role for such an entity operating or organized outside of the United States; or

2.   having the right, pursuant to a written contract or the bylaws, charter, operating agreement or similar documents of an entity to elect, appoint or designate a majority of: the board of directors of a corporation; the management committee of a joint venture or partnership; the management board of a limited liability company; or persons serving in a functionally equivalent role for such an entity operating or organized outside of the United States.

GG.  **Subsidiary** means any corporation, limited liability company, joint venture or partnership while the **Named Insured** has **Management Control** over such entity, if the **Named Insured**:

1.   had **Management Control** over such entity on the inception date of this Policy or such entity was an insured under a policy issued by the Underwriters of which this Policy is a renewal;

2.   acquires **Management Control** after the inception date of this Policy provided the revenues of the entity do not exceed twenty percent (20%) of the **Named Insured's** annual revenues for the four quarterly periods directly preceding inception of the **Policy Period**; or

3.   acquires **Management Control** after the inception date of this Policy provided that if the revenues of the entity exceed twenty percent (20%) of the **Named Insured's** annual revenues for the four quarterly periods directly preceding inception of the **Policy Period**, the provisions of Clause XVI., Mergers and Acquisitions, must be fulfilled;

provided that this Policy only provides coverage for acts, errors, omissions, incidents or events that take place while the **Named Insured** has **Management Control** over such entity.

HH.  **Third Party Information** means any trade secret, data, design, interpretation, forecast, formula, method, practice, credit or debit card magnetic strip information, process, record, report or other item of information of a third party not insured under this Policy which is not available to the general public and which the **Insured Organization** is legally required to maintain in confidence; however, **Third Party Information** shall not include **Personally Identifiable Information**.

7.   Clause **V. EXCLUSIONS**, paragraph H., O. and P. are deleted in their entirety and replaced with the following:

H.   For, arising out of or resulting from any act, error, omission, incident, failure of **Computer Security**, or **Security Breach** committed or occurring prior to the **Continuity Date** of this Policy:

1.    if any member of the **Control Group** on or before the **Continuity Date** knew or could have reasonably foreseen that such act, error or omission, incident, failure of **Computer Security**, or **Security Breach** might be expected to be the basis of a **Claim** or **Loss**; or

2.    in respect of which any **Insured** has given notice of a circumstance, which might lead to a **Claim** or **Loss**, to the insurer of any other policy in force prior to (i)  the Continuity Date of this Policy, or (ii) if this Policy is a renewal, the inception date of the first consecutive policy issued by the Underwriters of which this Policy is a renewal;

O.    For, arising out of or resulting from a **Claim** by or on behalf of one or more **Insureds** under this Insurance against any other **Insured** or **Insureds** under this Insurance; provided this exclusion shall not apply to (i) an otherwise covered **Claim** under Insuring Agreement I.A.1., I.A.2., or I.A.3. made by a current or former employee of the **Insured Organization**, or (ii) any **Claim** by or on behalf of an **Additional Insured** against an Insured that is not an **Additional Insured**;

P.    For, arising out of or resulting from:

1.    any **Claim** made by any business enterprise in which any **Insured** has greater than a twenty percent (20%) ownership interest or made by any parent company or other entity which owns more than twenty percent (20%) of the **Named Insured**; or

2.    the **Insured's** activities as a trustee, partner, member, **Manager**, officer, director or employee of any employee trust, charitable organization, corporation, company or business other than that of the **Insured Organization**;

8.    Clause **VI. DEFINITIONS** is amended by the addition of the following paragraph:

AI-A    **Additional Insured** means:

1.    any natural person or entity that the **Insured Organization** has expressly agreed in writing to add as an **Additional Insured** under this policy prior to the commission of any act for which such person or entity would be provided coverage for under this Policy, but only to the extent the **Insured Organization** would have been liable and coverage would have been afforded under the terms and conditions of this Policy had such **Claim** been made against the **Insured Organization**; and

2.    any other person or entity added as an Additional Insured by endorsement to this Policy.

9.    Clause **X., NOTICE OF CLAIM, LOSS OR CIRCUMSTANCE THAT MIGHT LEAD TO A CLAIM**, paragraph A. is deleted in its entirety and replaced with the following:

A.    If any **Claim** is made against the **Insured**, the **Insured**, upon knowledge of the **Control Group**, shall forward as soon as practicable to the Underwriters through persons named in Item 9.(a) of the Declarations written notice of such **Claim** in the form of a telecopy, email or express or certified mail together with every demand, notice, summons or other process received by the **Insured** or the **Insured's** representative.  In no event shall the Underwriters be given notice of a **Claim** later than sixty (60) days after the expiration date of the **Policy Period**, or the end of the Optional Extension Period (if applicable).

10.     Clause **XVI.**, **Mergers and Acquisitions**, paragraph A. is deleted in its entirety and replaced with the following:

A.      **Newly Acquired Subsidiaries**

If during the **Policy Period** the **Named Insured** or any **Subsidiary** acquires a privately held entity whose annual revenues are more than twenty percent (20%) of the Named Insured's total annual revenues for the four quarterly periods directly preceding inception of the **Policy Period**, then, subject to the **Policy Period** and all other terms and conditions of this Policy, coverage under this Policy shall be afforded for a period of sixty (60) days, but only for any **Claim** that arises out of any act, error or omission first committed or incident or event first occurring after the entity becomes so owned. Coverage beyond such sixty (60) day period shall only be available if the **Named Insured** gives the Underwriters written notice of the acquisition, obtains the written consent of Underwriters to extend coverage beyond such sixty (60) day period to the entity and agrees to pay any additional premium required by Underwriters.

11.     Clause **XVIII.**, **CANCELLATION**,, paragraph C. is deleted in its entirety and replaced with the following:

C.      If the **Named Insured** cancels this Policy, the earned premium shall be computed on a pro rata basis.


All other terms and conditions of this Policy remain unchanged.


_____
Authorized Representative

**Effective date of this Endorsement: 11-Nov-2017**
**This Endorsement is attached to and forms a part of Policy Number: W20D68170101**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

<u>**BBR BOOST ENDORSEMENT**</u>

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1.      The following is added to the end of Clause VII. Limit of Liability and Coverage:

   Notwithstanding anything in paragraphs D., E. or F. to the contrary, if (i) the total number of **Notified Individuals** to whom **Notification Services**, **Call Center Services** or **Breach Resolution and Mitigation Services** are provided exceeds the amount stated in Item 3.B.1., or (ii) the amount of the **Computer Expert Services**, **Legal Services** and **Public Relations and Crisis Management Services** provided to the **Insured Organization** exceeds the aggregate limit of coverage stated in Item 3.B.2., the **Insured Organization** may elect for this Policy to cover the costs, fees and expenses incurred to provide such **Privacy Breach Response Services** in excess of the amounts set forth in Items 3.B.1. and 3.B.2. of the Declarations (the "**Additional Breach Response Costs**") up to an amount equal to the **Policy Aggregate Limit of Liability** (the "**Additional Breach Response Limit**").

2.      If the **Named Insured** elects for this Policy to cover **Additional Breach Response Costs** under the **Additional Breach Response Limit**, Clause VII. Limit of Liability and Coverage, paragraph F. is deleted in its entirety and replaced with the following:

   F.      If the total number of notifications made pursuant to Insuring Agreement B.3. aggregates to more than the number of notifications stated in Item 3.B.1. of the Declarations, the **Additional Breach Response Costs** with respect to any excess notifications will be covered under the **Additional Breach Response Limit**. If an incident involves notifications made pursuant to Insuring Agreement B.3. both within and in excess of the number of **Notified Individuals** stated in Item 3.B.1. of the Declarations, all costs to provide **Notification Services, Call Center Services,** and **Breach Resolution and Mitigation Services** with respect to any individuals in excess of the number of **Notified Individuals** limit will be allocated pro rata between the limit stated in Item 3.B.1. of the Declarations and the number of notifications in excess of such limit based on the total number of notifications. The same service providers that provide **Privacy Breach Response Services** covered within the limits stated in Items 3.B.1. and 3.B.2. of the Declarations will provide all **Privacy Breach Response Services** in excess of such limits.

3.      If the **Named Insured** elects for this Policy to cover **Additional Breach Response Costs** under the **Additional Breach Response Limit**:

   A      The **Additional Breach Response Limit** is part of, and not in addition to, the **Policy Aggregate Limit of Liability** and the **Policy Aggregate Limit of Liability** will be reduced, and may be exhausted, by **Additional Breach Response Costs** covered under the **Additional Breach Response Limit**.

   B      Upon exhaustion of the **Additional Breach Response Limit**, the Underwriters will not be obligated to provide, nor will there be coverage under this Policy for, any **Privacy Breach Response Services** or **Additional Breach Response Costs**.

4.    The definition of "**Loss**" stated in Clause VI. Definitions, paragraph O. is amended to include **Additional Breach Response Costs**.

5.    The first paragraph of Clause VII.A. is deleted in its entirety and replaced with the following:

The Policy Aggregate Limit of Liability set forth in Item 3.A.1. of the Declarations (the "**Policy Aggregate Limit of Liability**") is the Underwriters' combined total limit of liability for all **Damages**, **Penalties**, **PCI Fines, Expenses and Costs**, **Claims Expenses** and **Additional Breach Response Costs** payable under this Policy.

6.    **Additional Breach Response Costs** will not include costs, fees or expenses incurred to provide the **Privacy Breach Response Services** described in Clause VI. Definitions paragraphs G.3. or AA.2.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 11-Nov-2017**
**This Endorsement is attached to and forms a part of Policy Number: W20D68170101**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

## SINGLE RETENTION ENDORSEMENT

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that Clause
VIII. Retention, paragraph C. is deleted in its entirety and replaced with the following:

C.       In the event that any **Loss** arising out of an incident or **Claim** is subject to more than one
         **Retention**, the applicable **Retention** amounts shall apply to such **Loss**, provided that the sum of
         such **Retention** amounts shall not exceed the largest applicable **Retention** amount.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 11-Nov-2017**
**This Endorsement is attached to and forms a part of Policy Number: W20D68170101**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

<u>**FRAUDULENT INSTRUCTION COVERAGE**</u>

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1.    Item 3.A. of the Declarations is amended by the addition of:

                                                                        USD 100,000

      FI.    Aggregate sublimit applicable to all loss under
             Insuring Agreement FI. (Fraudulent Instruction):

2.    The **Retention** amount applicable to each incident, event, or related incidents or events, giving
      rise to an obligation to pay loss under Insuring Agreement FI. shall be equal to the amount stated
      in Item 4.A. of the Declarations.

3.    Clause I. Insuring Agreements is amended by the addition of:

      FI.    **FRAUDULENT INSTRUCTION**

             To indemnify the **Named Insured** for loss, in excess of the applicable **Retention**,
             resulting directly from an **Insured** having transferred, paid, or delivered any **Money** or
             **Securities** as a direct result of **Fraudulent Instructions**, provided such loss is first
             discovered by the **Insured** and reported in writing to the Underwriters during the **Policy**
             **Period** and must occur after the Retroactive Date and before the end of the **Policy**
             **Period**. Coverage under this Insuring Agreement is sublimited to the amount set forth in
             Item 3.A.FI. of the Declarations.

4.    Clause V. Exclusions, paragraph Q. is deleted in its entirety and replaced with the following:

      Q.    For, arising out of or resulting from any of the following:

             (1) trading losses, trading liabilities or change in value of accounts; (2) any loss, transfer
             or theft of monies, securities or tangible property of others in the care, custody or control
             of the **Insured Organization**; (3) the monetary value of any transactions or electronic
             fund transfers by or on behalf of the **Insured** which is lost, diminished, or damaged
             during transfer from, into or between accounts; or (4) the value of coupons, price
             discounts, prizes, awards, or any other valuable consideration given in excess of the total
             contracted or expected amount; provided that subsections (1), (2) and (3) of this
             exclusion shall not apply to **Loss** covered under Insuring Agreement FI.;

5.    There shall be no coverage under Insuring Agreement FI. for **Loss** arising out of or resulting
      from, either directly or indirectly:

      1.    the actual or alleged use of credit, debit, charge, access, convenience, customer
             identification or other cards;

2.      any transfer of money, goods, information or other item involving any person or entity, who is not an Authorized Employee, with authorized access to the **Insured's** authentication mechanism;

3.      the processing of, or the failure to process, credit, check, debit, personal identification number debit, electronic benefit transfers or mobile payments for merchant accounts;

4.      any **Fraudulent Instruction** that was not verified with the requestor using an **Out-of-Band Authentication**;

5.      the failure of any party to perform, in whole or in part, under any contract or agreement;

6.      the failure, malfunction, inadequacy or illegitimacy of any product or service;

7.      accounting or arithmetical errors or omissions;

8.      indirect or consequential loss of any kind including income not realized as the result of a covered loss; or

9.      fees, costs or expenses incurred in defending or prosecuting any legal proceeding or claim.

6.      Clause VI. Definitions, paragraph O., "**Loss**" is amended to include loss covered under Insuring Agreement FI.

7.      Clause VI. Definitions is amended by the addition of:

FI-A.   **Authorized Employee** means an employee who is authorized by the **Insured** to transfer **Money** or **Securities** or to instruct other employees to transfer **Money** or **Securities**.

FI-B.   **Client** means a customer of the **Insured** to whom the **Insured** provides goods or services under a written contract or for a fee.

FI-C.   **Fraudulent Instructions** means a fraudulent written instruction, electronic instruction (including email or web-based instruction) or telephone instruction provided by a person purporting to be a **Vendor**, **Client**, or an **Authorized Employee**, that is intended to mislead an **Insured** through the misrepresentation of a material fact that is relied upon in good faith by such **Insured**.

FI-D.   **Money** means:

1.      currency, coins or bank notes in current use and having a face value; and

2.      traveler's checks, register checks or money orders held for sale to the public.

FI-E.   **Out-of-Band Authentication** means a method of challenge and response to the requestor of a transfer, payment or delivery of **Money** or **Securities** by an **Insured**, via a method other than the original means of request, to verify the authenticity or validity of the request.

FI-F.   **Securities** mean negotiable and non-negotiable instruments or contracts representing either **Money** or property and includes:

1.      tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

2.      evidences of debt issued in connection with credit or charge cards, which cards

are not issued by the **Insured**.

FI-G.   **Third Party** means any person or entity other than a **Related Party**.

FI-H.   **Vendor** means any entity or natural person that provides goods or services to the **Insured** pursuant to a written agreement.

8.     Clause X. Notice of Claim, Loss or Circumstance That Might Lead to a Claim is amended by the addition of:

FI-A.   With respect to Insuring Agreement FI., the **Named Insured** shall forward written notice as soon as practicable upon discovery of such transfer, payment or delivery of **Money** or **Securities** to which this Policy applies, to the Underwriters through persons named in Item 9.(a) of the Declarations in the form of telecopy, email or express or certified mail. In no event shall the Underwriters be given notice of such transfer, payment or delivery of **Money** or **Securities** later than the expiration date of the **Policy Period** or the end of the Optional Extension Period (if applicable).

Before coverage under Insuring Agreement FI. will apply, the **Named Insured** must prepare and submit to the persons named in Item 9.(a) of the Declarations a proof of loss, duly sworn to, within sixty (60) days after the **Insured** discovered such loss. Such proof of loss shall include any available documentation of fraudulent written, electronic or telephone instructions, documentation of verification via a method other than the original means of the request, the amount of loss incurred, and all other insurance available to the **Insured** in connection with such loss.

9.     All losses arising out of or resulting from the same **Fraudulent Instruction**, multiple or series of **Fraudulent Instructions** purporting to be from the same **Vendor, Client** or **Authorized Employee** or related **Vendors, Clients** or **Authorized Employees**, or multiple or a series of **Fraudulent Instructions** from the same **Third Party** or related **Third Parties** shall be deemed to be each a single loss under this Policy subject to the **Retention** stated in Section 2. of this Endorsement.

10.    Coverage under this Endorsement is excess to the coverage provided by any commercial crime policy; provided, however, notwithstanding the foregoing or anything in this Policy to the contrary, the Underwriters will recognize erosion of the **Retention** applicable to Insuring Agreement FI. by any payments made by or on behalf of the **Insured Organization** pursuant to such commercial crime policy issued to the **Insured Organization**, but only if such payments are for **Loss** that would otherwise be covered under Insuring Agreement FI.

All other terms and conditions of this Policy remain unchanged.

_____

Authorized Representative

**Effective date of this Endorsement: 11-Nov-2017**
**This Endorsement is attached to and forms a part of Policy Number: W20D68170101**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>AMEND ITEM 3.B. ENDORSEMENT</u>

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that the sublimit of up to 10% of the **Notified Individuals** Limit of Coverage in Item 3.B.1. of the Declarations will apply to **Notified Individuals** residing outside of the United States, Mexico and Canada, and this sublimit is part of and not in addition to the **Notified Individuals** Limit of Coverage.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 11-Nov-2017**
**This Endorsement is attached to and forms a part of Policy Number: W20D68170101**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>**FIRST PARTY ENDORSEMENT**</u>

This endorsement modifies insurance provided under the following:

**BEAZLEY BREACH RESPONSE**

In consideration of the premium charged for this Policy, it is hereby understood and agreed that:

1.      The following limits of coverage will apply to coverage provided under this endorsement:

| | |
|---|---|
| **Cyber Extortion Loss**: | USD 3,000,000 |
| **Data Recovery Costs**: | USD 3,000,000 |
| **Business Interruption Loss**: | USD 3,000,000 |
| **Dependent Business Loss**: | USD 1,000,000 |

2.      The following Retention and Waiting Period will apply to coverage provided under this Endorsement:

Each **Extortion Threat**, **Security Breach**, **System Failure** or failure of computer security to prevent a breach of computer systems operated by a
**Dependent Business**:                                                                           USD 25,000

**Waiting Period**:                                                                                      10 Hours

3.      **FIRST PARTY INSURING AGREEMENTS**

The Underwriters agree to indemnify the **Insured Organization** for:

**Cyber Extortion Payments and Expenses**

**Cyber Extortion Loss** that the **Insured Organization** incurs as a result of an **Extortion Threat** first made against the **Insured Organization** during the **Policy Period**.

**Data Recovery Costs**

**Data Recovery Costs** that the **Insured Organization** incurs during the **Policy Period** as a direct result of a **Security Breach** that first occurs after the Retroactive Date and before the end of the **Policy Period**.

**Business Interruption Loss**

**Business Interruption Loss** that the **Insured Organization** sustains during the **Policy Period** as a result of a **Security Breach** or **System Failure** that first occurs after the Retroactive Date and before the end of the **Policy Period**.

**Dependent Business Loss**

**Dependent Business Loss** that the **Insured Organization** sustains during the **Policy Period** as a result of a failure of computer security to prevent a breach of computer systems operated by a **Dependent Business** that first occurs after the Retroactive Date and before the end of the **Policy Period**.

4.      Coverage under this Policy will not apply to **First Party Loss** for, arising out of or resulting from:

Seizure, nationalization, confiscation, or destruction of property or data by order of any governmental or public authority;

Costs or expenses incurred by the **Insured** to identify or remediate software program errors or vulnerabilities or update, replace, restore, assemble, reproduce, recollect or enhance **Data** or **Computer Systems** to a level beyond that which existed prior to a **Security Breach**, **System Failure** or **Extortion Threat**;

Failure or malfunction of satellites or of power, utility, mechanical or telecommunications (including internet) infrastructure or services that are not under the **Insured Organization's** direct operational control; or

Fire, flood, earthquake, volcanic eruption, explosion, lighting, wind, hail, tidal wave, landslide, act of God or other physical event.

5.      Clause VI. Definitions, paragraph O. "**Loss**" is amended to include **First Party Loss**.

6.      **DEFINITIONS**

The following definitions are added to the Policy:

**Business Interruption Loss** means:

1.   **Income Loss**;

2.   **Forensic Expenses**; and

3.   **Extra Expense**;

actually sustained during the **Period of Restoration** as a result of the actual interruption of the **Insured Organization's** business operations caused by a **Security Breach** or **System Failure**. Coverage for **Business Interruption Loss** will apply only after the **Waiting Period** has elapsed.

**Business Interruption Loss** will not include (i) loss arising out of any liability to any third party; (ii) legal costs or legal expenses; (iii) loss incurred as a result of unfavorable business conditions; (iv) loss of market or any other consequential loss; (v) **Dependent Business Loss**; or (vi) **Data Recovery Costs**.

**Cyber Extortion Loss** means:

1.   any **Extortion Payment** that has been made by or on behalf of the **Insured Organization** with the Underwriters' prior written consent to prevent or respond to an **Extortion Threat**; and

2.   reasonable and necessary expenses incurred by the **Insured Organization** with the Underwriters' prior written consent to prevent or respond to an **Extortion Threat**.

**Data** means any software or electronic data that exists in **Computer Systems** and that is subject to regular back-up procedures.

**Data Recovery Costs** means the reasonable and necessary costs incurred by the **Insured Organization** to regain access to, replace, or restore **Data**, or if **Data** cannot reasonably be

accessed, replaced, or restored, then the reasonable and necessary costs incurred by the **Insured Organization** to reach this determination.

**Data Recovery Costs** will not include: (i) the monetary value of profits, royalties, or lost market share related to **Data**, including but not limited to trade secrets or other proprietary information or any other amount pertaining to the value of **Data**; (ii) legal costs or legal expenses; (iii) loss arising out of any liability to any third party; or (iv) **Cyber Extortion Loss**.

**Dependent Business** means any entity that is not a part of the **Insured Organization** but which provides necessary products or services to the **Insured Organization** pursuant to a written contract.

**Dependent Business Loss** means:

1. **Income Loss**;

2. **Forensic Expenses**; and

3. **Extra Expense**;

actually sustained during the **Period of Restoration** as a result of an actual interruption of the **Insured Organization's** business operations caused by a failure of computer security to prevent a breach of computer systems operated by a **Dependent Business**. Coverage for **Dependent Business Loss** will apply only after the **Waiting Period** has elapsed.

**Dependent Business Interruption Loss** will not include (i) loss arising out of any liability to any third party; (ii) legal costs or legal expenses; (iii) loss incurred as a result of unfavorable business conditions; (iv) loss of market or any other consequential loss; (v) **Business Interruption Loss**; or (vi) **Data Recovery Costs**.

**Digital Currency** means a type of digital currency that:

1. requires cryptographic techniques to regulate the generation of units of currency and verify the transfer thereof;

2. is both stored and transferred electronically; and

3. operates independently of a central bank or other central authority.

**Extortion Payment** means money, **Digital Currency**, marketable goods or services demanded to prevent or terminate an **Extortion Threat**.

**Extortion Threat** means a threat to:

1. alter, destroy, damage, delete or corrupt **Data**;

2. perpetrate the **Unauthorized Access or Use** of **Computer Systems**;

3. prevent access to **Computer Systems** or **Data**;

4. steal, misuse or publicly disclose **Data**, **Personally Identifiable Information** or **Third Party Information**;

5. introduce malicious code into **Computer Systems** or to third party computers systems from **Computer Systems**; or

6. interrupt or suspend **Computer Systems**;

unless an **Extortion Payment** is received from or on behalf of the **Insured Organization**.

**Extra Expense** means reasonable and necessary expenses incurred by the **Insured Organization** during the **Period of Restoration** to minimize, reduce or avoid **Income Loss**, over and above those expenses the **Insured Organization** would have incurred had no **Security Breach**, **System Failure** or failure of computer security occurred.

**First Party Loss** means **Cyber Extortion Loss**, **Data Recovery Costs**, **Business Interruption Loss** and **Dependent Business Loss**.

**Forensic Expenses** means reasonable and necessary expenses incurred by the **Insured Organization** to investigate the source or cause of a **Security Breach** or **System Failure**.

**Income Loss** means an amount equal to:

1.  net profit or loss before interest and tax that the **Insured Organization** would have earned or incurred; and

2.  continuing normal operating expenses incurred by the **Insured Organization** (including payroll), but only to the extent that such operating expenses must necessarily continue during the **Period of Restoration**.

**Period of Restoration** means the 180-day period of time that begins upon the actual and necessary interruption of the **Insured Organization's** business operations.

**System Failure** means an unintentional, accidental or negligent act, error or omission by the **Insured Organization** in:

1.  entering, modifying, creating, handling, developing or maintaining **Data**; or

2.  operating or maintaining **Computer Systems**.

    For purposes of this definition: (i) **Computer Systems** means only those computers (including software residing on such computers) and associated input and output devices, data storage devices, networking equipment, and back up facilities that are operated by and either owned by or leased to the **Insured Organization**; and (ii) **Data** means any software or electronic data that exists in **Computer Systems** described in (i) and that is subject to regular back-up procedures.

**Waiting Period** means the period of time that begins upon the actual interruption of the **Insured Organization's** business operations caused by:

1.  failure of **Computer Security** to prevent a **Security Breach**;

2.  **System Failure**; or

3.  failure of computer security to prevent a breach of computer systems operated by a **Dependent Business**;

    and ends after the elapse of the number of hours set forth in Section 2. of this Endorsement.

7.  **LIMITS OF COVERAGE**

    The aggregate limits of coverage payable under this Policy for **Cyber Extortion Loss**, **Data Recovery Costs**, **Business Interruption Loss** and **Dependent Business Loss**, respectively,

are stated in Section 1. of this Endorsement and such limits are part of, and not in addition to, the **Policy Aggregate Limit of Liability**.

All **Dependent Business Loss** payable under this Policy is part of and not in addition to the **Business Interruption Loss** limit stated in Section 1. of this Endorsement.

8.    **RELATED OR CONTINUING EVENTS**

All **First Party Loss** resulting from the same or a continuing incident or event, or from multiple related or continuing incidents or events will be deemed to be a single incident or event and multiple related or continuing incidents or events will be deemed to have occurred at the time of the first such incident or event.

9.    **RETENTIONS**

The **Retentions** stated in Section 2. of this Endorsement apply separately to each **Extortion Threat**, **Security Breach**, **System Failure** or failure of computer security to prevent a breach of computer systems operated by a **Dependent Business** that results in **Cyber Extortion Loss**, **Data Recovery Costs**, **Business Interruption Loss** or **Dependent Business Loss**, respectively.

Coverage for **Business Interruption Loss** and **Dependent Business Loss** will apply after the **Waiting Period** has elapsed and the Underwriters will then indemnify the **Named Insured** for all **Business Interruption Loss** and **Dependent Business Loss** sustained during the **Period of Restoration** in excess of the **Retention**.

10.    **NOTICE OF FIRST PARTY LOSS**

A.    In the event of an **Extortion Threat**, the **Named Insured** must seek the Underwriters' consent via the email address specified in Item 9.(a) of the Declarations prior to incurring **Cyber Extortion Loss**.

B.    With respect to **Data Recovery Costs**, **Business Interruption Loss** or **Dependent Business Loss** the **Named Insured** must forward written notice by express mail, email or telecopy to the Underwriters through persons named in Item 9.(a) of the Declarations as soon as practicable after discovery of the circumstance, incident or event giving rise to such loss. The **Named Insured** will provide the Underwriters a proof of **Data Recovery Costs**, **Business Interruption Loss** or **Dependent Business Loss**, and this Policy will cover the reasonable and necessary costs, not to exceed USD 50,000, that the **Named Insured** incurs to contract with a third party to prepare such proof. All **First Party Loss** must be discovered and reported, and all proofs of loss must be provided, to the Underwriters no later than six (6) months after the end of the **Policy Period**.

11.    **VALUATION AND CURRENCY OF EXTORTION PAYMENT**

If any **Extortion Payment** is made by or on behalf of the **Insured Organization** in **Digital Currency**, payment by the Underwriters under this Policy will be made in United States Dollars equal to the US Dollar-value of the **Digital Currency** at the time the **Extortion Payment** is made.

For purposes of this paragraph, an **Extortion Payment** using **Digital Currency** will be considered "made" at the time that such **Digital Currency** is first recorded in a public ledger of transactions for such **Digital Currency** (for example, the time at which **Digital Currency** is included in a block on the blockchain.)

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**CERTIFICATE PROVISIONS**

 # Lloyd's Insurance

**This Insurance** is effected with certain Underwriters at Lloyd's, London.

**This Certificate** is issued in accordance with the limited authorization granted to the Correspondent by certain Underwriters at Lloyd's, London whose syndicate numbers and the proportions underwritten by them can be ascertained from the office of the said Correspondent (such Underwriters being hereinafter called "Underwriters") and in consideration of the premium specified herein, Underwriters hereby bind themselves severally and not jointly, each for his own part and not one for another, their Executors and Administrators.

**The Assured** is requested to read this Certificate, and if it is not correct, return it immediately to the Correspondent for appropriate alteration.

All inquiries regarding this Certificate should be addressed to the following Correspondent:

SLC-3 (USA) NMA2868 (24/08/00) Printed by the Corporation of Lloyd's.

1. **Signature Required.** This Certificate shall not be valid unless signed by the Correspondent on the attached Declaration Page.

2. **Correspondent Not Underwriters.** The Correspondent is not an Underwriter hereunder and neither is nor shall be liable for any loss or claim whatsoever. The Underwriters hereunder are those Underwriters at Lloyd's, London whose syndicate numbers can be ascertained as hereinbefore set forth. As used in this Certificate "Underwriters" shall be deemed to include incorporated as well as unincorporated persons or entities that are Underwriters at Lloyd's, London.

3. **Cancellation.** If this Certificate provides for cancellation and this Certificate is cancelled after the inception date, earned premium must be paid for the time the insurance has been in force.

4. **Assignment.** This Certificate shall not be assigned either in whole or in part without the written consent of the Correspondent endorsed hereon.

5. **Attached Conditions Incorporated.** This Certificate is made and accepted subject to all the provisions, conditions and warranties set forth herein, attached or endorsed, all of which are to be considered as incorporated herein.

6. It is hereby understood and agreed that wherever the word 'Policy' appears herein it shall be deemed to read 'Certificate.'



# BEAZLEY BREACH RESPONSE

**NOTICE: INSURING AGREEMENTS A., C., D. AND E. OF THIS POLICY PROVIDE COVERAGE ON A CLAIMS MADE AND REPORTED BASIS AND APPLY ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR THE OPTIONAL EXTENSION PERIOD (IF APPLICABLE) AND REPORTED TO THE UNDERWRITERS DURING THE POLICY PERIOD OR AS OTHERWISE PROVIDED IN CLAUSE X. OF THIS POLICY. AMOUNTS INCURRED AS CLAIMS EXPENSES UNDER THIS POLICY SHALL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY AND ARE SUBJECT TO RETENTIONS.**

**INSURING AGREEMENT B. OF THIS POLICY PROVIDES FIRST PARTY COVERAGE ON AN INCIDENT DISCOVERED AND REPORTED BASIS AND APPLIES ONLY TO INCIDENTS FIRST DISCOVERED BY THE INSURED AND REPORTED TO THE UNDERWRITERS DURING THE POLICY PERIOD.**

Please review the coverage afforded under this Insurance Policy carefully and discuss the coverage hereunder with your insurance agent or broker.

The Underwriters agree with the **Named Insured**, set forth in Item 1. of the Declarations made a part hereof, in consideration of the payment of the premium and reliance upon the statements in the **Application** to this Insurance Policy (hereinafter referred to as the "Policy" or "Insurance") and subject to all the provisions, terms and conditions of this Policy:

I.   **INSURING AGREEMENTS**

A.   **Information Security & Privacy Liability**

To pay on behalf of the **Insured**:

**Damages** and **Claims Expenses**, in excess of the **Retention**, which the **Insured** shall become legally obligated to pay because of any **Claim**, including a **Claim** for violation of a **Privacy Law**, first made against any **Insured** during the **Policy Period** or Optional Extension Period (if applicable) and reported in writing to the Underwriters during the **Policy Period** or as otherwise provided in Clause X. of this Policy for:

1.   theft, loss, or **Unauthorized Disclosure** of **Personally Identifiable Information** or **Third Party Information** that is in the care, custody or control of the **Insured Organization**, or a third party for whose theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Information** or **Third Party Information** the **Insured Organization** is legally liable (a third party shall include a Business Associate as defined by the Health Insurance Portability and Accountability Act ("HIPAA")), provided such theft, loss or **Unauthorized Disclosure** first takes place on or after the Retroactive Date and before the end of the **Policy Period**;

2.      one or more of the following acts or incidents that directly result from a failure of **Computer Security** to prevent a **Security Breach**, provided that such act or incident first takes place on or after the Retroactive Date and before the end of the **Policy Period**;

    (a)     the alteration, corruption, destruction, deletion, or damage to data stored on **Computer Systems**;

    (b)     the failure to prevent transmission of malicious code from **Computer Systems** to computer or network systems that are not owned, operated or controlled by an **Insured**; or

    (c)     the participation by the **Insured Organization's Computer Systems** in a denial-of-service attack directed against computer or network systems that are not owned, operated or controlled by an **Insured**;

3.      the **Insured Organization's** failure to timely disclose an incident described in Insuring Agreement A.1. or A.2. in violation of any **Breach Notice Law**; provided such incident giving rise to the **Insured Organization's** obligation under a **Breach Notice Law** must first take place on or after the Retroactive Date and before the end of the **Policy Period**;

4.      failure by the **Insured** to comply with that part of a **Privacy Policy** that specifically:

    (a)     prohibits or restricts the **Insured Organization's** disclosure, sharing or selling of a person's **Personally Identifiable Information**;

    (b)     requires the **Insured Organization** to provide access to **Personally Identifiable Information** or to correct incomplete or inaccurate **Personally Identifiable Information** after a request is made by a person; or

    (c)     mandates procedures and requirements to prevent the loss of **Personally Identifiable Information**;

provided the acts, errors or omissions that constitute such failure to comply with a **Privacy Policy** must first take place on or after the Retroactive Date and before the end of the **Policy Period**, and the **Insured Organization** must, at the time of such acts, errors or omissions have in force a **Privacy Policy** that addresses those subsections above that are relevant to such **Claim**; or

5.      failure by the **Insured** to administer (a) an identity theft prevention program required by regulations and guidelines promulgated pursuant to 15 U.S.C. §1681m(e), as amended, or (b) an information disposal program required by regulations and guidelines promulgated pursuant to 15 U.S.C. §1681W, as amended; provided the acts, errors or omissions that constitute such failure must first take place on or after the Retroactive Date and before the end of the **Policy Period**.

B. **Privacy Breach Response Services**

To provide **Privacy Breach Response Services** to the **Insured Organization** in excess of the **Retention** because of an incident (or reasonably suspected incident) described in Insuring Agreement A.1. or A.2. that first takes place on or after the Retroactive Date and before the end of the **Policy Period** and is discovered by the **Insured** and is reported to the Underwriters during the **Policy Period**.

**Privacy Breach Response Services** means the following:

1. **Computer Expert Services**;

2. **Legal Services**;

3. **Notification Services** to provide notification to:

 (a) individuals who are required to be notified by the **Insured Organization** under the applicable **Breach Notice Law**; or

 (b) in the Underwriters' discretion, individuals affected by an incident in which their **Personally Identifiable Information** has been subject to theft, loss or **Unauthorized Disclosure** in a manner which compromises the security or privacy of such individual by posing a significant risk of financial, reputational or other harm to the individual;

4. **Call Center Services**;

5. **Breach Resolution and Mitigation Services**; and

6. **Public Relations and Crisis Management Expenses**.

**Privacy Breach Response Services** also includes assistance from the BBR Services Team and access to educational and loss control information at no charge.

**Privacy Breach Response Services** will be provided subject to the terms and conditions of this Policy and the **Information Packet**, will be subject to the applicable retentions and limitations set forth in the Declarations, and shall not include any internal salary or overhead expenses of the **Insured Organization**.

C. **Regulatory Defense and Penalties**

To pay on behalf of the **Insured**:

**Claims Expenses** and **Penalties** in excess of the **Retention**, which the **Insured** shall become legally obligated to pay because of any **Claim** in the form of a **Regulatory Proceeding**, first made against any **Insured** during the **Policy Period** or Optional Extension Period (if applicable) and reported in writing to the Underwriters during the **Policy Period** or as otherwise provided in Clause X. of this Policy, for a violation of a **Privacy Law** and caused by an incident described in Insuring Agreements A.1., A.2. or A.3. that first takes place on or after the Retroactive Date and before the end of the **Policy Period**.

D.  **Website Media Content Liability**

To pay on behalf of the **Insured**:

**Damages** and **Claims Expenses**, in excess of the **Retention**, which the **Insured** shall become legally obligated to pay resulting from any **Claim** first made against any **Insured** during the **Policy Period** or Optional Extension Period (if applicable) and reported in writing to the Underwriters during the **Policy Period** or as otherwise provided in Clause X. of this Policy for one or more of the following acts first committed on or after the Retroactive Date and before the end of the **Policy Period** in the course of the **Insured Organization's** display of **Media Material** on its web site or on social media web pages created and maintained by or on behalf of the **Insured Organization**:

1.  defamation, libel, slander, trade libel, infliction of emotional distress, outrage, outrageous conduct, or other tort related to disparagement or harm to the reputation or character of any person or organization;

2.  a violation of the rights of privacy of an individual, including false light and public disclosure of private facts;

3.  invasion or interference with an individual's right of publicity, including commercial appropriation of name, persona, voice or likeness;

4.  plagiarism, piracy, misappropriation of ideas under implied contract;

5.  infringement of copyright;

6.  infringement of domain name, trademark, trade name, trade dress, logo, title, metatag, or slogan, service mark, or service name; or

7.  improper deep-linking or framing within electronic content.

E.  **PCI Fines, Expenses and Costs**

To indemnify the **Insured** for **PCI Fines, Expenses and Costs**, in excess of the **Retention**, which the **Insured** shall become legally obligated to pay because of a **Claim** first made against any **Insured** during the **Policy Period** or Optional Extension Period (if applicable) and reported in writing to the Underwriters during the **Policy Period** or as otherwise provided in Clause X. of this Policy.  Coverage under this Insuring Agreement is sublimited to the amount set forth Item 3.A.3. of the Declarations, and the Underwriters shall have no duty to defend any **Claim** or pay **Claims Expenses** with respect to any **Claim** under this Insuring Agreement.

## II.  DEFENSE AND SETTLEMENT OF CLAIMS

A.  The Underwriters shall have the right and duty to defend, subject to all the provisions, terms and conditions of this Policy:

1.  any **Claim** against the **Insured** seeking **Damages** which are payable under the terms of this Policy, even if any of the allegations of the **Claim** are groundless, false or fraudulent; or

2.  under Insuring Agreement C., any **Claim** in the form of a **Regulatory Proceeding**.

Defense Counsel shall be mutually agreed upon between the **Named Insured** and the Underwriters, but in the absence of such agreement, the Underwriters' decision shall be final.

B.     With respect to any **Claim** against the **Insured** seeking **Damages** or **Penalties** which are payable under the terms of this Policy, the Underwriters will pay **Claims Expenses** incurred with their prior written consent. The Limit of Liability available to pay **Damages** and **Penalties** shall be reduced and may be completely exhausted by payment of **Claims Expenses**. **Damages**, **Penalties**, and **Claims Expenses** shall be applied against the Each **Claim Retention** payable by the **Insured**.

C.     If the **Insured** shall refuse to consent to any settlement or compromise recommended by the Underwriters and acceptable to the claimant and elects to contest the **Claim**, the Underwriters' liability for any **Damages**, **Penalties** and **Claims Expenses** shall not exceed:

1.     the amount for which the **Claim** could have been settled, less the remaining **Retention**, plus the **Claims Expenses** incurred up to the time of such refusal; plus

2.     fifty percent (50%) of any **Claims Expenses** incurred after the date such settlement or compromise was recommended to the **Insured** plus fifty percent (50%) of any **Damages** above the amount for which the **Claim** could have been settled. The remaining fifty percent (50%) of such **Claims Expenses** and **Damages** must be borne by the **Insured** at their own risk and uninsured;

or the applicable Limit of Liability, whichever is less, and the Underwriters shall have the right to withdraw from the further defense thereof by tendering control of said defense to the **Insured**. The portion of any proposed settlement or compromise that requires the **Insured** to cease, limit or refrain from actual or alleged infringing or otherwise injurious activity or is attributable to future royalties or other amounts that are not **Damages** (or **Penalties** for **Claims** covered under Insuring Agreement C.) shall not be considered in determining the amount for which a **Claim** could have been settled.

D.     The Underwriters agree that the **Insured** may settle any **Claim** where the **Damages**, **Penalties** and **Claims Expenses** do not exceed the **Retention**, provided that the entire **Claim** is resolved and the **Insured** obtains a full release on behalf of all the **Insureds** from all claimants.

## III.   THE INSURED AND THE INSURED ORGANIZATION

As used throughout this Policy, whether expressed in singular or plural, "**Insured**" shall mean:

A.     The Named Insured listed in Item 1. of the Declarations (the "**Named Insured**") and any **Subsidiaries** of the **Named Insured** (together the "**Insured Organization**");

B.     A director, manager of a limited liability company ("**Manager**") or officer of the **Insured Organization**, but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

C.      An employee (including a part time or temporary employee) of the **Insured Organization**, but only for work done while acting within the scope of his or her employment and related to the conduct of the **Insured Organization's** business;

D.      A principal if the **Named Insured** is a sole proprietorship, or a partner if the **Named Insured** is a partnership, but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

E.      Any person who previously qualified as an **Insured** under III.B., III.C. or III.D. above prior to the termination of the required relationship with the **Insured Organization**, but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

F.      The estate, heirs, executors, administrators, assigns and legal representatives of any **Insured** in the event of such **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this Insurance; and

G.      The lawful spouse, including any natural person qualifying as a domestic partner under the provisions of any applicable federal, state, or local law in the United States, of any **Insured**, but solely by reason of any act, error or omission of an **Insured** other than such spouse or domestic partner.

## IV.   TERRITORY

This Insurance applies to **Claims** made, acts committed, or **Loss** occurring anywhere in the world.

## V.   EXCLUSIONS

The coverage under this Insurance does not apply to any **Claim** or **Loss**;

A.      For, arising out of or resulting from:

      1.     physical injury, sickness, disease or death of any person, including any mental anguish or emotional distress resulting from such physical injury, sickness, disease or death; or

      2.     physical injury to or destruction of any tangible property, including the loss of use thereof; provided that electronic data shall not be considered tangible property for purposes of this exclusion;

B.      For, arising out of or resulting from any employer-employee relations, policies, practices, acts or omissions, or any actual or alleged refusal to employ any person, or misconduct with respect to employees, whether such **Claim** is brought by an employee, former employee, applicant for employment, or relative or domestic partner of such person; provided, that this exclusion shall not apply to an otherwise covered **Claim** under Insuring Agreement A.1., A.2., or A.3. by a current or former employee of the **Insured Organization**, or to the providing of **Privacy Breach Response Services** involving current or former employees of the **Insured Organization**;

C.      For, arising out of or resulting from any actual or alleged act, error or omission or breach of duty by any director, officer or **Manager** in the discharge of their duty if

the **Claim** is brought by or on behalf of the **Named Insured**, a **Subsidiary**, or any principals, directors, officers, **Managers**, stockholders, members or employees of the **Named Insured** or a **Subsidiary** in his or her capacity as such;

D.  For, arising out of or resulting from any contractual liability or obligation, or arising out of or resulting from breach of contract or agreement either oral or written; provided, that this exclusion will not apply:

1.  only with respect to the coverage provided pursuant to Insuring Agreement A.1., to any obligation of the **Insured Organization** to maintain the confidentiality or security of **Personally Identifiable Information** or of **Third Party Information**;

2.  only with respect to Insuring Agreement D.4., for misappropriation of ideas under implied contract;

3.  to **Computer Expert Services** or **Legal Services** covered under Insuring Agreement B.;

4.  to **PCI Fines, Expenses and Costs** covered under Insuring Agreement E.; or

5.  to the extent the **Insured** would have been liable in the absence of such contract or agreement;

E.  For, arising out of or resulting from any actual or alleged antitrust violation, restraint of trade, unfair competition, or false or deceptive or misleading advertising or violation of the Sherman Antitrust Act, the Clayton Act, or the Robinson-Patman Act, as amended;

F.  For, arising out of or resulting from any actual or alleged false, deceptive or unfair trade practices; however this exclusion does not apply to:

1.  any **Claim** covered under Insuring Agreements A.1., A.2., A.3. or C.; or

2.  the providing of **Privacy Breach Response Services** covered under Insuring Agreement B.,

that results from a theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Information** provided that no member of the **Control Group** participated or colluded in such theft, loss or **Unauthorized Disclosure**;

G.  For, arising out of or resulting from:

1.  the actual or alleged unlawful collection, acquisition or retention of **Personally Identifiable Information** (except as otherwise covered under Insuring Agreement A.5.) or other personal information by, on behalf of, or with the consent or cooperation of the **Insured Organization**; or the failure to comply with a legal requirement to provide individuals with the ability to assent to or withhold assent (e.g. opt-in or opt-out) from the collection, disclosure or use of **Personally Identifiable Information**; provided, that this exclusion shall not apply to the actual or alleged unlawful collection, acquisition or retention of **Personally Identifiable Information** by a person or entity that is not a **Related Party** and without the knowledge of the **Insured Organization**; or

2.      the distribution of unsolicited email, text messages,  direct mail, or facsimiles, wire tapping, audio or video recording, or telemarketing, if such distribution, wire tapping or recording is done by or on behalf of the **Insured Organization**;

H.      For, arising out of or resulting from any act, error, omission, incident, failure of **Computer Security**, or **Security Breach** committed or occurring prior to the inception date of this Policy:

1.      if any member of the **Control Group** on or before the **Continuity Date** knew or could have reasonably foreseen that such act, error or omission, incident, failure of **Computer Security**, or **Security Breach** might be expected to be the basis of a **Claim** or **Loss**; or

2.      in respect of which any **Insured** has given notice of a circumstance, which might lead to a **Claim** or **Loss**, to the insurer of any other policy in force prior to (i) the inception date of this Policy, or (ii) if this Policy is a renewal, the inception date of the first consecutive policy issued by the Underwriters of which this Policy is a renewal;

I.      For, arising out of or resulting from any related or continuing acts, errors, omissions, incidents or events, where the first such act, error, omission, incident or event was committed or occurred prior to the Retroactive Date;

J.      For, arising out of resulting from any of the following:

1.      any actual or alleged violation of the Organized Crime Control Act of 1970 (commonly known as Racketeer Influenced and Corrupt Organizations Act or RICO), as amended;

2.      any actual or alleged violation of any securities law including but not limited to the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Act of 1940, the Sarbanes-Oxley Act of 2002 or any "Blue Sky" laws;

3.      any actual or alleged acts, errors, or omissions related to any of the **Insured Organization's** pension, healthcare, welfare, profit sharing, mutual or investment plans, funds or trusts, including any violation of any provision of the Employee Retirement Income Security Act of 1974 (ERISA);

4.      any actual or alleged violation of a regulation promulgated under any of the laws described in 1., 2. or 3. above; or

5.      any actual or alleged violation of a federal, state, local or foreign laws or legislation similar to the laws described in 1., 2. or 3. above;

however this exclusion does not apply to any otherwise covered **Claim** under Insuring Agreement A.1., A.2., or A.3., or to providing **Privacy Breach Response Services** covered under Insuring Agreement B., that results from a theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Information**, provided that no member of the **Control Group** participated or colluded in such theft, loss or **Unauthorized Disclosure**;

K.    any actual or alleged discrimination of any kind including but not limited to age, color, race, sex, creed, national origin, marital status, sexual preference, disability or pregnancy;

L.    Arising out of or resulting from any criminal, dishonest, fraudulent, or malicious act, error or omission, any intentional **Security Breach**, intentional violation of a **Privacy Policy**, or intentional or knowing violation of the law, if committed by such **Insured**, or by others if the **Insured** colluded or participated in any such conduct or activity; provided this exclusion shall not apply to:

    1.    **Claims Expenses** incurred in defending any **Claim** alleging the foregoing until such time as there is a final non-appealable adjudication, judgment, binding arbitration decision or conviction against the **Insured**, or written admission by the **Insured**, establishing such conduct, or a plea of *nolo contendere* or no contest regarding such conduct, at which time the **Named Insured** shall reimburse the Underwriters for all **Claims Expenses** incurred defending the **Claim** and the Underwriters shall have no further liability for **Claims Expenses**; or

    2.    a **Claim** or **Loss** against a natural person **Insured** if such **Insured** did not personally commit, participate in or know about any act, error, omission, incident or event giving rise to such **Claim** or **Loss**.

For purposes of this exclusion, only acts, errors, omissions or knowledge of a member of the **Control Group** will be imputed to the **Insured Organization**.

M.    For, arising out of or resulting from any actual or alleged:

    1.    infringement of patent or patent rights or misuse or abuse of patent;

    2.    infringement of copyright arising from or related to software code or software products other than infringement resulting from a theft or **Unauthorized Access or Use** of software code by a person who is not a **Related Party**;

    3.    use or misappropriation of any ideas, trade secrets or **Third Party Information** (i) by, or on behalf of, the **Insured Organization**, or (ii) by any other person or entity if such use or misappropriation is done with the knowledge, consent or acquiescence of a member of the **Control Group**;

    4.    disclosure, misuse or misappropriation of any ideas, trade secrets or confidential information that came into the possession of any person or entity prior to the date the person or entity became an employee, officer, director, **Manager**, principal, partner or **Subsidiary** of the **Insured Organization**; or

    5.    under Insuring Agreement A.2., theft of or **Unauthorized Disclosure** of data;

N.    For, in connection with or resulting from a **Claim** brought by or on behalf of any state, federal, local or foreign governmental entity, in such entity's regulatory or official capacity; provided, this exclusion shall not apply to an otherwise covered **Claim** under Insuring Agreement C. or to the providing of **Privacy Breach Response Services** under Insuring Agreement B. to the extent such services are legally required to comply with a **Breach Notice Law**;

O.    For, arising out of or resulting from a **Claim** by or on behalf of one or more **Insureds** under this Insurance against any other **Insured** or **Insureds** under this Insurance; provided this exclusion shall not apply to an otherwise covered **Claim** under Insuring Agreement A.1., A.2., or A.3. made by a current or former employee of the **Insured Organization**;

P.    For, arising out of or resulting from:

    1.    any **Claim** made by any business enterprise in which any **Insured** has greater than a fifteen percent (15%) ownership interest or made by any parent company or other entity which owns more than fifteen percent (15%) of the **Named Insured**; or

    2.    the **Insured's** activities as a trustee, partner, member, **Manager**, officer, director or employee of any employee trust, charitable organization, corporation, company or business other than that of the **Insured Organization**;

Q.    For, arising out of or resulting from any of the following: (1) trading losses, trading liabilities or change in value of accounts; (2) any loss, transfer or theft of monies, securities or tangible property of others in the care, custody or control of the **Insured Organization;** (3) the monetary value of any transactions or electronic fund transfers by or on behalf of the **Insured** which is lost, diminished, or damaged during transfer from, into or between accounts; or (4) the value of coupons, price discounts, prizes, awards, or any other valuable consideration given in excess of the total contracted or expected amount;

R.    For, arising out of or resulting from:

    1.    the actual or alleged obligation to make licensing fee or royalty payments, including but limited to the amount or timeliness of such payments;

    2.    any costs or expenses incurred or to be incurred by the **Insured** or others for the reprinting, reposting, recall, removal or disposal of any **Media Material** or any other information, content or media, including any media or products containing such **Media Material**, information, content or media;

    3.    any **Claim** brought by or on behalf of any intellectual property licensing bodies or organizations, including but not limited to, the American Society of Composers, Authors and Publishers, the Society of European Stage Authors and Composers or Broadcast Music, Inc;

    4.    the actual or alleged inaccurate, inadequate or incomplete description of the price of goods, products or services, cost guarantees, cost representations, or contract price estimates, the authenticity of any goods, products or services, or the failure of any goods or services to conform with any represented quality or performance;

    5.    any actual or alleged gambling, contest, lottery, promotional game or other game of chance; or

    6.    any **Claim** made by or on behalf of any independent contractor, joint venturer or venture partner arising out of or resulting from disputes over ownership of

rights in **Media Material** or services provided by such independent contractor, joint venturer or venture partner;

S.    Arising out of or resulting from, directly or indirectly occasioned by, happening through or in consequence of: war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority; provided, that this exclusion will not apply to **Cyber Terrorism**.

For purposes of this exclusion, "**Cyber Terrorism**" means the premeditated use of disruptive activities, or threat to use disruptive activities, against a computer system or network with the intention to cause harm, further social, ideological, religious, political or similar objectives, or to intimidate any person(s) in furtherance of such objectives.

T.    Either in whole or in part, directly or indirectly arising out of or resulting from or in consequence of, or in any way involving:

1.    asbestos, or any materials containing asbestos in whatever form or quantity;

2.    the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungi, molds, spores or mycotoxins of any kind; any action taken by any party in response to the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of fungi, molds, spores or mycotoxins of any kind, such action to include investigating, testing for, detection of, monitoring of, treating, remediating or removing such fungi, molds, spores or mycotoxins; and any governmental or regulatory order, requirement, directive, mandate or decree that any party take action in response to the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of fungi, molds, spores or mycotoxins of any kind, such action to include investigating, testing for, detection of, monitoring of, treating, remediating or removing such fungi, molds, spores or mycotoxins;

The Underwriters will have no duty or obligation to defend any **Insured** with respect to any **Claim** or governmental or regulatory order, requirement, directive, mandate or decree which either in whole or in part, directly or indirectly, arises out of or results from or in consequence of, or in any way involves the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungi, molds, spores or mycotoxins of any kind;

3.    the existence, emission or discharge of any electromagnetic field, electromagnetic radiation or electromagnetism that actually or allegedly affects the health, safety or condition of any person or the environment, or that affects the value, marketability, condition or use of any property; or

4.    the actual, alleged or threatened discharge, dispersal, release or escape of Pollutants; or any governmental, judicial or regulatory directive or request that the **Insured** or anyone acting under the direction or control of the **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or

neutralize Pollutants. Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant including gas, acids, alkalis, chemicals, heat, smoke, vapor, soot, fumes or waste. Waste includes but is not limited to materials to be recycled, reconditioned or reclaimed.

## VI.   DEFINITIONS

A.   **Application** means all applications, including any attachments thereto, and all other information and materials submitted by or on behalf of the **Insured** to the Underwriters in connection with the underwriting of this Policy, or prior policies of which this Policy is a renewal.

B.   **Breach Notice Law** means any federal, state, local or foreign statute or regulation that requires notice to persons whose **Personally Identifiable Information** was accessed or reasonably may have been accessed by an unauthorized person.

C.   **Breach Resolution and Mitigation Services** means a credit monitoring, identity monitoring or other solution selected from the products listed in the **Information Packet** and offered to **Notified Individuals**. The product offered to **Notified Individuals** will be selected by the Underwriters in consultation with the **Insured Organization** and in accordance with the guidance provided in the Breach Resolution and Mitigation section of the **Information Packet**.

The product offer will be included in the communication provided pursuant to Insuring Agreement B.3.

D.   **Call Center Services** means the provision of a call center to answer calls during standard business hours for a period of ninety (90) days following notification (or longer if required by applicable law or regulation) of an incident for which notice is provided pursuant to Insuring Agreement B.3. (Notification Services). Such notification shall include a toll free telephone number that connects to the call center during standard business hours. Call center employees will answer questions about the incident from **Notified Individuals** and will provide information required by the HIPAA/Health Information Technology for Economic and Clinical Health Act ("HITECH") media notice or by other applicable law or regulation.

**Call Center Services** will include up to 10,000 calls per day and will be provided in accordance with the terms and conditions set forth in the **Information Packet**. **Call Center Services** will be provided by a service provider selected by the Underwriters in consultation with the **Insured Organization** from the list of service providers in the **Information Packet**.

E.   **Claim** means:

1.   a written demand received by any **Insured** for money or services, including the service of a suit or institution of regulatory or arbitration proceedings;

2.   with respect to coverage provided under Insuring Agreement C. only, institution of a **Regulatory Proceeding** against any **Insured**;

3.   a written request or agreement to toll or waive a statute of limitations relating to a potential **Claim** described in paragraph 1. above; and

4.    with respect to coverage provided under Insuring Agreement A.1. only, a demand received by any **Insured** to fulfill the **Insured Organization's** contractual obligation to provide notice of an incident (or reasonably suspected incident) described in Insuring Agreement A.1. pursuant to a **Breach Notice Law**;

Multiple **Claims** arising from the same or a series of related or repeated acts, errors, or omissions, or from any continuing acts, errors, omissions, or from multiple **Security Breaches** arising from a failure of **Computer Security**, shall be considered a single **Claim** for the purposes of this Policy, irrespective of the number of claimants or **Insureds** involved in the **Claim**. All such **Claims** shall be deemed to have been made at the time of the first such **Claim**.

F.    **Claims Expenses** means:

1.    reasonable and necessary fees charged by an attorney designated pursuant to Clause II., Defense and Settlement of Claims, paragraph A.;

2.    all other legal costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim**, suit, or proceeding arising in connection therewith, or circumstance which might lead to a **Claim**, if incurred by the Underwriters, or by the **Insured** with the prior written consent of the Underwriters;

3.    actual loss of salary and reasonable expenses resulting from the optional attendance by a corporate office of the **Named Insured** at any mediation meetings, arbitration proceedings, hearings, depositions, or trials relating to the defense of any **Claim**, subject to a maximum of $2,000 per day and $100,000 in the aggregate, which amounts shall be part of and not in addition to the **Policy Aggregate Limit of Liability** shown in Item 3.A.1. of the Declarations; and

4.    the premium cost for appeal bonds for covered judgments or bonds to release property used to secure a legal obligation, if required in any **Claim** against an **Insured**; provided the Underwriters shall have no obligation to appeal or to obtain bonds.

**Claims Expenses** do not include any salary, overhead, or other charges by the **Insured** for any time spent in cooperating in the defense and investigation of any **Claim** or circumstance that might lead to a **Claim** notified under this Policy, or costs to comply with any regulatory orders, settlements or judgments.

G.    **Computer Expert Services** means costs for:

1.    a computer security expert to determine the existence and cause of an actual or suspected electronic data breach which may require the **Insured Organization** to comply with a **Breach Notice Law** and to determine the extent to which such information was accessed by an unauthorized person or persons, and if such breach is actively in progress on the **Insured Organization's Computer Systems**, to assist in containing the existing intrusion on such systems from accessing **Personally Identifiable Information**; and

2.      a PCI Forensic Investigator that is approved by the PCI Security Standards Council and is retained by the **Insured Organization** in order to comply with the terms of a **Merchant Services Agreement** to investigate the existence and extent of an actual or suspected compromise of credit card data; and in the Underwriters' discretion, where a computer security expert described in 1. above has not been retained, for a computer security expert to provide advice and oversight in connection with the investigation conducted by the PCI Forensic Investigator; and

3.      a computer security expert, up to USD 50,000 (which amount is part of and not in addition to the sublimit of coverage stated in Item 3.B.2. of the Declarations), to demonstrate the **Insured's** ability to prevent a future electronic data breach as required by a **Merchant Services Agreement**.

**Computer Expert Services** will be provided in accordance with the terms and conditions set forth in the **Information Packet** and will be provided by a service provider selected by the **Insured Organization** in consultation with the Underwriters from the list of service providers in the **Information Packet**.

H.      **Computer Security** means software, computer or network hardware devices, as well as the **Insured Organization's** information security policies and procedures, the function or purpose of which is to prevent **Unauthorized Access or Use**, a denial-of-service attack against **Computer Systems**, infection of **Computer Systems** by malicious code or transmission of malicious code from **Computer Systems**. **Computer Security** includes anti-virus and intrusion detection software, firewalls and electronic systems that provide access control to **Computer Systems** through the use of passwords, biometric or similar identification of authorized users.

I.      **Computer Systems** means computers, any software residing on such computers and associated input and output devices, data storage devices, networking equipment, and back up facilities:

1.      operated by and either owned by or leased to the **Insured Organization**; or

2.      systems operated by a third party service provider and used for the purpose of providing hosted computer application services, including cloud services, to the **Insured Organization** or for processing, maintaining, hosting or storing the **Insured Organization's** electronic data, pursuant to written contract with the **Insured Organization** for such services.

J.      **Continuity Date** means (i) the date stated in Item 8. of the Declarations with respect to the **Named Insured** and any **Subsidiaries** acquired before the date stated in Item 8. of the Declarations; (ii) with respect to any **Subsidiaries** acquired after the date stated in Item 8. of the Declarations, the date the **Named Insured** acquired such **Subsidiary**.

K.      **Control Group** means any principal, partner, corporate officer, director, **Manager,** general counsel (or most senior legal counsel) or risk manager of the **Insured Organization** and any individual in a substantially similar position.

L.      **Damages** means a monetary judgment, award or settlement; provided that the term **Damages** shall not include or mean:

1.    future profits, restitution, disgorgement of unjust enrichment or profits by an **Insured**, or the costs of complying with orders granting injunctive or equitable relief;

2.    return or offset of fees, charges, or commissions charged by or owed to an **Insured** for goods or services already provided or contracted to be provided;

3.    taxes or loss of tax benefits;

4.    fines, sanctions or penalties;

5.    punitive or exemplary damages or any damages which are a multiple of compensatory damages, unless insurable by law in any applicable venue that most favors coverage for such punitive, exemplary or multiple damages;

6.    discounts, coupons, prizes, awards or other incentives offered to the **Insured's** customers or clients;

7.    liquidated damages, but only to the extent that such damages exceed the amount for which the **Insured** would have been liable in the absence of such liquidated damages agreement;

8.    fines, costs or other amounts an **Insured** is responsible to pay under a **Merchant Services Agreement**; or

9.    any amounts for which the **Insured** is not liable, or for which there is no legal recourse against the **Insured**.

M.    **Information Packet** means the Information Packet provided with this Policy. The **Information Packet** is incorporated into and forms part of this Policy and may be updated by the Underwriters from time to time.

N.    **Legal Services** means fees charged by an attorney:

1.    to determine the applicability of and actions necessary for the **Insured Organization** to comply with **Breach Notice Laws** due to an actual or reasonably suspected theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Information**;

2.    to provide necessary legal advice to the **Insured Organization** in responding to actual or suspected theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Information**;

3.    to advise the **Insured Organization** regarding the notification of relevant governmental entities of an actual or reasonably suspected theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Information**; and

4.    to advise the **Insured Organization** in responding to credit card system operating regulation requirements for any actual or suspected compromise of credit card data that is required to be reported to the **Insured Organization's** merchant bank under the terms of a **Merchant Services Agreement**, but **Legal Services** does not include fees incurred in any actual or threatened legal proceeding, arbitration or mediation, or any advice in responding to credit card system operating regulations in connection with an assessment of **PCI Fines, Expenses and Costs**.

**Legal Services** will be provided in accordance with the terms and conditions set forth in the **Information Packet** and will be provided by an attorney selected by the **Insured Organization** in consultation with the Underwriters from the list of attorneys in the **Information Packet**.

O.   **Loss** means **Damages**, **Claims Expenses**, **Penalties**, **PCI Fines, Expenses and Costs** and **Privacy Breach Response Services**.

P.   **Management Control** means:

1.   owning, directly or indirectly, more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of an entity's directors (in the case of a corporation), members of the board of managers (in the case of a limited liability company), management committee members (in the case of a joint venture or partnership) or persons serving in a functionally equivalent role for such an entity operating or organized outside of the United States; or

2.   having the right, pursuant to a written contract or the bylaws, charter, operating agreement or similar documents of an entity to elect, appoint or designate a majority of: the board of directors of a corporation; the management committee of a joint venture or partnership; the management board of a limited liability company; or persons serving in a functionally equivalent role for such an entity operating or organized outside of the United States.

Q.   **Media Material** means any information in electronic form, including words, sounds, numbers, images, or graphics and shall include advertising, video, streaming content, web-casting, online forum, bulletin board and chat room content, but does not mean computer software or the actual goods, products or services described, illustrated or displayed in such **Media Material**.

R.   **Merchant Services Agreement** means any agreement between an **Insured** and a financial institution, credit/debit card company, credit/debit card processor or independent service operator enabling an **Insured** to accept credit card, debit card, prepaid card, or other payment cards for payments or donations.

S.   **Notification Services** means:

1.   notification by first class mail or e-mail to United States, Canadian or Mexican residents; and

2.   notification by first class mail or e-mail to individuals residing outside the United States, Canada or Mexico, but only to the extent reasonably practicable.

E-mail notification will be provided in lieu of first class mail to the extent reasonable, practicable and where permitted under the applicable **Breach Notice Law**. **Notification Services** will be provided by a service provider selected by the Underwriters in consultation with the **Insured Organization** from the list of service providers in the **Information Packet** and will be provided in accordance with the terms and conditions set forth in the **Information Packet**.

T.     **Notified Individual** means an individual person to whom notice is given or attempted to be given under Insuring Agreement B.3 pursuant to a **Breach Notice Law**.

U.     **PCI Fines, Expenses and Costs** means the direct monetary fines, penalties, reimbursements, fraud recoveries or assessments owed by the **Insured Organization** under the terms of a **Merchant Services Agreement**, but only where such fines, penalties, reimbursements, fraud recoveries or assessments result both from the **Insured Organization's** actual or alleged noncompliance with published PCI Data Security Standards and from a data breach caused by an incident (or reasonably suspected incident) described in Insuring Agreement A.1. or A.2.; provided, that the term **PCI Fines, Expenses and Costs** shall not include or mean any charge backs, interchange fees, discount fees or prospective service fees.

V.     **Penalties** means:

1.     any civil fine or money penalty payable to a governmental entity that was imposed in a **Regulatory Proceeding** by any federal, state, local or foreign governmental entity, in such entity's regulatory or official capacity; the insurability of **Penalties** shall be in accordance with the law in the applicable venue that most favors coverage for such **Penalties**; and

2.     amounts which the **Insured** is legally obligated to deposit in a fund as equitable relief for the payment of consumer claims due to an adverse judgment or settlement of a **Regulatory Proceeding** (including such amounts required to be paid into a "Consumer Redress Fund"); but and shall not include payments to charitable organizations or disposition of such funds other than for payment of consumer claims for losses caused by an event covered pursuant to Insuring Agreements A.1., A.2. or A.3.;

but shall not mean (a) costs to remediate or improve **Computer Systems**, (b) costs to establish, implement, maintain, improve or remediate security or privacy practices, procedures, programs or policies, (c) audit, assessment, compliance or reporting costs, or (d) costs to protect the confidentiality, integrity and/or security of **Personally Identifiable Information** from theft, loss or disclosure, even if it is in response to a regulatory proceeding or investigation.

W.     **Personally Identifiable Information** means:

1.     information concerning the individual that constitutes "nonpublic personal information" as defined in the Gramm-Leach Bliley Act of 1999, as amended, and regulations issued pursuant to the Act;

2.     medical or heath care information concerning the individual, including "protected health information" as defined in the Health Insurance Portability and Accountability Act of 1996, as amended, and regulations issued pursuant to the Act;

3.     information concerning the individual that is defined as private personal information under statutes enacted to protect such information in foreign countries, for **Claims** subject to the law of such jurisdiction;

4.     information concerning the individual that is defined as private personal information under a **Breach Notice Law**;

5.    education records as defined by the Family Educational Rights and Privacy Act (FERPA), which are directly related to an individual's attendance as a student;

6.    the individual's drivers license or state identification number, social security number, unpublished telephone number, and credit, debit or other financial account numbers in combination with associated security codes, access codes, passwords or pins; if such information allows an individual to be uniquely and reliably identified or contacted or allows access to the individual's financial account or medical record information.

**Personally Identifiable Information** does not include publicly available information that is lawfully made available to the general public from government records.

X.    **Policy Period** means the period of time between the inception date shown in the Declarations and the effective date of termination, expiration or cancellation of this Insurance and specifically excludes any Optional Extension Period or any prior policy period or renewal period.

Y.    **Privacy Law** means a federal, state or foreign statute or regulation requiring the **Insured Organization** to protect the confidentiality and/or security of **Personally Identifiable Information**.

Z.    **Privacy Policy** means the **Insured Organization's** public declaration of its policy for collection, use, disclosure, sharing, dissemination and correction or supplementation of, and access to **Personally Identifiable Information**.

AA.    **Public Relations and Crisis Management Expenses** shall mean the following costs approved in advance by the Underwriters in their discretion, and which are directly related to mitigating harm to the **Insured Organization's** reputation or potential **Loss** covered by the Policy resulting from an incident described in Insuring Agreement A.1. or A.2. or from a **Public Relations Event**:

1.    costs incurred by a public relations or crisis management consultant;

2.    costs for media purchasing or for printing or mailing materials intended to inform the general public about the incident, such costs to be limited to $100,000;

3.    for incidents or events in which notification services are not otherwise provided pursuant to Insuring Agreement A. or B., costs to provide notifications and notices via e-mail or first class mail to affected individuals where such notifications are not required by law ("voluntary notifications"), including to non-affected customers or patients of the **Insured Organization**;

4.    costs to provide government mandated public notices related to breach events (including such notifications required under HITECH);

5.    costs to provide services to restore healthcare records of **Notified Individuals** residing in the United States whose **Personally Identifiable Information** was compromised as a result of theft, loss or **Unauthorized Disclosure**; and

6.    other costs approved in advance by the Underwriters.

**Public Relations and Crisis Management Expenses** must be incurred no later than twelve (12) months following the reporting of such **Claim** or breach event to the Underwriters and, with respect to clauses 1. and 2. above, within ninety (90) days following the first publication of such **Claim** or incident. If voluntary notifications are provided, e-mail notification will be provided in lieu of first class mail to the extent practicable.

BB.    **Public Relations Event** means the publication or imminent publication in a newspaper (or other general circulation print publication) or on radio, television or a publicly accessible website of a covered **Claim** under this Policy.

CC.    **Regulatory Proceeding** means a request for information, civil investigative demand, or civil proceeding commenced by service of a complaint or similar proceeding brought by or on behalf of any federal, state, local or foreign governmental entity in such entity's regulatory or official capacity in connection with such proceeding.

DD.    **Retention** means the applicable retention for each **Claim** or incident as specified in Item 4. of the Declarations.

EE.    **Related Party** means the **Insured Organization** and any past, present or future employees, directors, officers, **Managers**, partners or natural person independent contractors of the **Insured Organization**.

FF.    **Security Breach** means:

1.    **Unauthorized Access or Use** of **Computer Systems**, including **Unauthorized Access or Use** resulting from the theft of a password from a **Computer System** or from any **Insured**;

2.    a denial of service attack against **Computer Systems** or computer systems that are not owned, operated or controlled by an **Insured**; or

3.    infection of **Computer Systems** by malicious code or transmission of malicious code from **Computer Systems**,

whether any of the foregoing is a specifically targeted attack or a generally distributed attack.

A series of continuing **Security Breaches**, related or repeated **Security Breaches**, or multiple **Security Breaches** resulting from a continuing failure of **Computer Security** shall be considered a single **Security Breach** and be deemed to have occurred at the time of the first such **Security Breach**.

GG.    **Subsidiary** means any corporation, limited liability company, joint venture or partnership while the **Named Insured** has **Management Control** over such entity, if the **Named Insured**:

1.    had **Management Control** over such entity on the inception date of this Policy or such entity was an insured under a policy issued by the Underwriters of which this Policy is a renewal;

2.    acquires **Management Control** after the inception date of this Policy provided the revenues of the entity do not exceed fifteen percent (15%) of the **Named**

**Insured's** annual revenues for the four quarterly periods directly preceding inception of the **Policy Period**; or

3.   acquires **Management Control** after the inception date of this Policy provided that if the revenues of the entity exceed fifteen percent (15%) of the **Named Insured's** annual revenues for the four quarterly periods directly preceding inception of the **Policy Period**, the provisions of Clause XVI. Mergers and Acquisitions, must be fulfilled;

provided that this Policy only provides coverage for acts, errors, omissions, incidents or events that take place while the **Named Insured** has **Management Control** over such entity.

HH.   **Third Party Information** means any trade secret, data, design, interpretation, forecast, formula, method, practice, credit or debit card magnetic strip information, process, record, report or other item of information of a third party not insured under this Policy which is not available to the general public and is provided to the **Insured** subject to a mutually executed written confidentiality agreement or which the **Insured Organization** is legally required to maintain in confidence; however, **Third Party Information** shall not include **Personally Identifiable Information**.

II.   **Unauthorized Access or Use** means the gaining of access to or use of **Computer Systems** by an unauthorized person or persons or the use of **Computer Systems** in an unauthorized manner.

JJ.   **Unauthorized Disclosure** means the disclosure of (including disclosure resulting from phishing) or access to information in a manner that is not authorized by the **Insured Organization** and is without knowledge of, consent, or acquiescence of any member of the **Control Group**.

## VII.   LIMIT OF LIABILITY AND COVERAGE

A.   The Policy Aggregate Limit of Liability set forth in Item 3.A.1. of the Declarations (the "**Policy Aggregate Limit of Liability**") is the Underwriters' combined total limit of liability for all **Damages**, **Penalties**, **PCI Fines, Expenses and Costs**, and **Claims Expenses** payable under this Policy.

The sublimit of liability stated in Item 3.A.2. of the Declarations is the aggregate sublimit of liability payable under Insuring Agreement C. of this Policy and is part of, and not in addition to, the **Policy Aggregate Limit of Liability**.

The sublimit of liability stated in Item 3.A.3. of the Declarations is the aggregate sublimit of liability payable under Insuring Agreement E. of this Policy and is part of, and not in addition to, the **Policy Aggregate Limit of Liability**.

Neither the inclusion of more than one **Insured** under this Policy, nor the making of **Claims** by more than one person or entity shall increase the Limit of Liability.

B.   The Limit of Liability for the Optional Extension Period shall be part of and not in addition to the **Policy Aggregate Limit of Liability**.

C.   The Underwriters shall not be obligated to pay any **Damages**, **Penalties**, **PCI Fines, Expenses and Costs** or **Claims Expenses,** or to undertake or continue defense of any suit or proceeding, after the **Policy Aggregate Limit of Liability** has been exhausted by payment of **Damages**, **Penalties**, **PCI Fines, Expenses**

**and Costs** or **Claims Expenses**, or after deposit of the **Policy Aggregate Limit of Liability** in a court of competent jurisdiction. Upon such payment, the Underwriters shall have the right to withdraw from the further defense of any **Claim** under this Policy by tendering control of said defense to the **Insured**.

D.  The amount stated in Item 3.B.1. of the Declarations is the maximum total number of **Notified Individuals** to whom notification will be provided or attempted for all incidents or series of related incidents giving rise to an obligation to provide **Notification Services**, **Call Center Services** or **Breach Resolution and Mitigation Services**.

The aggregate limit of coverage stated in Item 3.B.2. of the Declarations is the aggregate limit of coverage for all **Computer Expert Services**, **Legal Services** and **Public Relations and Crisis Management Services** combined.

E.  The Underwriters shall not be obligated to provide any **Notification Services**, **Call Center Services**, or **Breach Resolution and Mitigation Services** after the number of **Notified Individuals** under Insuring Agreement B.3. reaches an aggregate of the number of **Notified Individuals** stated in Item 3.B.1. of the Declarations. If the total number of individuals to be notified under the Policy exceeds the number of **Notified Individuals** stated in Item 3.B.1. of the Declarations, the **Insured** shall be responsible for providing notification, credit monitoring services or identity monitoring services to such additional individuals in accordance with Clause VII.F. below.

F.  If the total number of notifications made pursuant to Insuring Agreement B.3. aggregates to more than the number of notifications stated in Item 3.B.1. of the Declarations, the **Insured Organization** will be responsible for paying for **Privacy Breach Response Services** with respect to any excess notifications, and such costs will not be covered by the Policy. If an incident involves notifications made pursuant to Insuring Agreement B.3. both within the notification limit stated in Item 3.B.1. of the Declarations and in excess of such limit, all excess notifications will be provided by the same service provider that provides **Notification Services** covered under the Policy, and the costs will be allocated between the Underwriters and the **Insured Organization** pro rata based on the number of covered and non-covered notifications.

G.  Unless otherwise specified in this Policy, **Privacy Breach Response Services** will be provided by the service providers listed in the **Information Packet**. In the event a service provider is unable to or does not provide the services set forth, the Underwriters will make reasonable efforts to procure similar services from other sources; provided, the maximum the Underwriters will pay for the costs of procuring and providing all **Privacy Breach Response Services** under Insuring Agreement B., including substitute products and services shall be no more than USD 10,000,000 in the aggregate for the **Policy Period**, which amount shall be in addition to the **Policy Aggregate Limit of Liability**. In the event there is a change of law, regulation or enforcement that prevents the Underwriters or its service providers from providing all or part of the **Privacy Breach Response Services**, the Underwriters will make reasonable efforts to substitute other services but, if this is not possible, the Underwriters shall not be obligated to provide such services.

H.     To the extent that costs to provide **Privacy Breach Response Services** are covered pursuant to a **Claim** described in Clause VI.E.4., such costs shall be covered solely under Insuring Agreement A. and not under Insuring Agreement B. or any other Insuring Agreement in this Policy.

## VIII.   RETENTION

A.     The **Retention** amount set forth in Item 4.A. of the Declarations applies separately to each incident, event or related incidents or events, giving rise to a **Claim**. The **Retention** shall be satisfied by monetary payments by the **Named Insured** of **Damages**, **Claims Expenses**, **Penalties** or **PCI Fines, Expenses and Costs**.

B.     **Notification Services**, **Call Center Services**, and **Breach Resolution and Mitigation Services** will only be provided for each incident, event or related incidents or events, requiring notification to at least the number of individuals set forth in Item 4.B.1. of the Declarations. For incidents involving notification to fewer individuals there shall be no coverage for any such services under Insuring Agreement B.

       For all **Computer Expert Services**, **Legal Services** and **Public Relations and Crisis Management Services**, the **Retention** amounts set forth in Item 4.B.2. of the Declarations apply separately to each incident, event or related incidents or events, giving rise to an obligation to provide such services; and the Each Incident **Retention** shall be satisfied by monetary payments by the **Named Insured** for such services.

C.     In the event that **Damages**, **Claims Expenses**, **Penalties** or **PCI Fines, Expenses and Costs** arising out of a **Claim** are subject to more than one **Retention**, the applicable **Retention** amounts shall apply to such **Damages**, **Claims Expenses**, **Penalties** or **PCI Fines, Expenses and Costs**, provided that the sum of such **Retention** amounts shall not exceed the largest applicable **Retention** amount.

D.     Satisfaction of the applicable **Retention** is a condition precedent to the payment by the Underwriters of any amounts or providing of any services hereunder, and the Underwriters shall be liable only for the amounts in excess of such **Retention** subject to the Underwriters' total liability not exceeding the **Policy Aggregate Limit** or the Limits of Coverage for **Privacy Breach Response Services** set forth in Item 3.B. of the Declarations.  The **Named Insured** shall make direct payments within the **Retention** to appropriate other parties designated by the Underwriters.

## IX.    OPTIONAL EXTENSION PERIOD

A.     Upon termination of this Insurance for any reason except the non-payment of premium, the **Named Insured** shall have the right, upon payment in full and not proportionally or otherwise in part of the percentage shown in Item 7.(a) of the Declarations of the full premium set forth in Item 5. of the Declarations, to have issued an endorsement providing an Optional Extension Period for the period of time set forth in Item 7.(b) of the Declarations for **Claims** first made against any **Insured** and reported to the Underwriters during the Optional Extension Period, and arising out of any act, error or omission committed on or after the Retroactive Date and before the end of the **Policy Period**, subject to the conditions set forth herein. In order for the **Named Insured** to invoke the Optional Extension Period option, the payment of the additional premium for the Optional Extension Period must be paid to

the Underwriters within thirty (30) days of the termination of this Insurance. If notice of election of the Optional Extension Period and full premium payment is not given to the Underwriters within such thirty (30) day period, there shall be no right to purchase the Optional Extension Period.

B.  The Limit of Liability for the Optional Extension Period shall be part of, and not in addition to, the applicable Limit of Liability of the Underwriters for the **Policy Period** and the exercise of the Optional Extension Period shall not in any way increase such **Policy Aggregate Limit of Liability** or any sublimit of liability. The Optional Extension Period does not apply to Insuring Agreement B.

C.  The right to the Optional Extension Period shall not be available to the **Named Insured** where the Policy premium has not been paid in full, or where cancellation or non-renewal by the Underwriters is due to non-payment of premium or failure of an **Insured** to pay such amounts in excess of the applicable limit of liability or within the amount of the applicable **Retention**.

D.  All notices and premium payments with respect to the Optional Extension Period option shall be directed to the Underwriters through the entity named in Item 9.(c) of the Declarations.

E.  At the commencement of the Optional Extension Period the entire premium shall be deemed earned, and in the event the **Named Insured** terminates the Optional Extension Period for any reason prior to its natural expiration, the Underwriters will not be liable to return any premium paid for the Optional Extension Period.

## X.   NOTICE OF CLAIM, LOSS OR CIRCUMSTANCE THAT MIGHT LEAD TO A CLAIM

A.  If any **Claim** is made against the **Insured**, the **Insured** shall forward as soon as practicable to the Underwriters through persons named in Item 9.(a) of the Declarations written notice of such **Claim** in the form of a telecopy, email or express or certified mail together with every demand, notice, summons or other process received by the **Insured** or the **Insured's** representative. In no event shall the Underwriters be given notice of a **Claim** later than the end of the **Policy Period**, the end of the Optional Extension Period (if applicable), or sixty (60) days after the expiration date of the **Policy Period**.

B.  With respect to Insuring Agreement B., for a legal obligation to comply with a **Breach Notice Law** because of an incident (or reasonably suspected incident) described in Insuring Agreement A.1. or A.2., such incident or reasonably suspected incident must be reported as soon as practicable during the **Policy Period** after discovery by the **Insured** via the email address or telephone number set forth in Item 9.(b) of the Declarations; provided, that unless the **Insured** cancels the Policy, or the Underwriters cancel for non-payment of premium, incidents discovered by the **Insured** prior to expiration of the Policy shall be reported as soon as practicable, but in no event later than sixty (60) days after the end the **Policy Period**; provided further, that if this Policy is renewed by the Underwriters and **Privacy Breach Response Services** are provided because of such incident or suspected incident that was discovered by the Insured prior to the expiration of the Policy, and first reported during the sixty (60) day post **Policy Period** reporting period, then any subsequent **Claim** arising out of such incident or suspected incident is deemed to have been made during the **Policy Period**.

Notwithstanding the foregoing, if the **Named Insured** reasonably believes that the **Privacy Breach Response Services** provided as a result of such incident or suspected incident are not likely to meet or exceed the **Retention**, then reporting of such incident or suspected incident under this Clause X.B. is at the **Named Insured's** option, but unless such incident or suspected incident is reported in accordance with the first paragraph of this Clause X.B., there shall be no coverage for **Privacy Breach Response Services** in connection with such incident or suspected incident.

C.    If during the **Policy Period**, the **Insured** becomes aware of any circumstance that could reasonably be the basis for a **Claim** it may give written notice to the Underwriters in the form of a telecopy, email or express or certified mail through persons named in Item 9.(a) of the Declarations as soon as practicable during the **Policy Period**. Such a notice must include:

1.    the specific details of the act, error, omission, or **Security Breach** that could reasonably be the basis for a **Claim**;

2.    the injury or damage which may result or has resulted from the circumstance; and

3.    the facts by which the **Insured** first became aware of the act, error, omission or **Security Breach**.

Any subsequent **Claim** made against the **Insured** arising out of such circumstance which is the subject of the written notice will be deemed to have been made at the time written notice complying with the above requirements was first given to the Underwriters.

An incident or reasonably suspected incident reported to Underwriters during the **Policy Period** and in conformance with Clause X.B. shall also constitute notice of a circumstance under this Clause X.C.

D.    A **Claim** or legal obligation under paragraph A. or B. above shall be considered to be reported to the Underwriters when written notice is first received by the Underwriters in the form of a telecopy, email or express or certified mail or email through persons named in Item 9.(a) of the Declarations of the **Claim** or legal obligation, or of an act, error, or omission, which could reasonably be expected to give rise to a **Claim** if provided in compliance with paragraph C. above.

## XI.   ASSISTANCE AND COOPERATION

A.    The Underwriters shall have the right to make any investigation they deem necessary, and the **Insured** shall cooperate with the Underwriters in all investigations, including investigations regarding the **Application** for and coverage under this Policy. The **Insured** shall execute or cause to be executed all papers and render all assistance as is requested by the Underwriters. The **Insured** agrees not to take any action which in any way increases the Underwriters' exposure under this Policy.

B.    Upon the Underwriters' request, the **Insured** shall assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the **Insured** because of acts, errors or omissions, incidents or events with respect to which insurance is afforded under

this Policy; and the **Insured** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.

C.    The **Insured** shall not admit liability, make any payment, assume any obligations, incur any expense, enter into any settlement, stipulate to any judgment or award or dispose of any **Claim** without the written consent of the Underwriters, except as specifically provided in Clause II., Defense and Settlement of Claims, paragraph D.

Compliance with a **Breach Notice Law** will not be considered an admission of liability for purposes of this Clause XI.C.

D.    Expenses incurred by the **Insured** in assisting and cooperating with the Underwriters do not constitute **Claims Expenses** under the Policy.

## XII.   SUBROGATION

If any payment is made under this Policy and there is available to the Underwriters any of the **Insured's** rights of recovery against any other party, then the Underwriters shall maintain all such rights of recovery. The **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **Insured** shall do nothing after an incident or event giving rise to a **Claim** or **Loss** to prejudice such rights. Any recoveries shall be applied first to subrogation expenses, second to **Loss** paid by the Underwriters, and lastly to the **Retention**. Any additional amounts recovered shall be paid to the **Named Insured**.

## XIII.  OTHER INSURANCE

The insurance under this Policy shall apply in excess of any other valid and collectible insurance available to any **Insured,** including any self-insured retention or deductible portion thereof unless such other insurance is written only as specific excess insurance over the **Policy Aggregate Limit of Liability** or any other applicable Limit of Liability of this Policy.

## XIV.  ACTION AGAINST THE UNDERWRITERS

No action shall lie against the Underwriters or the Underwriters' representatives unless and until, as a condition precedent thereto, the **Insured** shall have fully complied with all provisions, terms and conditions of this Insurance and the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment or award against the **Insured** after trial, regulatory proceeding, arbitration or by written agreement of the **Insured**, the claimant, and the Underwriters.

No person or organization shall have the right under this Policy to join the Underwriters as a party to an action or other proceeding against the **Insured** to determine the **Insured's** liability, nor shall the Underwriters be impleaded by the **Insured** or the **Insured's** legal representative.

The **Insured's** bankruptcy or insolvency or of the **Insured's** estate shall not relieve the Underwriters of their obligations hereunder.

## XV.   ENTIRE AGREEMENT

By acceptance of the Policy, all **Insureds** agree that this Policy embodies all agreements between the Underwriters and the **Insured** relating to this Policy. Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a

change in any part of this Policy or stop the Underwriters from asserting any right under the terms of this Insurance; nor shall the terms of this Insurance be waived or changed, except by endorsement issued to form a part of this Policy signed by the Underwriters.

## XVI.  MERGERS AND ACQUISITIONS

A.  **Newly Acquired Subsidiaries**

If during the **Policy Period** the **Named Insured** or any **Subsidiary** acquires an entity whose annual revenues are more than fifteen percent (15%) of the **Named Insured's** total annual revenues for the four quarterly periods directly preceding inception of the **Policy Period**, then, subject to the **Policy Period** and all other terms and conditions of this Policy, coverage under this Policy shall be afforded for a period of sixty (60) days, but only for any **Claim** that arises out of any act, error or omission first committed or incident or event first occurring after the entity becomes so owned.  Coverage beyond such sixty (60) day period shall only be available if the **Named Insured** gives the Underwriters written notice of the acquisition, obtains the written consent of Underwriters to extend coverage to the entity beyond such sixty (60) day period and agrees to pay any additional premium required by Underwriters.

B.  **Mergers or Consolidations**

If during the **Policy Period** the **Named Insured** consolidates or merges with or is acquired by another entity, or sells substantially all of its assets to any other entity, then this Policy shall remain in full force and effect, but only with respect to a **Security Breach**, or other act or incidents that occur prior to the date of the consolidation, merger or acquisition. There shall be no coverage provided by this Policy for any other **Claim** or **Loss** unless the **Named Insured** provides written notice to the Underwriters prior to such consolidation, merger or acquisition, the **Named Insured** has agreed to any additional premium and terms of coverage required by the Underwriters and the Underwriters have issued an endorsement extending coverage under this Policy.

C.  All notices and premium payments made under this Clause XVI. shall be directed to the Underwriters through the entity named in Item 9.(c) of the Declarations.

## XVII.  ASSIGNMENT

The interest hereunder of any **Insured** is not assignable. If the **Insured** shall die or be adjudged incompetent, such insurance shall cover the **Insured's** legal representative as the **Insured** as would be permitted under this Policy.

## XVIII.  CANCELLATION

A.  This Policy may be cancelled by the **Named Insured**, by surrender thereof to the Underwriters or by mailing or delivering to the Underwriters through the entity named in Item 9.(c) of the Declarations, written notice stating when the cancellation shall be effective.

B.  This Policy may be cancelled by the Underwriters by mailing or delivering to the **Named Insured** at the address shown in the Declarations written notice stating when, not less than sixty (60) days thereafter, such cancellation shall be effective. However, if the Underwriters cancel this Insurance because the **Insured** has failed

to pay a premium when due, this Policy may be cancelled by the Underwriters by mailing a written notice of cancellation to the **Named Insured** at the address shown in the Declarations stating when, not less than ten (10) days thereafter, such cancellation shall be effective. Mailing of notice shall be sufficient proof of notice. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery (where permitted by law) of such written notice either by the **Named Insured** or by the Underwriters shall be equivalent of mailing.

C.  If the **Named Insured** cancels this Policy, the earned premium shall be computed in accordance with the customary short rate portion of the full premium set forth in Item 5. of the Declarations.

D.  If the Underwriters cancel this Policy prior to any **Claim** being reported or **Loss** incurred under this Policy, earned premium shall be computed pro rata.

E.  The premium shall be deemed fully earned if any **Claim**, or any circumstance that could reasonably be the basis for a **Claim** or **Loss**, is reported to the Underwriters on or before the date of cancellation.

F.  Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

## XIX.  SINGULAR FORM OF A WORD

Whenever the singular form of a word is used herein, the same shall include the plural when required by context.

## XX.  HEADINGS

The titles of paragraphs, section, provisions, or endorsements of or to this Policy are intended solely for convenience and reference, and are not deemed in any way to limit or expand the provisions to which they relate and are not part of the Policy.

## XXI.  WARRANTY BY THE INSURED

By acceptance of this Policy, all **Insureds** agree that the statements contained in the **Application** are their agreements and representations and that the Underwriters issue this Policy, and assume the risks hereunder, in reliance upon the truth thereof.

## XXII.  NAMED INSURED AS AGENT

The **Named Insured** shall be considered the agent of all **Insureds**, and shall act on behalf of all **Insureds** with respect to the giving of or receipt of all notices pertaining to this Policy, the acceptance of any endorsements to this Policy, and the **Named Insured** shall be responsible for the payment of all premiums and **Retentions**.

## XXIII. SERVICE OF SUIT CLAUSE (U.S.A)

A.  It is agreed that in the event of the Underwriters' failure to pay any amount claimed to be due under this Insurance, the Underwriters will, at the **Insured's** request, submit to the jurisdiction of a court of competent jurisdiction within the United States.  Nothing in this clause constitutes or should be understood to constitute a waiver of the Underwriters' rights to commence an action in any court of competent

jurisdiction in the United States, to remove an action to a United States District Court, or seek a transfer of a case to another court as permitted by the laws of the United States or any state in the United States. It is further agreed that service of processing such suit may be made upon the Underwriters' representative, designated in Item 10. of the Declarations, and that in any suit instituted against any one of them upon this contract, the Underwriters will abide by the final decision of such court or of any appellate court in the event of an appeal.

B.      The Underwriters' representative designated in Item 10. of the Declarations is authorized and directed to accept service of process on the Underwriters' behalf in any such suit and/or upon the **Insured's** request to give a written undertaking to the **Insured** that they will enter a general appearance upon the Underwriters' behalf in the event such a suit shall be instituted.

C.      Pursuant to any statute of any state, territory, or district of the United States which makes provision therefore, the Underwriters hereby designate the Superintendent, Commissioner, or Director of Insurance or other officer specified for that purpose in the statute, or his successor in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on the **Insured's** behalf or any beneficiary hereunder arising out of this Policy, and hereby designate the Underwriters' representative listed in Item 9. of the Declarations as the person to whom said officer is authorized to mail such process or a true copy thereof.

## XXIV. CHOICE OF LAW

Any disputes involving this Policy shall be resolved applying the law designated in Item 11. of the Declarations.

## XXV.   VALUATION AND CURRENCY

All premiums, limits, deductibles, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States. If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States dollars or is paid in a currency other than United States dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in the *Wall Street Journal* on the date the judgment becomes final or payment of the settlement or other element of **Damages**, **Penalties**, or **PCI Fines, Expenses and Costs** is due or, with respect to **Claims Expenses**, the date they are paid.

## XXVI. AUTHORIZATION

By acceptance of this Policy, the **Insureds** agree that the **Named Insured** will act on their behalf with respect to the giving and receiving of any notice provided for in this Policy, the payment of premiums and the receipt of any return premiums that may become due under this Policy, and the agreement to and acceptance of endorsements.

Beazley Group | Beazley Breach Response

# BBR

## Information Pack



Your Services

# Beazley Breach Response

## Information Packet for privacy breach response and risk management services

Thank you for purchasing a Beazley Breach Response (BBR) insurance policy.

BBR is the industry leading solution for data privacy and security risk management, and provides a range of services designed to help your organization respond to an actual or suspected data breach incident effectively, efficiently, and in compliance with the law.

This Information Packet details the features of your BBR policy and sets out the process for responding to an actual or suspected data breach, including how to obtain the maximum benefit of Beazley's Breach Response Services team. We encourage you to circulate this Information Packet to the members of your data breach incident response team, and incorporate the resources available under the policy as a component of your incident response plan.

Your BBR policy includes an array of benefits and services including:

• Complimentary loss control and risk management information including online resources and value-added educational webinars (beazleybreachsolutions.com).

• A computer forensics "Information Security Incident Response" guide to empower your organization's IT staff with knowledge of crucial forensic procedures that can make or break the investigation of a suspected breach.

• Assistance at every stage of the investigation of, and response to, a data breach incident from Beazley's in-house BBR Services team of data privacy attorneys and technical experts.

A single call or email to BBR Services, notifying the team of a suspected data breach will begin activation of the following services:

**Initial breach investigation and consulting**
• Legal services
• Computer forensic services

**Response to breach events**
• Notification services including foreign notification where applicable
• Call center services
• Breach resolution and mitigation services
• Public relations and crisis management expenses



To notify us of a breach, send an email to
bbr.claims@beazley.com

# Risk management tools and resources

As a BBR policy holder, your organization is entitled to enroll in **beazleybreachsolutions.com**, a risk management portal that provides educational and loss control information relating to compliance with applicable laws, safeguarding information, preparing to respond to breach incidents and best practices.

If you enroll in **beazleybreachsolutions.com**, you will have the opportunity to attend webinars on current topics related to information security and breach preparedness, and be able to receive other risk management tools and information that we periodically make available to our policy holders.

The website includes a wide variety of training resources to help educate employees about privacy and data security risks. You will find overviews, security awareness posters, employee tip sheets, recorded training webinars, and PowerPoint slide decks you can download and adapt.

You will also have access to our online training site, elearning.beazleybreachsolutions.com. On this training site, you can upload employee lists, create training assignments for your employees, and track individual completion of training.

## Information Security Incident Response Guide

Beazley, in partnership with Navigant, a leader in complex data management and forensics analysis, developed a joint Information Security Incident Response Guide aimed at providing a roadmap for companies to prepare for and manage the aftermath of a data security breach. The guide, provided to BBR policyholders, addresses the increasing need for effective risk management on the part of companies hoping to limit the damage caused by a data breach.

The Information Security Incident Response Guide addresses information security incidents such as malware intrusions, social engineering attacks, unauthorized network access, lost or stolen devices, and other kinds of data security incidents and breaches. The guide also provides in-depth case studies and best practices for preparation, risk assessment, and incident documentation, highlighting the varied components of an effective response.





# Activation of breach response services

## Beazley Breach Response Services Team

Beazley is committed to providing industry leading data breach response services for our clients. This is why we created the BBR Services team; a dedicated business unit within Beazley, focused exclusively on helping insureds successfully prepare for and respond to breaches.
The BBR Services team works in collaboration with you to triage and assess the severity of a data breach incident, while coordinating the range of resources and services you may need to meet legal requirements and maintain customer confidence. BBR Services is your frontline partner in data breach investigation and response, and available to your organization regardless of the size, severity, or cost of a data breach.

## When to notify us?

You should notify Beazley as soon as you suspect that personally identifiable or confidential data for which you are responsible might have been compromised. The sooner you notify us about a potential data breach, the more our BBR Services team can do to help.

It is also important that you contact us first before retaining any service providers as the BBR Services team will take you through the process and work with you to secure services from providers that best match your needs.

## How to notify us?

Send an email to **bbr.claims@beazley.com** with the following in your notification email:

- the name of your organization and insurance policy number if possible;
- a short description of the incident;
- the date the incident occurred (if known);
- the date your organization discovered the incident; and
- contact information for the point person handling the investigation.

**Do not:**
- email Beazley staff directly to provide the initial notice; or
- include any personally identifiable information or protected health information.

Email is strongly recommended as the best method of notification; you may alternatively provide notice of an incident by calling Beazley's 24-hour hotline, (866) 567-8570, and provide the information described above.

## What happens after notifying us?

A BBR Services team member will respond to the notice generally on the same or next business day and will schedule a phone call to discuss the incident, assist you with any needed breach investigation and response services available under your BBR policy. We recommend that those within your organization who are involved in investigating the incident participate on this phone call.

The BBR Services team will continue to collaborate with you throughout the investigation and response process, to provide guidance and to arrange breach investigation and response services provided by Beazley's network of expert service providers.

## Cyber extortion and ransomware response services?

With thousands of ransomware attacks occurring on a daily basis, ransomware is a threat facing all organizations across all industries. Beazley's dedicated in-house team, Beazley Breach Response (BBR) Services, provides timely ransomware assistance to BBR policyholders based on our repeated and extensive experience handling ransomware incidents.

If your organization is experiencing a ransomware attack, BBR Services assists by:

- Promptly consulting with your team to determine an appropriate response;
- Recommending and facilitating a fast connection with computer forensic services to determine if personally identifiable information or protected health information was compromised; and/or
- Facilitating introductions to service providers who can help you with data decryption, data restoration, or securing bitcoin if your organization decides to pay the ransom.

BBR Services has developed a ransomware tip sheet for BBR policyholders that explains the ransomware threat and the immediate steps companies facing this threat should take. This tip sheet can help your organization minimize the impact of a ransomware attack and speed up the recovery time following an attack.

You can download the tip sheet from our policyholder risk management website, beazleybreachsolutions.com, or you can email bbrservices@beazley.com to request a copy.

# Legal services

If an incident occurs that might require notification under relevant breach notice laws or regulations, specific Legal Services to assist you in investigating and responding to the incident are included.

**BBR Services will arrange Legal Services for you and will connect you to these experts; please do not contact Beazley's partnering law firms directly without the involvement of BBR Services.**



**United States**
Baker Hostetler LLP
Theodore J. Kobus III, Lynn Sessions, Craig A. Hoffman, Randal L. Gainer, Eric A. Packel and Scott Koller
*www.bakerlaw.com*

Buchanan Ingersoll & Rooney PC
Matt Meade and Pamela Hepp
*www.bipc.com*

McDonald Hopkins LLC
James J. Giszczak and Dominic Paluzzi
*www.mcdonaldhopkins.com*

Mullen Coughlin
John F. Mullen
*www.mullen.legal*

Norton Rose Fulbright
David Navetta and Boris Segalis
*www.nortonrosefulbright.com*

Vedder Price
Bruce A. Radke and Michael J. Water
*www.vedderprice.com*

**Canada**
Dentons Canada LLP
Chantal Bernier and Timothy Banks
*www.dentons.com/canada*

Fasken Martineau DuMoulin LLP
Alex Cameron
*www.fasken.com*

nNovation LLP
Kris Klein
*www.nNovation.com*

**Mexico**
Davara Abogados
Isabel Davara
*www.davara.com.mx*

Lex Informática
Joel A. Gómez Treviño
*www.lexinformatica.com*

Platero, Galicia & Lemus Abogados
Luis Mario Lemus Rivero
*www.pglabogados.com*

R1OS Abogados
Agustín Ríos
*www.riosabogados.com*

# Computer expert services

In the event that external forensics assistance is needed to assess the impact of a data incident on your computer system, Computer Expert Services will be provided to (1) help to determine whether, and the extent to which, notification must be provided to comply with Breach Notice Laws, and (2) if applicable, give advice and oversight in connection with the investigation conducted by a PCI Forensic Investigator.

The computer security expert that provides Computer Expert Services will require access to information, files and systems and it is important for you to comply with the expert's requests and cooperate with the investigation. Reports or findings of the expert will be made available to you, us, the BBR Services team and any attorney that you retain to provide advice with regard to the incident.

**BBR Services will arrange Computer Expert Services for you and will connect you to these experts; please do not contact Beazley's partnering forensics firms directly without the involvement of BBR Services.**

**United States and Canada**
Crypsis
*www.crypsisgroup.com*

Kroll Ontrack
*www.krollontrack.com*

LMG Security
*www.lmgsecurity.com*

Mandiant ®
*www.mandiant.com*

Navigant Consulting, Inc.
*www.navigant.com*

RSM
*www.rsmus.com*

SecureWorks
*www.secureworks.com*

Sylint
*www.sylint.com*

Verizon Investigative Response Unit
*www.verizonenterprise.com/products/security/risk-team/investigative-response.xml*

**Canada**
CGI
*www.cgi.com*

Mandiant ®
*www.mandiant.com*

Verizon Investigative Response Unit
*www.verizonenterprise.com/products/security/risk-team/investigative-response.xml*

**Mexico**
Duriva
*www.duriva.com*

KPMG
*www.kpmg.com.mx*

MaTTica
*www.mattica.com*

Scitum
*www.scitum.com.mx*

# Notification services and call center services

BBR Services will assist you with the notification process, including arranging for notification and/or call center service. BBR Services will walk you through notification details such as how to work with privacy counsel to develop notification letters and how to timely provide notification letters, relevant addresses and other required deliverables to the notification vendor.

Notification letters will be black and white and two-sided; returned mail will be provided to you at your request. Mailing may be staggered to accommodate the number of notifications and anticipated call center volume. For notifications by U.S. mail, the notification vendor will update and mail notifications according to the U.S. Postal Service data base of address changes. Notification services do not include further tracing of individuals whose notifications are returned.

BBR Services will also walk you through developing a set of frequently asked questions (FAQs) for use by the call center and how to anticipate and prepare for call escalations.

**United States**
Dasher
*www.dasherinc.com*

Epiq Corporate Services, Inc.
*www.epiqcorporateservices.com*

Garden City Group, LLC
*www.gardencitygroup.com*

Intelligent Business Concepts, Inc.
*www.intellbc.com*

NPC, Inc.
*www.npcweb.com*

**Canada**
Epiq Corporate Services, Inc.
*www.epiqcorporateservices.com*

Miratel Solutions Inc.
*www.miratelinc.com*

**Mexico**
Business Advantage
*www.business-advantage.com.mx*

Konecta
*www.grupokonecta.com*

Epiq Corporate Services, Inc.
*www.epiqsystems.com*



# Breach resolution and mitigation services

Beazley Breach Response includes a number of products that provide Resolution and Mitigation Services, including one and three bureau monitoring and identity monitoring solutions. All the solutions include Identity Restoration services.* Based on our experience, three bureau credit monitoring is generally appropriate for breaches involving data such as names combined with social security numbers. For breaches involving less sensitive data, one bureau credit monitoring or identity monitoring solutions may be appropriate. The BBR Services team has handled over 6,000 data breaches and will advise you on which products or solutions may be applicable for a particular breach event.

A product or solution may be offered where reasonably practicable and only to the extent available in a particular jurisdiction. Notified Individuals will have up to ninety (90) days from mailing of the notification to subscribe to an offered product or solution and they must qualify for enrollment, complete the enrollment process and agree to the applicable terms and conditions set by the provider. Enrollees of an offered product or solution will have access to the services provided under such product or solution for 12 months from the date of their enrollment.

* Subscribers will automatically receive access to Identity Restoration services from the date of the notification letter through the full duration of the product term, even if consumers don't enroll in the product. If they do enroll in an IdentityWorks product, identity restoration is extended through the full duration of the product term as well. Product enrollments must occur prior to the Enrollment End Date indicated on the order form.

## Credit monitoring products

- Experian IdentityWorks ℠

  Credit: Ensures they have access to credit monitoring (1 or 3 Bureaus), Identity Restoration services and identity theft insurance to help them regain their security.

  Minor Plus: Monthly monitoring of Experian information for every enrolled child, internet surveillance, Identity Restoration services and identity theft insurance.

- Equifax Complete™ Advantage Plan (for Canadian residents only)
- Equifax Credit File ID Alert™ (for Canadian residents only)

## Identity monitoring products

- Experian's Identity and Identity Minor: A solution for when credit monitoring isn't needed. This cost effective product scours chat rooms, blogs, websites and other data sources to identify and alert members of the illegal trading and selling of personal identities. Includes Identity Restoration and identity theft insurance.



## Additional information on products and offerings

Descriptions of each of the credit or identity monitoring products and solutions are attached. Such descriptions are provided by ConsumerInfo.com, Inc. and Equifax Canada Co. and are for informational purposes only and are not part of the Policy. The actual services available with each product or solution are governed by the terms and conditions of the applicable agreements that you must enter into prior to the product or solution being offered to Notified Individuals. Further information about the ConsumerInfo.com and Equifax Canada products can be obtained at the telephone numbers indicated in the applicable description. You may also contact us through your insurance broker to receive additional information about the Services.

## Your responsibilities

To ensure that the Services described above are provided promptly and properly, you must follow the requirements and procedures set forth in the Policy and in this Information Packet. We require your assistance and cooperation with us and with any third party vendors providing Services. Please respond to BBR Services or outside vendor requests and inquiries in a timely manner and enter into necessary contracts required by our vendors for the provision of services. You will be responsible for paying any costs resulting from your failure to timely provide responses, accurate information or approvals necessary for the provision of the Services. There is no coverage under the Policy for any of your internal salary or overhead expenses or for your assistance and cooperation in responding to a breach incident. In the event of a breach incident or suspected incident, do not contact any service providers directly. Instead, you must first provide notice to us at **bbr.claims@beazley.com** or at **(866) 567-8570**, as further described on page 3 of this Information Packet and also in Item 9.(b) of the Declarations.

Contacting any of the service providers listed in this Information Packet shall not constitute notice under the terms of the Policy.

As used in this Information Packet, the terms "we" or "us" or have the same meaning as the term "Underwriters" in the Policy and "you" has the same meaning as the "Insured Organization" in the Policy. Capitalized terms not defined in this Information Packet have the same meaning as set forth in the Policy.

## Appendices

Experian IdentityWorks ℠

Equifax Complete™ Advantage Plan

Equifax Credit File ID Alert™





**Experian's Credit** solution ensures they have access to progressive credit monitoring, identity restoration and identity theft insurance to help them regain their security.

It notifies your customers when their personal information has been compromised and helps them resolve identity theft and other types of criminal activity sooner rather than later.

Experian has managed thousands of data breach incidents in the finance, education, commerce, medical and government sectors. We can manage yours.

| Features | Credit |
|----------|--------|
| Daily Credit Monitoring | 1 or 3 Bureaus |
| Credit Report Upon Enrollment | ✔ |
| Daily Credit Reports (Online) | ✔ |
| Identity Restoration | ✔ |
| Product Delivery Method | Online (email) Off line (U.S. Mail) |
| Enrollment (Phone and Online) | ✔ |
| ExtendCARE™ | ✔ |
| Blanket Identity Restoration (Available Upon Notification) | ✔ |
| $1 Million Identity Theft Insurance* | ✔ |

**Experian Highlights:**

**100%**

Success Rate Resolving Fraud Cases

**100%**

Score Received in Client Satisfaction Review

**3,000+**

Data Breaches Serviced Annually

* Identity theft insurance is underwritten by insurance company subsidiaries or affiliates of American International Group, Inc. (AIG). The description herein is a summary and intended for informational purposes only and does not include all terms, conditions and exclusions of the policies described. Please refer to the actual policies for terms, conditions, and exclusions of coverage. Coverage may not be available in all jurisdictions.

©2017 Experian Information Solutions, Inc. All rights reserved. Experian and the marks used herein are service marks or registered trademarks of Experian Information Solutions, Inc. Other product and company names mentioned herein may be the trademarks of their respective owners.

Experian Data Breach Resolution

Visit: experian.com/databreach
Call: 1 (866) 751-1323
Email: databreachinfo@experian.com



Experian's **Minor Plus** provides comprehensive coverage when it comes to protecting a child's identity.

Minor Plus provides monthly monitoring of Experian® information for every enrolled child, internet surveillance, identity restoration services and identity theft insurance from material damages that may occur against a child whose credit file is misused. It's an important benefit for your customers and an important opportunity for you.

Experian has managed thousands of data breach incidents in the finance, education, commerce, medical and government sectors. We can manage yours.

| Features | Minor Plus |
|---|---|
| Minor Internet Surveillance | ✔ |
| Minor SSN Monitoring | 1 Bureau |
| Identity Restoration | ✔ |
| Product Delivery Method | Online (email) Off line (U.S. Mail) |
| Enrollment (Phone and Online) | ✔ |
| ExtendCARE™ | ✔ |
| Blanket Identity Restoration (Available Upon Notification) | ✔ |
| $1 Million Identity Theft Insurance* | ✔ |

**Experian Highlights:**

# 100%

Success Rate Resolving Fraud Cases

# 100%

Score Received in Client Satisfaction Review

# 3,000+

Data Breaches Serviced Annually

* Identity theft insurance is underwritten by insurance company subsidiaries or affiliates of American International Group, Inc. (AIG). The description herein is a summary and intended for informational purposes only and does not include all terms, conditions and exclusions of the policies described. Please refer to the actual policies for terms, conditions, and exclusions of coverage. Coverage may not be available in all jurisdictions.

©2017 Experian Information Solutions, Inc. All rights reserved. Experian and the marks used herein are service marks or registered trademarks of Experian Information Solutions, Inc. Other product and company names mentioned herein may be the trademarks of their respective owners.

**Experian Data Breach Resolution**

Visit: experian.com/databreach
Call: 1 (866) 751-1323
Email: databreachinfo@experian.com



## Experian's **Identity** and **Identity Minor** is the most cost-effective breach response solution available

Identity and Identity Minor scours chat rooms, blogs, websites and other data sources to identify the illegal trading and selling of personal identities. Detect compromised personal information sooner, no matter where it occurs. Your members can also have peace of mind knowing our identity restoration agents and identity theft insurance are available to them if something were to happen.

Experian has managed thousands of data breach incidents in the finance, education, commerce, medical and government sectors. We can manage yours.

| Features | Identity | Identity Minor |
|---|---|---|
| Internet Surveillance | ✔ | - |
| Minor Internet Surveillance | - | ✔ |
| Identity Restoration | ✔ | ✔ |
| Product Delivery Method | Online | Online |
| Enrollment | Online | Online |
| ExtendCARE™ | ✔ | ✔ |
| Blanket Identity Restoration (Available Upon Notification) | ✔ | ✔ |
| $1 Million Identity Theft Insurance* | ✔ | ✔ |

### Experian Highlights:

**100%**

Success Rate Resolving Fraud Cases

**100%**

Score Received in Client Satisfaction Review

**3,000+**

Data Breaches Serviced Annually

* Identity theft insurance is underwritten by insurance company subsidiaries or affiliates of American International Group, Inc. (AIG). The description herein is a summary and intended for informational purposes only and does not include all terms, conditions and exclusions of the policies described. Please refer to the actual policies for terms, conditions, and exclusions of coverage. Coverage may not be available in all jurisdictions.

©2017 Experian Information Solutions, Inc. All rights reserved. Experian and the marks used herein are service marks or registered trademarks of Experian Information Solutions, Inc. Other product and company names mentioned herein may be the trademarks of their respective owners.

**Experian Data Breach Resolution**

Visit: experian.com/databreach
Call: 1 (866) 751-1323
Email: databreachinfo@experian.com



CONSUMER INFORMATION SOLUTIONS

# Corporate Data Breach Solutions

## What is Credit Monitoring?

*Equifax Complete*™

**Advantage Plan**

### key features

> **Online access** to view your Equifax credit report 24/7

> **Credit monitoring** with e-mail notification of key changes to your credit file

> **Updates** of your Equifax credit report and score once every three months

> **Dedicated** customer service

Equifax Canada Co. is Canada's largest credit reporting agency. A credit reporting agency is an independent organization that receives information from credit grantors and other (private and public) sources regarding individuals' credit activity. This information is compiled in a credit report for each Consumer.

Your credit report is a summary of your credit history. Your credit report contains information about your credit cards and loans, such as: when you opened your account, account balance, payment history, etc. Your credit report also includes personal information that is available in public records, such as a bankruptcy.

## What is Credit Monitoring?

Your credit report is updated regularly to reflect credit activity changes. Credit monitoring allows you to have immediate visibility to changes in your credit report, providing you with the confidence that your credit identity is intact.

## Equifax Complete™ Advantage Plan

As a consumer, you can take an active role in monitoring your personal credit information. Using Equifax's online tool, you can view your credit file 24/7 and monitor any changes, maintaining certainty that your credit score and identity have not been compromised.

For further information about Equifax Canada and protecting your identity,
please visit www.equifax.ca. You can also visit the Financial Consumer Agency of Canada at www.fcac-acfc.gc.ca to learn more about credit reporting agencies.

Certain conditions apply to all offers. Equifax and EFX are registered trademarks of Equifax Canada Co. Inform Enrich Empower is a trademark of Equifax Inc., used here under license. ©2013 Equifax Canada Co. All rights reserved



CIS - 150 - E - 06/13

INFORM ❯ ENRICH ❯ EMPOWER™



CONSUMER INFORMATION SOLUTIONS

# Corporate Data Breach Solutions

### What is a Credit Alert Flag

## How will a Credit File Alert Flag protect me from potential fraud activity?

A Credit File Alert Flag is one layer of identity theft protection. It provides peace of mind that your credit file has a warning system for credit lenders should anyone fraudulently try to seek credit in your name.

Equifax Canada Co. is Canada's largest credit reporting agency. A credit reporting agency is an independent organization that receives information from credit grantors and other (private and public) sources regarding individuals' credit activity. This information is compiled in a credit report for each Consumer.

Your credit file is a summary of your credit history. Your credit file contains information about your credit cards and loans, such as: when you opened your account, account balance, payment history, etc. Your credit file also includes personal information that is available in public records, such as a bankruptcy.

### What is a Credit File Alert Flag?

A credit file alert flag is a narrative description that is placed on your credit file. This flag alerts credit grantors that the individual's personal identification may have been compromised. Credit grantors will then need to take further precautions to verify the identity of the person seeking credit. This may take the form of requiring the credit seeker to apply in person rather than over the phone or web, provide photo ID, or answer additional authentication questions. It is at the discretion of the lending institution's authentication protocol processes as to what steps they will take.

A Credit File Alert Flag stays on your credit file for a period of six years and it does **NOT** affect your credit score in any way. You have the option to choose to have it removed at any time within the six years by calling Equifax Canada at 1-800-465-7166.

For further information about Equifax Canada and protecting your identity, please visit www.equifax.ca. You can also visit the Financial Consumer Agency of Canada at www.fcac-acfc.gc.ca to learn more about credit reporting agencies.

Certain conditions apply to all offers. Equifax and EFX are registered trademarks of Equifax Canada Co. Inform Enrich Empower is a trademark of Equifax Inc., used here under license. ©2013 Equifax Canada Co. All rights reserved



CIS - 150 - E - 06/13

INFORM ❯ ENRICH ❯ EMPOWER™

# Beazley Group

Plantation Place South
60 Great Tower Street
London EC3R 5AD
United Kingdom

T +44 (0)20 7667 0623
F +44 (0)20 7674 7100

........................................................

30 Batterson Park Road
Farmington
Connecticut, 06032
USA

T +1 (860) 677 3700
F +1 (860) 679 0247

........................................................

Two Liberty Place
50 S. 16th Street, Suite 2700
Philadelphia
Pennsylvania, 19102
USA

T +1 (215) 446 8410
F +1 (215) 446 8469

........................................................

# Beazley Insurance Services

101 California Street
Suite 1850
San Francisco
California, 94111
USA
CA Lic. #0G55497

T +1 (415) 263 4040
F +1 (415) 263 4099

# beazley

beazley.com/bbr

The descriptions contained in this communication are for preliminary informational purposes only. The product is available on an admitted basis in some but not all US jurisdictions through Beazley Insurance Company, Inc., and is available on a surplus lines basis through licensed surplus lines brokers underwritten by Beazley syndicates at Lloyd's. The exact coverage afforded by the product described herein is subject to and governed by the terms and conditions of each policy issued. The publication and delivery of the information contained herein is not intended as a solicitation for the purchase of insurance on any US risk. Beazley USA Services, Inc. is licensed and regulated by insurance regulatory authorities in the respective states of the US and transacts business in the State of California as Beazley Insurance Services (License#: 0G55497). CBSL329_US_05/17

# Exhibit (C)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| GUIDECRAFT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. _____ |
| | ) | |
| OJCOMMERCE, LLC; | ) | |
| OJCOMMERCE.COM, INC.; and NAOMI | ) | **COMPLAINT FOR TRADEMARK** |
| HOME, INC., | ) | **INFRINGEMENT, TRADE DRESS** |
| | ) | **INFRINGEMENT, UNFAIR** |
| | ) | **COMPETITION** |
| Defendants. | ) | |
| | ) | |
| | ) | |

## COMPLAINT

Plaintiff, Guidecraft, Inc., by its attorneys Jacobowitz and Gubits LLP brings this Complaint against Defendants OJCOMMERCE, LLC, OJCOMMERCE.COM, INC., and NAOMI HOME, INC., and alleges as follows:

## STATEMENT OF THE CASE

1.     This is an action by Plaintiff against Defendant for federal trademark infringement and unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), common law trademark infringement, common law trade dress infringement, and for substantial and related claims of unfair competition under the statutory and common laws of the State of New York, all arising from Defendant's unauthorized use of Plaintiff's trademark and design in connection with the manufacture, advertising, promotion, and/or sale of Defendant's products, specifically its products that unlawfully imitate and infringe upon Plaintiff's KITCHEN HELPER® line of children's stools, Step-Up children's stools, and High-Rise Step-Up children's stools ("the Infringing Products").

2.      Plaintiff seeks injunctive and monetary relief to retain control over the substantial goodwill associated with its trademarks, trade dress, and product design ("Intellectual Property") which are being unlawfully exploited by Defendant, and to avoid irretrievably lost sales.

## THE PARTIES

3.      Plaintiff, Guidecraft, Inc. (herein, "Guidecraft") is a New York Corporation having a place of business at 204 Route 17, Tuxedo Park, New York 10987.

4.      Defendant OJCommerce, LLC (herein, "OJCommerce") is a Delaware corporation having a principal place of business at 11651 Interchange Circle South, Miramar, Florida 33025.

5.      Upon information and belief, OJCommerce is doing business throughout the United States and within the state of New York, and within this Judicial District.

6.      Upon further information and belief, and based on representations of Defendants' counsel, OJCommerce, LLC sells goods through an interactive website, which Plaintiff believes to be www.ojcommerce.com.

7.      Defendant OJCommerce.com, Inc. (herein, "OJCommerce.com") is a Delaware corporation having a principal place of business at 11651 Interchange Circle South, Miramar, Florida 33025.

8.      Upon information and belief, OJCommerce.com is doing business throughout the United States and within the state of New York, and within this Judicial District.

9.      Upon information and belief, OJCommerce.com, Inc. owns the interactive website ojcommerce.com, through which OJCommerce, LLC and Defendant Naomi Homes sell the infringing products at issue in this litigation.

10. Defendant Naomi Home, Inc. (herein, "Naomi Home") is a Delaware corporation having an address at 1811 Silverside Road, Wilmington, Delaware 19810.

11. Upon information and belief, Naomi Home is doing business throughout the United States and within the State of New York, and within this Judicial District.

12. Upon information and belief, Naomi Home is the house brand for OJCommerce, manufactures the infringing products at issue in this litigation, and thereafter markets and sells the infringing products through, *inter alia*, the interactive website owned by OJCommerce.com.

13. Upon information and belief, Defendants OJCommerce, OJCommerce.com, and Naomi Home are related entities owned, operated, and controlled by the same individual.

## NATURE OF THE ACTION, JURISDICTION AND VENUE

14. This is an action in law and equity arising under the Trademark and Unfair Competition Laws of the United States (15 U.S.C. § 1051 *et seq.*) and the statutory and common laws of the state of New York.

15. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1338. This matter involves a federal question pursuant to 15 U.S.C. §§ 1114 & 1125(a). Diversity jurisdiction is established as this controversy arises between citizens of different states and involves an amount in controversy in excess of the jurisdictional threshold of 28 U.S.C. § 1332. Additionally, supplemental jurisdiction over the state statutory and common law claims exists pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

16. Venue in this Court is based upon 28 U.S.C. § 1391(b).

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

17. Guidecraft is a manufacturer of fine educational and STEM toys and furniture and, since 1966 has been engaged in the business of designing, manufacturing, marketing, and

selling a wide variety of toys and children's furniture in this Judicial District and elsewhere, principally through resellers and internet sales.

18. Guidecraft's brand and overall recognition has been guided by 50 years of manufacturing children's products that are tested to meet or exceed international safety standards and which are durable, lasting products made from environmentally certified materials.

19. Some of Guidecraft's most successful products within its children's furniture lineup are its children's stools, including the KITCHEN HELPER® Children's Stool, the Step-Up Children's Stool, and the High-Rise Step-Up Children's Stool, which Guidecraft has been selling in this Judicial District and elsewhere since 2008.

## Guidecraft's KITCHEN HELPER® Children's Stool

20. One such line of products developed, manufactured, and marketed by Guidecraft, which is sold under Guidecraft's KITCHEN HELPER® trademark, is a very successful children's stool that permits a child to work with a parent or guardian at counter level.

21. Guidecraft's KITCHEN HELPER® trademark is registered with the United States Patent and Trademark Office.

22. Guidecraft has spent a great deal of time and resources developing the Kitchen Helper brand for its children's stools.

23. Guidecraft is the owner of United States trademark registration No. 5,265,613 for KITCHEN HELPER in connection with nonmetal step stools, portable non-metal platforms enclosed by guard rails or panels and adapted for supporting a standing child and the goodwill associated therewith (herein, the "Registration").

24. Guidecraft has made the registered KITCHEN HELPER® trademark distinctive and brought it recognition throughout the United States and much of the world through a

/var/folders/lz/gxc5r88s0d772c36klsf2t3w0000gn/T/com.microsoft.Outlook/Outlook Temp/1N9357102-Complaint in SDNY.DOCX

multifaceted Internet and catalog based marketing campaign for a high quality, child friendly, and parent friendly product. (A copy of the Registration certificate is attached hereto as Exhibit A).

25.     Guidecraft has devoted many thousands of hours to experimenting, testing, and perfecting KITCHEN HELPER® children's stools that function well, are beautiful, are safe for use by children, and store easily when not in use. Through those efforts, Guidecraft has developed a children's stool that is highly sought after in the marketplace and widely recognized in connection with its KITCHEN HELPER® trademark.

26.     Safety is a critical aspect of Guidecraft's KITCHEN HELPER® children's stools and consumers associate the KITCHEN HELPER® trademark with the safety-oriented Guidecraft children's stools. Guidecraft has worked closely with the United States Consumer Product Safety Commission (herein, the "USCPSC") to meet and exceed the rigorous safety tests dictated by the USCPSC in the children's market where safety is of supreme importance.

27.     Guidecraft has spent tremendous time and resources developing the uniquely aesthetic, non-functional design that is associated with its KITCHEN HELPER® children's stools, as well as the uniquely aesthetic, non-functional designs that are associated with Guidecraft's Step-Up and High-Rise Step-Up children's stools and has trade dress protection in those designs.

28.     The Guidecraft KITCHEN HELPER® children's stool design includes, but is not limited to, the non-functional features of the positioning of four large cut-out shapes in the sides of the classic version (see, e.g., top left picture from Paragraph 44 below) of the KITCHEN HELPER® children's stools, the half-moon shape cut into the side below the standing platform, stylized tapered, two-toed feet at the base of each of the legs, the visual flow and shape of the

walls and bars surrounding and below the platform, the colors in which the KITCHEN HELPER®, Step-Up, and High-Rise Step-Up children's stools are sold, and the overall appearance of the KITCHEN HELPER® children's stools.

29.     The non-functional design of the KITCHEN HELPER® children's stools has become known to the public through years of Guidecraft's advertising and significant sales, acquiring secondary meaning to the public and serving to designate to consumers that Guidecraft is the origin of those children's stools.

30.     Defendants' product is inferior to the genuine Guidecraft product for many reasons including the following.

(a)     Defendants copied an older version of the Guidecraft product. Guidecraft subsequently made significant changes to overall product stability and safety, including adding clips versus a screw to hold down the platform, adding a non-slide mat, and adding a mesh net that holds the child in the unit.

(b)     Defendants added a bar that goes across the back of the unit, and when not used is a scissoring hazard.

(c)     Defendants' product does not have a tracking sticker, which is required by the Consumer Product Safety Commission (CPSC), so there is no notice of country of origin, no manufacturer's name and address, no batch number, etc.

(d)     Defendants barely finish their wood and use a water-based coating which readily scratches off. If wood and water come in contact, which they will with use over time, then the wood can deteriorate and fail. Guidecraft uses a polyurethane coating over its entire product, which can withstand water.

(e)　　The Guidecraft product uses hardwood posts which are flexible and will not break from normal use by a child over time. Defendants use pine, which is less flexible, to cut costs.

(f)　　The Guidecraft product uses metal to metal hardware, barrel bolts to barrel nuts. Defendants use wood screws and plastic nuts, reducing cost but also reducing quality and safety.

(g)　　The shapes of the cutouts in Defendants' product could cause injury from having a child's feet or hands get caught.

(h)　　Many of these unsafe elements of Defendants' product violate the regulations of the CPSC. The fact that the product is on the market raises a strong presumption that the product has not been tested at all as required by law, and possibly that the product should be recalled.

### Guidecraft's Step-Up Children's Stool

31.　　Guidecraft has also spent a great deal of time developing and selling its Step-Up children's stool. The Step-Up children's stool has also become highly sought after in the marketplace due to its safety, beauty, and functionality.

32.　　The Guidecraft Step-Up children's stool design (see left picture in second row of pictures provided under Paragraph 44 below) includes, but is not limited to, the non-functional features of the shape of the upper and lower cut-outs in the sides of the Step-Up children's stools, and the positioning of those cut-outs in the sides of the Step-Up children's stools, the curvature of the uprights on the climbing side of the Step-Up children's stools, the side-toe at the base of the front legs and only the front legs of the Step-Up children's stools, the visual flow and shape

of the upright side-members, the shape and placement of the finger slots in the tops of the side-members, and the overall appearance of the Step-Up children's stools.

33.     The non-functional design of the Step-Up children's stools has become known to the public through years of Guidecraft's advertising and significant sales, acquiring secondary meaning to the public and serving to designate to consumers that Guidecraft is the origin of those children's stools.

**Guidecraft's High-Rise Step-Up Children's Stool**

34.     Guidecraft has also spent a great deal of time developing and selling its High-Rise Step-Up children's stool. The High-Rise Step-Up children's stool has also become highly sought after in the marketplace due to its safety, beauty, and functionality.

35.     The Guidecraft High-Rise Step-Up children's stool design (see left picture in third row of pictures from Paragraph 44 below) includes, but is not limited to, the non-functional features of the large curved and open hand grips, the position of the large curved and open hand grips at the top of the High-Rise Step-Up children's stools, the similarly sized top and bottom steps, the curvature of the support under each step, the open side uprights along the first step and closed side uprights along the second step, the angularity of the side uprights rising up to the curved and open hand grips, the shape and flow of the side uprights, the side-toe at the base of the front legs and only the front legs of the of the High-Rise Step-Up children's stools, the visual flow and shape of the High-Rise Step-Up stools, and the overall appearance of the High-Rise Step-Up children's stools.

36.     The non-functional design of the High-Rise Step-Up children's stools has become known to the public through years of Guidecraft's advertising and significant sales, acquiring

secondary meaning to the public and serving to designate to consumers that Guidecraft is the origin of those children's stools.

## DEFENDANTS' ACTS OF INFRINGEMENT

37.     From June 2012 until February 2018, Defendants OJCommerce.com and OJCommerce were wholesale purchasers of Plaintiff's toys and furniture goods, and engaged in selling the products for retail prices.

38.     During its time as resellers of Guidecraft's goods, Defendants OJCommerce.com and OJCommerce sold thousands of units of the KITCHEN HELPER® line of Guidecraft children's stools; Guidecraft's Step-Up children's stools; and Guidecraft's High-Rise Step-Up children's stools as a reseller for Guidecraft.

39.     During their time as Guidecraft resellers, OJCommerce.com, and OJCommerce, learned that the KITCHEN HELPER® trademark was well recognized and respected in the marketplace.

40.     Also during their time as Guidecraft resellers, OJCommerce.com, and OJCommerce learned much about the form of the Guidecraft children's stools and became well aware of Guidecraft's success with the KITCHEN HELPER® product form.

41.     Defendants OJCommerce.com and OJCommerce also learned much about the success of the Guidecraft Step-Up children's stool and High-Rise Step-Up children's stools product form during their time as Guidecraft resellers.

42.     Ultimately, Defendants OJCommerce.com and OJCommerce were terminated as resellers for Guidecraft based on their abusive re-selling practices.

43.     Having recognized the value of the KITCHEN HELPER® line of Guidecraft children's stools, Guidecraft's Step-Up children's stools, and Guidecraft's High-Rise Step-Up

children's stools during its role as a Guidecraft reseller, Defendants OJCommerce and OJCommerce.com, as well as their related and/or affiliated company, Naomi Home, took it upon themselves to begin developing, marketing, and selling knock-off, infringing versions of these products (herein, the "Infringing Products") throughout the United States and within this Judicial District.

44.     Defendants' use of Guidecraft's designs (see Exhibits B and C) in connection with its marketing and sale of the Infringing Products are depicted herein via pictures of representative Guidecraft products aligned next to Defendants Infringing Products (see also Exhibits B and C):







**Guidecraft KITCHEN HELPER® Children's Stool**                    **Defendants' Infringing Stool**

 

**Guidecraft Step-Up Children's Stool**          **Defendants' Infringing Stool**

45.     Specifically, upon information and belief, Defendant Naomi Home develops, markets, and sells the Infringing Products throughout the United States, including the State of New York, on the Internet through Defendant OJCommerce.com's interactive website, which provides a link that consumers click on to purchase the infringing products, as well as through online retailer Amazon. (A copy of the screen printout from Amazon.com is attached hereto as Exhibit B**)**. Upon further information and belief, Naomi Homes relies upon and/or otherwise contracts with Defendant OJCommerce to sell the Infringing Products on Defendant OJCommerce.com's interactive website. (A copy of the screen printout from OJCommerce.com is attached hereto as Exhibit C)**.**

46.     Upon information and belief, Defendant OJCommerce, LLC is a reseller for Naomi Home that markets and sells the Infringing Products throughout the United States, including the State of New York, on the Internet through Defendant OJCommerce.com's

interactive website, which provides a link that consumers click on to purchase the infringing products. (see Exhibit C).

47.     Upon information and belief, OJCommerce.com, Inc. owns the interactive website ojcommerce.com, through which its affiliated companies, Defendant OJCommerce, LLC and Defendant Naomi Homes, market and sell the Infringing Products at issue in this litigation throughout the United States, including the State of New York, on the Internet. (see Exhibit C).

48.     The Infringing Products are competitive with Guidecraft's products described above.

## Trade Mark Infringement

49.     Naomi Home has unlawfully marketed and sold low-quality stools utilizing Guidecraft's registered KITCHEN HELPER® trademark throughout the United States, and within the State of New York, through sales on Amazon (see Exhibit B).

50.     In its attempts to sell the Infringing Products through Amazon, Naomi Home has relied upon Amazon's search engine optimization to place Naomi Home's advertisements for the Infringing Products as an early displayed advertisement when a potential Amazon purchaser searches for Guidecraft's registered KITCHEN HELPER® trademark.

51.     In addition, Naomi Home has unlawfully marketed and sold low-quality stools utilizing Guidecraft's registered KITCHEN HELPER® trademark on the Internet throughout the United States, and within the State of New York, through reseller OJCommerce on Defendant OJCommerce.com's interactive website, www.ojcommerce.com. (see Exhibit C).

52.     Defendants have damaged Guidecraft and continue to cause Guidecraft harm by, among other improprieties, confusing the public and diluting Guidecraft's protected intellectual

property through their continued use of Guidecraft trademarks, Guidecraft's trade dress, and

Guidecraft's copyright protected product designs on inferior quality stools.

53.     In connection with the marketing and sale of the Infringing Products,

OJCommerce.com, OJCommerce, and Naomi Home have unlawfully used and are currently

unlawfully using Guidecraft's registered KITCHEN HELPER® trademark throughout the

United States of America, including the State of New York.

54.     OJCommerce.com, OJCommerce, and Naomi Home have unlawfully used and

are currently unlawfully using Guidecraft's registered KITCHEN HELPER® trademark in

connection with knock-off products made to appear to be Guidecraft products, *i.e.*, the Infringing

Products.

55.     Defendants' use of Guidecraft's registered KITCHEN HELPER® trademark (see

Exhibits B and C) constitutes trademark infringement in violation of U.S. and state trademark

law.

56.     Defendants' use of Guidecraft's registered KITCHEN HELPER® trademark in

connection with the sale, offering for sale, advertising, and distribution of goods included in the

Registration of Guidecraft's KITCHEN HELPER® trademark constitutes a false designation of

origin that is likely to cause confusion or mistake or to deceive consumers into believing that

Defendants' goods are associated with Guidecraft and to deceive consumers into believing that

Defendants' goods are sponsored, approved, or authorized by Guidecraft.

57.     On information and belief, Defendants have acted with full knowledge that

Guidecraft owns the Registration for the KITCHEN HELPER® trademark and Defendants have

acted willfully and intentionally to misrepresent their products as being affiliated with

Guidecraft.

/var/folders/lz/gxc5r88s0d772c36klsf2t3w0000gn/T/com.microsoft.Outlook/Outlook Temp/1N9357102-Complaint
in SDNY.DOCX

58.     Regardless of intent, Defendants' infringing use of Guidecraft's registered KITCHEN HELPER® trademark has caused consumers actual confusion and mistake, and is likely to cause such confusion and mistake, as to the source of Defendants' goods.

59.     Defendants have unlawfully used and continue to unlawfully use and misappropriate the goodwill and reputation Guidecraft has established in Guidecraft's registered KITCHEN HELPER® trademark in such a way that consumers have been and are likely to continue to be lured to purchase Defendants' products with the mistaken belief that Defendants' goods are Guidecraft goods or have an affiliation, sponsorship, or other connection with Guidecraft.

60.     Defendants sales of products that unlawfully bear Guidecraft's registered KITCHEN HELPER® trademark, but are inferior in quality to the genuine products of Guidecraft, cause harm to Guidecraft by tarnishing Guidecraft's reputation for high quality products.

61.     Guidecraft has been and will continue to be damaged by Defendants' foregoing acts of infringement, misappropriation, unfair competition, deceptive trade practices, and false advertising.

**Trade Dress Infringement**

62.     Defendants' use of Guidecraft's designs (see Exhibits B and C) constitutes trade dress infringement in violation of U.S. trademark law. Below are pictures of representative Guidecraft and Defendant children's stool products (see also Exhibits B and C):

/var/folders/lz/gxc5r88s0d772c36klsf2t3w0000gn/T/com.microsoft.Outlook/Outlook Temp/1N9357102-Complaint in SDNY.DOCX

14





Guidecraft                    Defendants





Guidecraft                    Defendants


63.    Defendants have unlawfully used and are currently unlawfully using Guidecraft's

trade dress protected children's stool designs in the United States.


/var/folders/lz/gxc5r88s0d772c36klsf2t3w0000gn/T/com.microsoft.Outlook/Outlook Temp/1N9357102-Complaint in SDNY.DOCX